UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CIV 3943

FELICITAS DEL CARMEN VILLANUEVA
GARNICA,

Civil Action No.

         Plaintiff,

**COMPLAINT**

         vs.

**JURY TRIAL DEMANDED**

MALU CUSTER EDWARDS aka MALU
HURLEY and MICHAEL HURLEY aka MICKY
HURLEY,

         Defendants.

*[stamp: RECEIVED JUN 10 2013 U.S.D.C. S.D.N.Y. CASHIERS]*

Plaintiff Felicitas del Carmen Villanueva Garnica, by and through her attorneys, Stoll,

Glickman & Bellina, LLP, alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is an action for damages arising out of Defendant Malu Custer Edwards

aka Malu Hurley's ("Edwards") and Defendant Michael Hurley aka Mickey Hurley's ("Hurley")

unlawful scheme to induce Plaintiff Felicitas del Carmen Villanueva Garnica ("Plaintiff" or "Ms.

Villanueva") to travel to the United States for the purposes of her involuntary servitude, resulting

in Plaintiff's forced labor at Defendants' residence in New York City, which was compelled by

means of serious harm and/or threats of the same, including intentional deprivation of medical

attention, medical care, and food, refusal to prevent Defendants' children from regularly

assaulting Plaintiff, restraint of movement, legal coercion, financial coercion, psychological

coercion, and/or poor working conditions.  Defendants deprived Plaintiff of the most basic rights

guaranteed by statutory and common law.

2.     Defendants trafficked Plaintiff to the United States from their primary residence

in Chile under false pretenses and for the purpose of unlawfully compelling her to care for their young children inside their residences in New York City for approximately three months before she fled in ill health and while suffering from the effects of physical and emotional trauma caused by her forced labor. Defendants' actions are in violation of The Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1590, 1592, 1594(a) and/or (b). Defendants' actions also give rise to common law causes of action for breach of contract, negligent infliction of emotional distress, fraudulent misrepresentation, intentional infliction of emotional distress, and false imprisonment.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1595(a) (civil trafficking).

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Since the Defendants reside in the Southern District of New York and a substantial part of the events and omissions giving rise to the Plaintiff's claims occurred in the Southern District of New York, venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## PARTIES

6. Plaintiff is a national of the Republic of Chile and a lawful United States resident presently living in New York, New York.

7. Defendant Malu Custer Edwards, age 29, is a national of the Republic of Chile and, upon information and belief, maintains dual United States citizenship.

8. At all relevant times, Edwards maintained a residence in Manhattan with Hurley.

2

She is currently employed as a graphic designer.

9.      Defendant Michael Hurley, age 35, is a national of the Republic of Chile and, upon information and belief, maintains dual United States citizenship.

10.     At all relevant times, Hurley maintained a residence in Manhattan with Edwards.

11.     Defendants currently married and were married at all relevant times herein.

12.     At all relevant times herein, each of the Defendants was the agent, co-owner, co-supervisor, co-manager, accomplice and/or co-conspirator, or working in concert with, the other Defendant and was acting within the course and scope of such agency, employment, unlawful scheme, conspiracy and/or concerted activity when all of the acts alleged herein were committed. To the extent that said conduct and omissions were perpetrated by one of the two Defendants, the remaining Defendant confirmed, ratified, and/or knowingly acquiesced in said conduct and omissions.

13.     Defendants are sued in their individual capacity and in their capacity as agents for one another.

14.     Whenever reference is made in this Complaint to any act by a Defendant and/or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

15.     Plaintiff was born on October 31, 1962 in Rio Bueno, Chile.  She has one son, age 38, with her ex-husband, whom she has been separated from for over 10 years and receives no financial support or alimony from him, nor does she receive any financial support from her elderly and ailing mother.

3

16.     Plaintiff has a high school education.

17.     Prior to coming to the United States, Plaintiff worked as a manicurist and a pedicurist on subsistence wages.

18.     Between January 2011 and March 2011, Defendants unlawfully and intentionally violated Plaintiff's personal liberty by confining her against her will and subjecting her to other forms of extreme mental, physical, and economic coercion and cruelty.

19.     Defendants restrained Plaintiff through express and implied threats of harm if she attempted to leave.

**Defendants' Background**

20.     Edwards is a descendant of famed Chilean Agustín Edwards McClure, who served as President of the League of Nations from 1922-23, and founded the Santiago edition of "El Mercurio," a Chilean newspaper considered to be the country's paper-of-record.

21.     Hurley is a descendant of Chile's founding settlers, and the stepson of world-renowned opera regisseur Pier Luigi Samartiani.

22.     Hurley is an interior decorator by trade and owns Hurley & Company, based in New York City, where he consults with clients on interior decorating and sells both antiques and furniture.

23.     Defendants both come from wealthy aristocratic families in Chile and, while maintaining permanent residence in Chile, live temporarily in the United States and travel throughout the world.

24.     As an example, New York Magazine's Winter Travel Guide 2012, published on October 21, 2012 included an article about the Defendants extensive travels, entitled "The Well-Heeled Family of Five," in which Edwards was quoted as having said, "This past summer, we

4

visited Paris, Antibes, Monaco, Nice, Rome, Florence, Portofino, London, and Ireland."

**Plaintiff Pursues Employment Abroad in December 2010 and is Referred to Defendants**

25.     In 2010, Plaintiff decided to pursue employment in the U.S. as a domestic worker so she could save enough money to start her own business as a farmer in the south of Chile upon her eventual return to her country.

26.     Plaintiff planned to be in a stronger financial position upon her return from the U.S. so she could move closer to her ailing mother and provide her with the physical and financial assistance she needed.

27.     On or about December 2010, Plaintiff contacted an agency which places potential employees with employers in Santiago, Chile.

28.     The owner of the agency connected Plaintiff with Edwards and Hurley who were looking for a domestic employee to work their home in Santiago, Chile.  Plaintiff was introduced to the Edwards' family, including Hurley and the couple's three children: Rex Hurley, presently age 10; Malu Hurley, presently age 8; and Olympia Hurley, presently age 6.

29.     On or about early December 2010, Plaintiff began working for Edwards and Hurley; she performed basic domestic duties, including but not limited to, making the beds, cooking, washing dishes, cleaning the floors, and taking care of the couple's three children.

30.     During that time, Plaintiff worked from 8 a.m. until 8 p.m., six days a week, and had Sundays off.  Defendants paid her a total of 280,000 Chilean pesos for the work she performed during the month of December which is the equivalent of approximately $583.00 in U.S. dollars.

**Edwards Requests Plaintiff's Continued Services in the U.S. Following Their Anticipated Relocation to the U.S. and Proposes a Fraudulent Employment Contract as an Inducement to Secure Plaintiff's Involuntary Labor in the U.S.**

31.     At the very beginning of Plaintiff's employment with Defendants, Edwards told Plaintiff that if she got along well with Edwards' children, she would make arrangements for Plaintiff to travel with her family to New York for two years while Edwards studied graphic design at the New School University.

32.     On a number of occasions after this conversation, Plaintiff overheard Edwards scolding the children stating, "Don't do that now, you'll scare off Felicitas. Behave well so she will come with us."

33.     Prior to the family's departure for the U.S., Plaintiff repeatedly tried to discuss her compensation and hours with Edwards; however, all Edwards would say is that she would take care of Plaintiff's medical insurance and other expenses, including food, clothes, and lodging.

34.     During the abovementioned conversations, Edwards further assured Plaintiff that she would be paid much more than she was earning in Chile.

35.     Plaintiff informed Edwards of her various chronic medical conditions which require medication, including hypertension.

36.     On or about January 1, 2011, Edwards gave Plaintiff an employment contract to sign, which was in English, however, Plaintiff does not speak English and could not read or understand the terms of the contract. Edwards later showed Plaintiff a "copy" of the contract written in Spanish and told Plaintiff that both versions were identical. Edwards told Plaintiff to ignore everything the contract stated, except for paragraphs 1, 2, 6, and 7, which she highlighted, telling Plaintiff that the remainder of the contract did not apply to her. Edwards further explained that the contract was required for Plaintiff to get her visa at the embassy.

37.     Plaintiff later learned that the Spanish version of the contract differed from the English version of the contract.

6

38.    In instructing Plaintiff not to read the entirety of the contract, by informing Plaintiff that certain portions of the contract did not apply to her, and through other means, including intentional misrepresentations, Edwards failed to make Plaintiff aware of the following terms relevant to her employment in the U.S.: (1) Edwards' obligation not to withhold Plaintiff's passport while they were in the U.S., (2) Plaintiff's obligation to carry the employment contract when entering the U.S. for presentation to the Immigration Officer, (3) Plaintiff's right to terminate the contract for any reason upon two weeks' notice, (4) Plaintiff's entitlement to health coverage, (5) the fact that the contract was for a term of one year and not two as Plaintiff was lead to believe in prior conversations, and (6) the telephone contacts for emergency resources including a hotline for reporting "abuse of domestic employees."

39.    Under the false impression that the contracts were identical, and under Edwards' direction, Plaintiff signed both versions despite the fact that she was unable to read the English version.

**Edwards Obtains a Passport for Plaintiff Under Suspicious Circumstances, Coaches Plaintiff on How to Respond During her Visa Application Interview at the Consulate, and Takes Her Passport from Her Immediately After The Visa Interview**

40.    Shortly thereafter, Plaintiff was informed by Edwards that she was in the process of obtaining a passport for Plaintiff and had made an appointment to obtain a visa for her.

41.    Under Chilean law, Plaintiff was required to appear at a local consulate to confirm her identity before a new passport would be issued.  Further, Plaintiff never obtained passport photos and none were taken of her.  Despite this, Plaintiff was informed by Edwards that her involvement was not needed to obtain a passport and that Edwards would take care of it herself.

42.    Within a matter of days, Edwards had obtained a passport for Plaintiff.

43.    On or about January 6, 2011, Plaintiff had an interview at the U.S. embassy in

7

Chile for her visa. Before the interview, Edwards prepped the Plaintiff on how to answer very basic questions about her employment in the U.S., instructing her to "be careful" about how she answered questions and to only answer questions Edwards had prepared her for. If a question was asked that Plaintiff was not prepared for, Edwards instructed her to lie and say that she did not understand the question.

44.     Edwards accompanied Plaintiff to the Consulate on the day of the interview.

45.     Prior to entering the Consulate, on the street just in front, Edwards handed Plaintiff her passport, which she suspected had been unlawfully obtained but could not confirm given the immediacy of her visa appointment.

46.     At this time, Edwards provided Plaintiff with a completed visa application which Plaintiff had signed but not reviewed and then instructed Plaintiff to go to the window inside and answer the interviewing officer's questions.

47.     When Plaintiff went inside the Consulate for her interview, Edwards waited outside.

48.     After Plaintiff was interviewed, she was granted and issued a B-1 Nonimmigrant Visa as a "Domestic Employee for a Nonimmigrant F-1 Visa Holder" and advised to keep her passport on her person at all times.

49.     The Chilean official at the Consulate also provided Plaintiff with materials on maintaining her safety abroad, including a pamphlet on the risk of human trafficking with telephone numbers for resources in the U.S. in the event that she was subjected to forced labor upon her arrival.

50.     After the abovementioned interview, when Plaintiff was back in the family's residence, Edwards took Plaintiff's passport with the intention of keeping it permanently.

51.   At that time, Edwards told Plaintiff that she would safeguard her passport and that Plaintiff could not keep it because she was not accustomed to having a passport.

52.   Later that same day, Plaintiff showed Edwards the pamphlet on the risks of human trafficking provided to her at the Consulate; Edwards immediately crumpled up the pamphlet and threw it away, telling Plaintiff, "You shouldn't pay attention to them because Americans are whiny; that information is not for you."

53.   In the same conversation, Edwards told Plaintiff that she only had to pay attention to what Edwards said and if she has any concerns she was to address them directly and exclusively to Edwards.

54.   After Edwards left the room, Plaintiff retrieved the pamphlet from the trash and kept it with her.

55.   Plaintiff continued working for Edwards and her family in Chile until January 13, 2011.

56.   On or about January 13, 2011, she left with the family and traveled to another Edwards's family home in Paracas, Peru.

57.   While in Peru, the family was joined by Edwards' father, Anthony Custer, his wife and their two children.

58.   Plaintiff continued working for the family in their Peruvian home until they left Peru for New York.

## Plaintiff travels to New York and is Subject to Involuntary Servitude by Edwards and Hurley

59.   On or about January 16, 2011, Plaintiff left with the family from Peru for New York.

60.   At the airport before flying to the U.S., Plaintiff asked Hurley to help her with her

9

bags since neither of the Defendants had offered to take any from the car to the check-in counter, to which Hurley responded angrily, "I don't carry bags for anyone," and stormed off, leaving Plaintiff to carry the bags herself.

61.     On the trip from Peru to New York, Edwards only gave Plaintiff her passport right before she was interviewed by an immigration official in customs.

62.     During the abovementioned interview, Edwards tried to remain with Plaintiff as the immigration official asked her questions, which prompted the official to ask Edwards to leave and wait for Plaintiff further ahead.

63.     After Plaintiff cleared customs, Edwards took Plaintiff's passport back.

64.     On the flight from Peru to New York, when it was time to complete the Customs and Immigration forms, Edwards attempted to complete Plaintiff's forms for her.

65.     While Edwards was attempting to complete Plaintiffs forms, a flight attendant approached Plaintiff and inquired where her documents were, to which Plaintiff responded by pointing out that Edwards was completing them for her.

66.     A flight attendant informed Edwards that since the passport belonged to Plaintiff, it has to be Plaintiff who completed the forms herself.

67.     Edwards insisted on completing the forms for Plaintiff but the flight attendant remained steadfast and said that if Edwards did not return Plaintiff's passport and allow her to complete her own forms, she would get someone else on the plane to intervene, as which point, Edwards returned all of the documents to Plaintiff, including her passport, and allowed her to complete the forms herself.

68.     On or about January 17, 2011, Plaintiff entered the U.S. after being inspected and clearing customs at John F. Kennedy International airport in New York.

**With Defendants' Awareness and Acceptance, the Children Repeatedly Assault Plaintiff Causing Physical Injury and Medically Corroborated Emotional Trauma**

69.    On or about January 17, 2011, the day Plaintiff arrived in New York with Edwards and Hurley, before the family had even settled in their U.S. residence, Edwards and Hurley left Plaintiff alone with the kids in the car causing their daughter Malu to begin crying and repeatedly stating to Plaintiff, "I don't want you here."

70.    Plaintiff responded by trying to calm Malu down, and Malu slapped Plaintiff in the face hard enough to cause Plaintiff's glasses to fall off of her face.

71.    When Edwards and Hurley returned to the car, Malu was still crying; however, when Plaintiff explained what had happened Edwards refused to accept the fact that her child hit Plaintiff.  Eventually, when Plaintiff insisted that Edwards ask Malu what had happened, Malu admitted to slapping Plaintiff, but her parents did nothing to reprimand her.

72.    After this first incident, and continuing for the remainder of Plaintiff's time with the Defendants, the children would slap and hit her on a daily basis, a fact that Plaintiff repeatedly brought to the attention of the Defendants.

73.    Based on Plaintiff's observations, it appeared that Defendants' children would respond in a physically abusive manner whenever they got upset because there were either insufficient quantities of food in the house or because they resented Plaintiff's presence as a caretaker.

74.    For example, typically the children would blame Plaintiff for the lack of food and would proceed by hitting Plaintiff about the body and the head.

75.    In response to the abovementioned outbursts, Plaintiff attempted to act in a sensitive and appropriate manner, and would attempt to set boundaries with the children; however, it was all to no avail because the Defendants' were resistant to addressing the issues

11

with their children.

76.     On at least one occasion, after Plaintiff complained to Edwards about the hitting, Edwards told Plaintiff that she should leave the children alone and that the children were merely adjusting to a new house and a new living environment.

77.     On a number of occasions Plaintiff was hit forcefully enough that the blow left a bruise and since Plaintiff was aware that Defendants were not likely to believe her when she complained about being beaten by the children, she began taking pictures of the bruises.

78.     After Plaintiff collected what she believed to be compelling proof of her injuries, she showed Defendants the photos, to which Edwards responded by stating, in sum and substance, "You have fair skin – that's why you are bruising.  It's not because of my children."

79.     The children would also hit Plaintiff with objects, including Edwards' youngest child who struck Plaintiff with a chair when she was not looking, causing significant pain and a bruise.

80.     On another occasion, Plaintiff was fixing the eldest child's scooter when the boy had a temper tantrum and slammed the handlebars into Plaintiff's head causing dizziness and substantial pain.

81.     On the day Plaintiff finally escaped the household, she was bending over retrieving milk from the refrigerator when Defendants' eldest child slammed the door on her head causing her to reel from pain, dizziness and disorientation.  She fell to the ground and experienced lightheadedness, immediately followed by deep concern for her own personal safety.

82.     The abovementioned incident and the constant barrage of abuse and mistreatment, along with Plaintiff's hunger and malnourishment, led Plaintiff to leave the household that day.

**Hurley Verbally Abuses Plaintiff and Habitually Locks Her in the Children's Room**

83.    Plaintiff was usually segregated from the adults in the household and forced to spend all of her time, even the time she had assumed would be "personal time", with the children.

84.    While still in Chile Plaintiff was expected to sit at a separate table with the children, and only to socialize with the other domestic helpers; not with the Hurley-Edwards family.

85.    Once in New York, on one occasion, Plaintiff was playing with the children in their bedroom when Hurley became enraged because they were making too much noise; he came in from across the hall and in a loud voice, told the children and Plaintiff that he was reading in the other room and expected everyone to keep quiet and remain in the bedroom.

86.    As he was leaving the children's bedroom, Hurley locked Plaintiff in the room and only unlocked the door when, almost four hours later, one of the children broke a lamp inside the room, which engaged Hurley and provoked him to unlock and enter the room threatening to hit the child, causing Plaintiff to plead with Hurley to leave the child alone.

87.    Eventually, Hurley left the children's bedroom and re-locked the Plaintiff and the children in the room.

88.    Upon existing the children's bedroom, Hurley began violently banging on the walls in anger, causing Plaintiff to fear him and avoid him for the rest of her stay with Defendants.

89.    On the same day as the abovementioned incident, Hurley became enraged with Plaintiff for eating the last piece of bread in the refrigerator, causing him to curse and scream at her to "get out of here."

90.     On most days Hurley would lock Plaintiff and the children in whichever room she was using to entertain them, requiring Plaintiff to stay in the room and wait until Hurley let her and the children out. She sometimes ended up falling asleep on the floor of whatever room they were locked in.

91.     Further, when locked in a room Plaintiff and the children would be without access to food, as was generally the case in the house regardless of whether Plaintiff and children were physically locked in to a room or not.

**In Violation of the Original Employment Agreement, Defendants Fail to Pay Plaintiff the Wages Originally Promised in the Employment Agreement, Refuse to Provide Medical Insurance or Access to Medical Care, and Fail to Buy Enough Food to Feed Plaintiff Causing Her to Suffer Physical and Emotional Distress**

92.     After Plaintiff arrived in New York in January 2011, Defendants reneged on their commitments to pay Plaintiff the wages promised in their employment agreement.

93.     Specifically, as per her employment agreement, Plaintiff expected to be paid $10; however, upon arrival in the U.S. Edwards informed Plaintiff that she would not pay her an hourly rate and instead she would pay a flat monthly salary of $700.00, which was far less than the state and federal minimum wage.

94.     When Plaintiff expressed her concern, Edwards told her that "this is all we can afford to pay you" and "no other nannies in the U.S. make more than $700.00 per month."

95.     Edwards went on to tell Plaintiff that nobody in the U.S. made more than $1,300 per month, implying that nobody else in the U.S. would be able to afford Plaintiff's services if they were more than $700.00 per month.

96.     Defendants paid Plaintiff at total of $800.00 in three separate installments; the first in January, the second in the beginning of February, and the third in the beginning of March.

97.     When Plaintiff complained about not being paid the amount she was promised,

14

90.     On most days Hurley would lock Plaintiff and the children in whichever room she was using to entertain them, requiring Plaintiff to stay in the room and wait until Hurley let her and the children out. She sometimes ended up falling asleep on the floor of whatever room they were locked in.

91.     Further, when locked in a room Plaintiff and the children would be without access to food, as was generally the case in the house regardless of whether Plaintiff and children were physically locked in to a room or not.

**In Violation of the Original Employment Agreement, Defendants Fail to Pay Plaintiff the Wages Originally Promised in the Employment Agreement, Refuse to Provide Medical Insurance or Access to Medical Care, and Fail to Buy Enough Food to Feed Plaintiff Causing Her to Suffer Physical and Emotional Distress**

92.     After Plaintiff arrived in New York in January 2011, Defendants reneged on their commitments to pay Plaintiff the wages promised in their employment agreement.

93.     Specifically, as per her employment agreement, Plaintiff expected to be paid $10; however, upon arrival in the U.S. Edwards informed Plaintiff that she would not pay her an hourly rate and instead she would pay a flat monthly salary of $700.00, which was far less than the state and federal minimum wage.

94.     When Plaintiff expressed her concern, Edwards told her that "this is all we can afford to pay you" and "no other nannies in the U.S. make more than $700.00 per month."

95.     Edwards went on to tell Plaintiff that nobody in the U.S. made more than $1,300 per month, implying that nobody else in the U.S. would be able to afford Plaintiff's services if they were more than $700.00 per month.

96.     Defendants paid Plaintiff at total of $800.00 in three separate installments; the first in January, the second in the beginning of February, and the third in the beginning of March.

97.     When Plaintiff complained about not being paid the amount she was promised,

and later about not being paid at all, Edwards would lie and tell Plaintiff that the family was struggling financially and could not afford to pay her.

98.     In the meantime, Edwards and Hurley spent lavishly on personal items, including clothing, dining out, and Edwards' education.

99.     Further, contrary to the terms of the written employment agreement, Plaintiff was not afforded any time off while in New York and was expected to care for the children from 8 AM to their bedtime, which was between 8 PM and 11 PM, every day.

100.    Throughout Plaintiff's time working for Defendants, she was only given fifteen minutes to eat her lunch and she had no dinner break, which required her to eat her dinner at the same time she fed the children.

101.    Given Defendants insistence on a flat rate of pay and the increased work schedule, Plaintiff's regular rate of pay fell to approximately $2.00 an hour.

102.    Also contrary to the employment agreement, Plaintiff was not provided with any health coverage or prescription reimbursement plan.

103.    Instead, with the intent to harm Plaintiff and ensure her continued vulnerability and isolation, Defendants actively denied Plaintiff access to health care through deception and fraud.

104.    Specifically, Edwards routinely told Plaintiff that because she is not a citizen that the police and hospitals in the U.S. would not help her.

105.    Hurley also told Plaintiff that she would have to wait 4 to 5 years after arriving in the U.S. before she could have access to hospital care.

106.    Defendants also repeatedly promised to fill Plaintiff's necessary medications but failed to do so.

107.    On or about March 4, 2011, Plaintiff began experiencing symptoms associated with the hypertension from which she suffered chronically.

108.    When her symptoms began presenting themselves, Plaintiff told Edwards that she needed her standard prescription medications refilled because she had run out, and that she had to see a doctor because she felt ill.

109.    In response to Plaintiffs request, Edwards told Plaintiff that her only opportunity was to go to a "poor people's hospital," that she had no idea where the public hospitals were located, and that she would not accompany Plaintiff because she did not want to interact with "those people" that receive medical attention in public hospitals.

110.    At this time, Edwards also again promised to have the medication delivered from Chile because, as Edwards stated, the medicine was too expensive in the U.S.

111.    On or about March 4, 2011, Plaintiff called 311 to receive information on going to a public hospital because she had become very ill, likely as a result of her inability to control her hypertension through medication.

112.    On or about March 4, 2011, Plaintiff told Edwards that she could not participate in the family trip to the movies because of the pain she was experiencing, to which Edwards responded by telling Plaintiff that her pain would go away if she went with them to the movie theater.

113.    Plaintiff pleaded with Edwards that she simply could not attend because she was too ill; Edwards thus promised Plaintiff that she would return with medicine for that night.

114.    Plaintiff hoped that Edwards would return with the medicine, so she decided not to go to the hospital that night; however, Edwards did not return with the medication.

115.    On the rare occasions when Plaintiff was able to briefly leave Defendants

household, Plaintiff was unable to afford to purchase enough food to ward of hunger, properly

nourish herself, or ward off infection and illness. As a result, she lost weight and frequently

contracted infections during her period with Defendants, ultimately leading to her need for

urgent medical care after she had left Defendants' custody.

116.    Edwards would infrequently shop for food and when she did she rarely purchased

enough food for the children or Plaintiff, buying only small amounts of milk, yogurt, eggs and

bread--nothing else.

117.    Plaintiff would feed the children breakfasts and lunches of bread and milk or

whatever else was available.

118.    Defendants' children were similarly underfed and often begged and cried for

food.

119.    On more than one occasion, Plaintiff shared her own food with the children who

were themselves hungry most days.

120.    On days when there was not enough food in the house to eat and Plaintiff was

able to discreetly leave the house, she would walk to a nearby bodega and buy a taco, a piece of

bread or a piece of fruit—whatever she could with the little money that she had in her possession

given the Defendants failure to pay her wages. When she returned to the house with the food she

purchased, she would need to hide the food or Defendants' children would plead with her to give

them the meal.

121.    As a result of the malnutrition and poor diet, Plaintiff's health deteriorated to the

point where she was in pain daily from stomach infections, ailments, and other chronic pains.

122.    On one occasion, with no food in kept in the house, Plaintiff snuck out and bought

a taco from a nearby bodega, which ultimately made her severely sick. Plaintiff suffered a

stomach infection and was ill for a few days, but could not go to the hospital.

123.    Meanwhile, Defendants would routinely spend money to drink bottles of wine before going out to lavish dinners out, leaving Plaintiff and the children to fend for themselves.

**Plaintiff Tells Edwards She Wants to Return to Chile and Edwards Repeatedly Threatens Harm if Plaintiff Tries To Leave**

124.    Starting in February of 2011, Plaintiff began petitioning Edwards to be let out of her contract and allowed to return to Chile.

125.    Unaware of her legal right to terminate the contract without repercussion and with a subsidized return flight, Plaintiff believed that she could only return if Defendants permitted her to do so.

126.    In every instance, Edwards refused to let Plaintiff quit.

127.    Instead, Edwards would talk about her immediate family and asked Plaintiff who would take care of her children.

128.    Edwards would then simply refuse Plaintiff's request and lie about the length of Plaintiff's contact, saying, "You signed a contract for 2 years. I brought you here for two years and you have the obligation to fulfill the contract."

129.    On or about February 3, 2011, the day in which Hurley berated Plaintiff for eating the last piece of bread, Hurley called Edwards to complain about Plaintiff, after which Edwards got on the phone with Plaintiff and demanded she feed the children.

130.    During the above mentioned phone call, Plaintiff, deeply upset, told Edwards that she could not feed the children because there was not enough food in the house to feed the children or to feed herself.

131.    While on the phone, Plaintiff continued to cry and told Edwards that she wanted

to return to Chile because she was unable to withstand the children's cruelty or the lack of food in the house.

132.    In response, Edwards stated, "You don't know the Custer family, Felicitas, we are very powerful, even here in New York, my grandfather was able to close St. Patrick's Cathedral just for him alone. I'm sorry, but you have to stay. You have a two year contract."

133.    When Plaintiff protested, telling Edwards that she was getting sick from the conditions, Edwards said, "I'm not going to let you leave," ignoring her pleas.

134.    Defendants manipulated Plaintiff's lack of sophistication in legal matters and led her to believe that she was unable to break the employment contract.

135.    Edwards promised to prevent the children from hitting Plaintiff but the hitting continued to occur on a daily basis.

136.    Edwards would often talk about how important her family was and claimed that powerful people surrounded them.

137.    For example, Edwards would say that Agustin Edwards, her grandfather, was well known and that no one would cross him because he was an influential person.

**Defendants Attempt to Isolate Plaintiff From Others**

138.    From the moment they arrived in New York, Edwards made it clear to Plaintiff that she was not to leave the house without Edwards' permission.

139.    On or about February 4, 2011 Plaintiff went to a local cell phone dealer to purchase a cell phone in order to call for help if needed.

140.    While Plaintiff was at the dealer, she told the salesperson that assisted her that she intended to use the phone to call for help because of her abusive employer.

141.    Sympathetic and helpful, the salesperson offered to help in whatever way she

could and provided Plaintiff with her personal phone number so Plaintiff could reach here if needed.

142.     Further, the salesperson told Plaintiff that Defendants' conduct was illegal under U.S. law and suggested Plaintiff start documenting the abusive behavior as proof of her treatment should she need it in the future.

143.     When Edwards found out that Plaintiff had purchased a cell phone, she became angry and demanded that Plaintiff give the phone to her, but Plaintiff refused and told her that she needed the phone to reach family members.

144.     Edwards then insisted that Plaintiff provide her with Plaintiff's cell phone number. After Plaintiff complied, Edwards accused Plaintiff of providing a fake number.

145.     Around this time, Plaintiff asked Edwards about having some days off, to which Edwards responded that Plaintiff could only go out to run specific errands and could not have any days off for herself.

146.     Whenever Plaintiff went out with the family, Edwards prevented her from speaking with anyone outside of the family.

147.     Edwards often asked Plaintiff whether she spoke with the doormen and instructed her me not to speak to them or to anyone else.

148.     In one instance, Plaintiff was outside with the family and asked a stranger for directions to the train. Edwards saw this interaction and told Plaintiff that she would not allow her to speak to strangers, asked Plaintiff what she was discussing with this person, and then told her that she was to go home immediately.

**Plaintiff Escapes and Receives Protective Shelter from Social Services Agencies, Non-Profit Organizations and the New York State Department of Labor Who Recognize Her Status as a Victim of Human Trafficking**

149.    On or about February 21, 2011, Plaintiff called the phone number for the National Human Trafficking Resource Center, which was located on the back of a pamphlet that was provided to her by the U.S. Embassy in Chile.

150.    Over time, Plaintiff had come to believe that her treatment at the hands of Edwards and her family was abusive and Plaintiff called this number to find out what she could do to escape.

151.    The operator at the National Human Trafficking Resource Center provided Plaintiff with the phone number to Safe Horizon, a non-profit organization which provides assistance to victims of domestic violence and others escaping violent environments.

152.    On or about March 14, 2011, the same day Edwards' son slammed her head into the refrigerator door; Plaintiff left the home without her belongings and called the phone number for Safe Horizon, who had previously offered to pick her up.

**After Leaving and Seeking Medical Attention, Plaintiff is Diagnosed With Health Conditions Consistent With Her Neglect and Mistreatment, and Her Health Continues to Deteriorate**

153.    Safe Horizon immediately arranged for Plaintiff to receive medical care.

154.    Plaintiff's blood pressure was dangerously elevated at the time of her visit and she had bruises all over her body from where the children had hit her.

155.    Plaintiff was also diagnosed with a number of maladies which had not been previously diagnosed, including a thyroid condition, vitiligo, and irregularities in key indicators of good health, all of which the doctors attributed to her poor nutrition and lack of necessary medical attention.

156.    Further, in the six months after her escape, Plaintiff suffered from intense headaches, nausea and vomiting.

157.    On or about August 24, 2011, Plaintiff lost consciousness without explanation, was taken to New York Downtown Hospital, and admitted overnight where a CAT scan was performed.

158.    The CAT scan revealed inflammation of the brain which was producing fluid, a condition commonly known as encephalitis.

159.    While, the fluid was drained via an inpatient procedure, but Plaintiff continues to experience ongoing symptoms from her injuries.

160.    Plaintiff was informed by her treating physician that the brain swelling may have been caused by blunt force trauma, possibly from being hit by the refrigerator door or other incidents involving Defendants' children.

161.    Further, upon the recommendation of general practice physician, Plaintiff was referred for a psychology consult where she was diagnosed with an adjustment disorder, post-traumatic stress and treated for pedophobia, an irrational fear of children, which had developed subsequent to her escape from Defendants' household.

162.    Plaintiff later applied for and was granted a U-Visa as a victim of human trafficking deserving of asylum.

163.    Plaintiff also petitioned the New York State Department of Labor and was awarded her back wages, which Defendants paid only after judgment was entered against them.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008 (18 U.S.C. § 1595)

#### A. Authority For Civil Action

164.    Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

165.   Plaintiff is a victim of the following violations of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a) and (b), as set forth in the First Claim for Relief.

166.   As set forth in 18 U.S.C. § 1595(a), Plaintiff may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in a violation" of these provisions.

167.   Defendants were perpetrators of the violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b).

168.   Defendants have knowingly benefited by receiving something of value from participation in a venture which each Defendant knew or should have known led to or engaged in violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b).

**B.  Forced Labor (18 U.S.C. § 1589)**

169.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.   Defendants knowingly obtained the labor or services of Plaintiff by means of force, threats of force, means of serious harm including deprivation of items or services necessary for maintaining her health and isolation, threats of serious harm, psychological coercion, means of abuse or threatened abuse of law or legal process, and a scheme, plan, or pattern intended to cause Plaintiff to believe that she would suffer serious harm if she did not perform the demanded labor in violation of 18 U.S.C. § 1589(a).

171.   Defendants knowingly benefitted financially and/or by receiving anything of

value by recruiting, enticing, harboring, transporting, providing, obtaining, and/or maintaining Plaintiff in violation of 18 U.S.C. § 1589(a).

172.    Plaintiff are authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595.  Plaintiff suffered injuries and damages as a proximate result of these actions.

## C. Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1590)

173.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein

174.    Defendants "knowingly recruit[ed], harbor[ed], transport[ed], provid[ed]" and/or obtained Plaintiff for labor or services in violation of 18 U.S.C. § 1590.

175.    Plaintiff brings these claims pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of trafficking.

176.    As a proximate result of Defendants' actions, Plaintiff suffered severe pain and suffering, including emotional distress, humiliation, embarrassment, and substantial lost wages.

## D. Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1592)

177.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.    Defendants knowingly removed, confiscated, and possessed the Plaintiff's passport and visa papers in the course of a violation and/or with the intent to violate 18 U.S.C. §§1589 and 1594(a).

179.    Defendants knowingly benefitted financially and/or by receiving anything of

value by recruiting, enticing, harboring, transporting, providing, obtaining, and/or maintaining Plaintiff in violation of 18 U.S.C. § 1592.

### E.  Attempt to Violate 18 U.S.C. §§ 1589 and 1590 (18 U.S.C.§ 1594(a))

180.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.  As set forth in ¶¶ 12–118, *supra*, Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590 in violation of 18 U.S.C. § 1594(a).

182.  Defendants knowingly benefitted financially and/or by receiving anything of value by recruiting, enticing, harboring, transporting, providing, obtaining, and/or maintaining Plaintiff in violation of 18 U.S.C. § 1594(a).

### F.  Conspiracy to Violate 18 U.S.C. §§ 1589, 1590, and 1592 (18 U.S.C. § 1594(b))

183.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.  Defendants conspired with each other to violate U.S.C. §§ 1589, 1590, and 1592 in violation of 18 U.S.C. § 1594(b).

185.  Defendants conspired with each other to violate U.S.C. §§ 1589 and 1590 in violation of 18 U.S.C. § 1594(b).

186.  Defendants knowingly benefitted financially and/or by receiving anything of value by recruiting, enticing, harboring, transporting, providing, obtaining, and/or maintaining Plaintiff in violation of 18 U.S.C. § 1594(b).

### G.  Alternatively, Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor by violating 18 U.S.C. §§ 1589 (2003), 1592 (2003) and 1594(a) (2003) (18 U.S.C. § 1590 (2003))

187.  Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

188.    Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the violations of 18 U.S.C. § 1589 (2003) as set forth above, Defendants knowingly engaged in efforts to recruit, transport, harbor, and/or obtain Plaintiff for labor or services in furtherance of Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a.  Removing, confiscating, or possessing Plaintiff's passport and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1589 (2003) and 1590 (2003) in violation of 18 U.S.C. § 1592(a) (2003); and

b.  Attempting to violate 18 U.S.C. §§ 1589 (2003) and 1590 (2003), in violation of 18 U.S.C. § 1594(a) (2003).

c.  Alternatively, in violation of 18 U.S.C. § 1590 (2003) and in addition to the violations of 18 U.S.C. § 1590 (2003) as set forth above, Defendants knowingly recruited, transported, harbored and/or obtained Plaintiff for labor or services in furtherance of Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code: 18 U.S.C. §§ 1589 (2003), 1590 (2003), and 1594(a) (2003).

### H. Damages for Violations of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (18 U.S.C. § 1595)

189.    As a proximate result of the conduct of Defendants, Plaintiff has suffered injuries to her person and property, as well as other damages that entitle Plaintiff to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

### SECOND CLAIM FOR RELIEF
### Breach of Contract

190.    Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

191.    Defendants entered into a written employment agreement with Plaintiff.

192.    Plaintiff provided her labor and services to Defendants pursuant to the employment agreement and in fulfillment of that employment agreement.

193.    Defendants breached their obligations to Plaintiff under the employment agreement by failing to comply with the contractual obligations, including but not limited to, compensation, access to health care and prescription medication, work hours, restraints on personal liberty, and the provision of food.

194.    Plaintiff suffered injuries and damages as a direct and proximate result of Defendants' breach of contract.

### THIRD CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress**

195.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

196.    Defendants owed a duty of reasonable care to Plaintiff while Plaintiff resided in Defendants' home and was employed by Defendants.

197.    Defendants breached their duties of reasonable care to Plaintiff by allowing and causing Plaintiff to suffer repeated instances of physical, psychological, and emotional abuse at the hands of Defendants and Defendants' children.

198.    Defendants knew or had reason to know of their own abuse and their children's abuse of Plaintiff, and that a likely result of such abuse was that Plaintiff would suffer severe emotional distress.

199.    Plaintiff's emotional distress in response to Defendants' abuse was entirely foreseeable.

200. The emotional distress caused by Defendants' abuse of Plaintiff was so severe that it resulted in physical and mental illness as well as bodily harm.

201. Plaintiff suffered severe emotional distress as a direct result of the abuse she endured in Defendants' home.

## FOURTH CLAIM FOR RELIEF
### Fraudulent Misrepresentation

202. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

203. As a result of the purported employer-employee relationship between Defendants and Plaintiff, the Defendants had a duty to give honest and correct information to Plaintiff.

204. Defendants made material false representations to Plaintiff about themselves, the compensation that Plaintiff was to receive in exchange for her labor, the nature of the work required and the provision of sufficient food, necessary prescription medications, restraints on personal liberty, work hours and health care all while knowing that those representations were false.

205. The information supplied in the false representations was known by Defendants to be needed for a serious purpose, namely Plaintiff's ability to secure enough income to support herself, procure food for herself and to provide critically needed medication for herself.

206. Defendants made these material false representations for the purpose of defrauding Plaintiff.

207. Plaintiff intended to and did rely on these material false representations and traveled to the United States to provide labor and services to Defendants.

208. Plaintiff suffered injuries and damages as a proximate result of Defendants' fraudulent misrepresentations

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

(i)     An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm, including, but not limited to, the loss of past and future income, wages, compensation, and other benefits of employment;

(ii)    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and compensatory harm, including, but not limited to, compensation for his depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering;

(iii)   An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

(iv)    An award of punitive damages;

(v)     An award of liquidated damages;

(vi)    An award of costs that Plaintiff has incurring in this action, such as Plaintiff's reasonable attorneys' fees and costs of prosecuting this action; and

(vii)   Such other and further relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

(i)     An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm, including, but not limited to, the loss of past and future income, wages, compensation, and other benefits of employment;

(ii)    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and compensatory harm, including, but not limited to, compensation for his depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering;

(iii)   An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

(iv)    An award of punitive damages;

(v)     An award of liquidated damages;

(vi)    An award of costs that Plaintiff has incurring in this action, such as Plaintiff's reasonable attorneys' fees and costs of prosecuting this action; and

(vii)   Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury as to all issues so triable.

Dated: New York, New York
       June 7, 2013

Stoll, Glickman & Bellina LLP.

Christopher Q. Davis (CD-7282)
Rachel M. Haskell (Admission Forthcoming)
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, Third Floor
Brooklyn, NY 11217
*Attorneys for Plaintiff*