**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FELICITAS DEL CARMEN VILLANUEVA
GARNICA,

                              Plaintiff,

        - against -

MALU CUSTER EDWARDS aka MALU
HURLEY and MICHAEL HURLEY aka
MICKY HURLEY,

                         Defendants.

Index No. 13–Civ–3943 (AKH)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

BECKER, GLYNN, MUFFLY, CHASSIN AND HOSINSKI LLP

299 PARK AVENUE

NEW YORK, NEW YORK 10171

(212) 888-3033

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ vi

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL POSTURE ............................................................................................... 4

STATEMENT OF UNDISPUTED FACTS ....................................................................... 5

      A.     Defendants Hired Plaintiff Prior To Moving From Chile To
            New York .................................................................................................... 5

      B.     Plaintiff And Edwards Executed An Employment Contract
            Downloaded From The Website Of The U.S. Embassy In
            Santiago, Chile ........................................................................................... 7

      C.     Plaintiff Travelled To The United States With Defendants Of
            Her Own Volition After Receiving A Valid Chilean Passport
            And A Valid United States Visa ................................................................. 9

      D.     Plaintiff's Employment In New York ....................................................... 11

            1.     Defendants Bought Food At Regular Intervals And Plaintiff
                     Left The Apartment To Purchase Her Own Food On A
                     Regular Basis ................................................................................ 12

            2.     Defendants' Children Were Well Fed And Plaintiff Admits
                     That She Could Have Prevented Them From Hitting Her ....................... 14

            3.     Plaintiff Admits That She Was Never Locked In A Room
                     And That She Had Time Off And Regularly Left The
                     Apartment For Hours At A Time ................................................... 17

            4.     Plaintiff Admits That She Spoke To Her Family On A
                     Regular Basis, Made Friends, And Refused Edwards's
                     Offer Of Free Phone Calls To Chile ............................................. 18

            5.     Plaintiff Rejected Multiple Offers Of Medical Help And
                     Chose Not To Go To A Hospital ................................................... 19

             6.     Plaintiff Does Not Claim That Defendants Physically
                     Harmed, Restrained Or Threatened Her ....................................... 22

             7.     Plaintiff Admits She Was Not Afraid Of Defendants And
                     That Her Decision To Continue To Work For Them Was
                     Not Based On Inability To Leave Or Fear Of Leaving ............................ 23

            8.     Plaintiff Admits That She Has Already Received All
                     Wages She Claimed She Was Owed Through The New
                     York State Department Of Labor ................................................... 25

i

9.    Plaintiff Left Defendants' Employment On Her First Try
      And Rejected Edwards's Offer To Purchase Her A Return
      Flight To Chile ........................................................................ 26

ARGUMENT ........................................................................................................... 27

I.    LEGAL STANDARD.......................................................................... 27

II.   PLAINTIFF HAS NOT RAISED A GENUINE ISSUE OF
      MATERIAL FACT IN SUPPORT OF ANY OF HER
      CLAIMS PURSUANT TO THE TRAFFICKING VICTIMS
      PROTECTION REAUTHORIZATION ACT...................................... 28

      A.    Plaintiff's Admissions That She Was Not Forced To Work
            For Defendants And That Defendants Engaged In No
            Conduct Prohibited By The Statute Defeat Her Claim
            Under 18 U.S.C. § 1589 As A Matter Of Law ......................... 28

            1.    Plaintiff's Claim Pursuant To The Forced Labor Statute
                  Fails As A Matter Of Law Because She Admits
                  Defendants' Alleged Conduct Did Not Compel Her To
                  Continue Working For Them............................................ 29

            2.    Plaintiff's Claim Pursuant To The Forced Labor Statute
                  Fails As A Matter Of Law Because She Admits
                  Defendants Did Not Use Any Of The Means Proscribed
                  By The Forced Labor Statute To Compel Her Labor .................. 33

                  a.    Plaintiff's Claim Under 18 U.S.C. § 1589(1) Fails
                        Because She Cannot Establish That Defendants
                        Forced Her To Work By Means Of Force, Threats
                        Of Force, Physical Restraint, Or Threats Of
                        Physical Restraint............................................... 33

                        i.    Plaintiff does not allege that Defendants
                              ever used or threatened to use force against
                              her ..................................................... 34

                              (a)    Plaintiff has not alleged that Defendants
                                     ever used or threatened to use violence
                                     against her ...................................... 34

                              (b)    Plaintiff's allegations that Defendants'
                                     children hit her are insufficient to support
                                     her Forced Labor Statute claim............... 35

                              (c)    Edwards's alleged threat regarding her
                                     family's power is insufficient to support
                                     Plaintiff's Forced Labor Statute claim ..... 36

ii. *Plaintiff cannot establish that Defendants obtained her labor through physical restraint or threats of physical restraint* .............. 40

b. Plaintiff's Claim Pursuant To 18 U.S.C. § 1589(2) Fails As A Matter Of Law Because She Admits Her Labor Was Not Compelled By Means Of Serious Harm Or Threats Of Serious Harm ................................... 43

i. *Defendants did not threaten or cause physical harm to Plaintiff* ...................................... 44

ii. *Defendants did not threaten or cause nonphysical harm to Plaintiff* ............................... 44

c. Plaintiff's Claim Pursuant to 18 U.S.C. § 1589(3) Fails As A Matter Of Law Because It Is Undisputed That Her Labor Was Not Compelled By Means Of Abuse Or Threatened Abuse Of Legal Process ................ 46

i. *The only abuse of legal process recognized pursuant to 18 U.S.C. § 1589(3) is deportation, which Plaintiff does not allege* ......... 46

ii. *Defendants' alleged statements concerning Plaintiff's rights as a noncitizen and a return trip to Chile are not abuses of legal process that coerced her labor* ............................ 47

(a) *Edwards's alleged statement that Plaintiff could be arrested if she sought emergency services does not support a claim that her labor was forced by an abuse of legal process* .......... 48

(b) *Defendants' alleged refusal to give Plaintiff a ticket back to Chile does not support a claim that her labor was forced by an abuse of legal process* ....................................... 48

iii. *Plaintiff's knowledge that she was legally in the U.S. prohibits a claim that her labor was forced by an abuse of legal process* ..................... 50

B. Plaintiff's Claim Under 18 U.S.C. § 1590 Fails As A Matter Of Law Because It Is Undisputed That Plaintiff Was Not Forced Into Labor ................................................................. 51

C. Plaintiff's Admission That She Had Her Passport In Her Possession At All Times While In The U.S. Precludes Her Claim Pursuant To 18 U.S.C. § 1592................................... 52

D.      Because Plaintiff Cannot Show That Defendants Intended To Force Her Labor Or Traffic Her To The United States, Her Claim Pursuant To 18 U.S.C. § 1594(a) Fails As A Matter Of Law ..................................................................................................... 52

E.      Because Plaintiff Cannot Establish That Either Defendant Conspired To Force Her Labor Or Traffic Her To The United States, Her Claim Pursuant To 18 U.S.C. § 1594(b) Fails As A Matter Of Law..................................................................................................... 53

III.    DEFENDANTS SHOULD BE AWARDED SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .................................................................. 54

A.      Plaintiff's NIED Claim Fails As A Matter Of Law Because She Cannot Establish That Defendants' Conduct Was Extreme And Outrageous ................................................................................................ 55

        1.      Plaintiff's Claim That Defendants Acted Extremely And Outrageously By Starving Her Fails Because Plaintiff Indisputably Had Ample Food................................................................... 56

        2.      Plaintiff's Claim That Defendants Acted Extremely And Outrageously By Allegedly Allowing Their Children To Hit Her Fails Because She Admits That She Allowed The Children's Alleged Behavior .................................................... 56

        3.      Plaintiff's Claim That Defendants Acted Extremely And Outrageously By Preventing Her From Leaving The Apartment Fails In Light Of Her Admission That She Regularly Left The Apartment For Hours At A Time ............................ 57

        4.      Defendants' Alleged Breach Of Their Contractual Obligations Is Insufficient As A Matter Of Law To Constitute Extreme And Outrageous Conduct.......................................... 58

        5.      Edwards's Alleged Statements That Her Family Was "Powerful" And That Plaintiff Could Not Quit Are Not "Extreme And Outrageous" As A Matter Of Law.................................... 58

B.      Plaintiff's NIED Claim Fails As A Matter Of Law Because She Admits That She Did Not Fear For Her Immediate Safety And Her Testimony Shows That Her Physical Safety Was Not In Direct And Immediate Jeopardy........................................................................ 59

        1.      Defendants Did Not Cause Plaintiff To Fear For Her Safety ................... 60

        2.      Plaintiff's Testimony Establishes As A Matter Of Law That Her Physical Safety Was Never Unreasonably Endangered By Defendants.......................................................................................... 60

C.    Plaintiff's NIED Claim Fails Because The Purported
Underlying Conduct Was Allegedly Intentional.................................................. 62

IV.    PLAINTIFF'S FRAUD CLAIM FAILS AS A MATTER OF LAW.............................. 62

A.    The Alleged Misrepresentations Are Wholly Subsumed By
The Written Employment Contract Between Plaintiff And
Edwards........................................................................................................ 62

B.    Plaintiff's Fraud Claim Fails As A Matter Of Law Because
She Does Not Allege That Defendants Made A False
Statement Of Present Fact......................................................................... 66

C.    The Undisputed Evidence Establishes That Plaintiff Did Not
Reasonably Rely On Defendants' Alleged Misrepresentations
Concerning Access To Health Care....................................................... 67

D.    The Undisputed Evidence Shows Plaintiff Suffered No Injury
As A Result Of Any Alleged Misrepresentation ................................... 68

CONCLUSION............................................................................................................. 69

TABLE OF AUTHORITIES

**Cases**

*Ajulushuku-Levy v. Schleifer*,
  2009 WL 4890768 (E.D.N.Y. Dec. 15, 2009) ........................................................... 57

*Alvarado v. Universidad Carlos Albizu*,
  2010 U.S. Dist. LEXIS 87662 (S.D. Fla. Aug. 25, 2010) ................................... passim

*Aziz Zarif Shabazz v. Pico*,
  994 F. Supp. 460 (S.D.N.Y. 1998) ................................................................... passim

*Brae Loch Manor Health Care Facility v. Thompson*,
  287 F. Supp. 2d 191 (W.D.N.Y. 2003) ...................................................................... 65

*Bridgestone/Firestone v. Recovery Credit Servs.*,
  98 F.3d 13 (2d Cir. 1996) ....................................................................... 63, 64, 65

*Camayo v. John Peroulis & Sons Sheep*,
  2012 U.S. Dist. LEXIS 136100 (D. Colo. Sept. 24, 2012) ..................................... 47

*Campoverde v. Sony Pictures Entm't*,
  2002 WL 31163804 (S.D.N.Y. Sept. 30, 2002) ......................................................... 59

*Cougar Audio, Inc. v. Reich*,
  2000 U.S. Dist. LEXIS 4894 (S.D.N.Y. 2000) ......................................................... 67

*Cruz v. Reiner*,
  2013 WL 5676303 (E.D.N.Y. Oct. 16, 2013) ................................................... passim

*Dallas Aero, Inc., v. CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003) ............................................................................. 68, 70

*David v. Signal Int'l, LLC*,
  2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 3, 2012) .................................... passim

*Deronette v. City of New York*,
  2007 WL 951925 (E.D.N.Y. March 27, 2007) ........................................................... 63

*Desilva v. N. Shore-Long Island Jewish Health Sys.*,
  2012 U.S. Dist. LEXIS 30597 (E.D.N.Y. 2012) ....................................................... 45

*Druschke v. Banana Republic, Inc.*,
  359 F. Supp. 2d 308 (S.D.N.Y. 2005) ............................................................... 54, 62

*Elat v. Ngoubene*,
  2014 U.S. Dist. LEXIS 7505 (D. Md. Jan. 21, 2014) ............................................... 47

*Epifani v. Johnson*,
  882 N.Y.S.2d 234 (N.Y. App. Div. 2009) ........................................................... 55, 58

*Frank Crystal & Co. v. Dillmann*,
  925 N.Y.S.2d 430 (N.Y. App. Div. 2011) ................................................................. 68

*G.D. Searle & Co. v. Medicore Comm'ns*,
  843 F. Supp. 895 (S.D.N.Y. 1994) ................................................................... 64, 65

*Grappo v. Alitalia Linee Aeree Italiane,*
   56 F.3d 427 (2d Cir. 1995) ................................................................................ 64

*Graubard Mollen Dannett & Horowitz v. Moskovitz,*
   653 N.E.2d 1179 (N.Y. 1995).............................................................................. 67

*Hawkins-El v. First American Funding, LLC,*
   891 F. Supp. 2d 402 (E.D.N.Y. 2012) ................................................................ 64

*Headley v. Church of Scientology Int'l,*
   687 F.3d 1173 (9th Cir. 2012) ...................................................................... passim

*Howell v. New York Post Co., Inc.,*
   81 N.Y.2d 115 (N.Y. 1993) ................................................................................. 55

*Huzar v. New York,*
   590 N.Y.S.2d 1000 (N.Y. Ct. Cl. 1992) .............................................................. 59

*Jeffreys v. City of New York,*
   426 F.3d 549 (2d Cir. 2005) ......................................................................... passim

*Jill Stuart (Asia) LLC v. Sanei Intern. Co.,*
   2013 WL 3203893 (S.D.N.Y. June 17, 2013) ..................................................... 66

*Kelly v. Chase Manhattan Bank,*
   717 F. Supp. 227 (S.D.N.Y. 1989) ..................................................................... 54

*Kenneth S. v. Berkshire Farm Center And Servcs. For Youth,*
   829 N.Y.S.2d 715 (N.Y. App. Div. 2007) .......................................................... 62

*Keywell Corp. v. Weinstein,*
   33 F.3d 159 (2d Cir. 1994) ................................................................................. 68

*Kiwanuka v. Bakilana,*
   844 F. Supp. 2d 107 (D.D.C. 2012)..................................................................... 46

*Lama Holding Co. v. Smith Barney Inc.,*
   668 N.E.2d 1370 (N.Y. 1996).............................................................................. 66

*Mairi Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.,*
   790 F. Supp. 2d 1134 (C.D. Cal. 2011) .............................................................. 45

*Meroni v. Holy Spirit Ass'n for Unification of World Christianity,*
   506 N.Y.S.2d 174 (N.Y. App. Div. 1986) .......................................................... 57

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,*
   500 F.3d 171 (2d Cir. 2007) ............................................................................... 67

*Merriweather v. Metropolitan Property and Cas. Ins. Co.,*
   2013 WL 5328143 (E.D.N.Y. Dec. 3, 2013) ...................................................... 67

*Miller v. Holtzbrinck Publishers, L.L.C,*
   377 Fed. Appx. 72 (2d Cir. 2010)........................................................................ 67

*Nat'l Comm. Bank v. Morgan Stanley Asset Mgmt. Inc.,*
   1997 WL 634292 (S.D.N.Y. Oct. 15, 1997) ....................................................... 69

*Novak v. Rubin,*
  514 N.Y.S.2d 523 (N.Y. App. Div. 1987) ...................................................... 58

*Nwagboli v. Teamwork Transp. Corp.,*
  2009 WL 4797777 (S.D.N.Y. Dec. 7, 2009) ................................................ 58

*Pasamba v. HCCA International,*
  2008 WL 2562928 (D. Ariz. June 24, 2008) ................................... 29, 47, 50, 51

*Reid v. Macy's N.E. at Herald Sq., N.Y.,*
  2013 WL 1808087 (N.Y. Sup. April 17, 2013) ........................................ 58

*Reno v. Bull,*
  124 N.E. 144 (N.Y. 1919) ............................................................................ 66

*Robbins v. New York State Electric and Gas Corp.,*
  2007 WL 2580502 (N.D.N.Y. Sept. 4 2007) ............................................ 55

*Rojas v. Roman Catholic Diocese of Rochester,*
  660 F.3d 98 (2d. Cir. 2011) ................................................................. passim

*Romero v. City of New York,*
  839 F. Supp. 2d 588 (E.D.N.Y. 2012) .................................................. 54, 55

*Ruiz v. Fernandez,*
  949 F. Supp. 2d 1055 (E.D. Wash. 2013) ............................................ 47

*Samirah v. Sabhnani,*
  772 F. Supp. 2d 437 (E.D.N.Y. 2011) .................................................. 40

*Santana v. Holder,*
  714 F.3d 140 (2d Cir. 2013) .............................................................. 34

*Sheila C. v. Povich,*
  768 N.Y.S.2d 571 (N.Y. Sup. Ct. 2003) ............................................. 60, 61

*Sheila C. v. Povich,*
  781 N.Y.S.2d 342 (N.Y. App. Div. 2004) ...................................... passim

*Shukla v. Sharma,*
  2009 U.S. Dist. LEXIS 90044 (E.D.N.Y. 2009) ................................... 50

*Shuvalova v. Cunningham,*
  2010 U.S. Dist. LEXIS 135502 (N.D. Cal. Dec. 22, 2010) ........................ 34, 39, 51

*Sofi Classic S.A. de C.V. v. Hurowitz,*
  444 F. Supp. 2d 231 (S.D.N.Y. 2006) .................................................. 67

*Sommer v. Federal Signal Corp.,*
  593 N.E.2d 1365 (N.Y. 1992) ............................................................ 64

*Spiteri v. Russo,*
  2013 U.S. Dist. LEXIS 128379 (E.D.N.Y. Sept. 7, 2013) .............................. 29, 32

*Strojmaterialintorg v. Russian Am. Commercial Corp.,*
  815 F. Supp. 103 (E.D.N.Y. 1993) ..................................................... 64, 65

viii

*Sudul v. Computer Outsourcing Servs.*,
    868 F. Supp. 59 (S.D.N.Y. 1994) ........................................................ 66

*Suto v. Fleishman*,
    164 F.3d 820 (2d Cir. 1999) ........................................................ 58, 59

*Swarna v. Al-Awadi*,
    2011 U.S. Dist. LEXIS 51908 (S.D.N.Y. May 12, 2011) ................ 34, 39

*Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
    2012 U.S. Dist. LEXIS 157725 (C.D. Cal. Aug. 27, 2012)................ 51, 52

*Tesoro Petroleum Corp. v. Holborn Oil Co.*,
    484 N.Y.2. 2d 834, 835 (N.Y. App. Div. 1985) ........................ 66

*Thompson v. Marine Midland Bank*,
    1999 U.S. App. LEXIS 22960 (2d Cir. 1999) ........................ 67

*TVT Records v. Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005) ........................................................ 66

*United States v. Bradley*,
    390 F.3d 145 (1st Cir. 2004).................................... 44, 47, 49

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011) .............................. 43, 44, 46

*United States v. Davila*,
    461 F.3d 298 (2d Cir. 2006) ........................................................ 38

*United States v. Garcia*,
    2003 U.S. Dist. LEXIS 22088 (W.D.N.Y. 2003) ................ 46

*United States v. Joyce*,
    693 F.2d 838 (8th Cir. 1982) ........................................................ 53

*United States v. Jungers*,
    702 F.3d 1066 (8th Cir. 2013) ........................................................ 53

*United States v. Nnaji*,
    447 Fed. Appx. 558 (5th Cir. 2011).................................... 44

*United States v. Sabhnani*,
    539 F. Supp. 2d 617 (E.D.N.Y. 2008) ........................ 54

*United States v. Sabhnani*,
    599 F.3d 215 (2d Cir. 2010) ........................................................ 40

*United States v. Yossunthorn*,
    167 F.3d 1267 (9th Cir. 2014) ........................................................ 53

*Velez v. Sanchez*,
    754 F. Supp. 2d 488 (E.D.N.Y. 2010) .............. 33, 36, 44, 51

*Wahlstrom v. Metro-North Commuter R. Co.*,
    89 F. Supp. 2d 506 (S.D.N.Y. 2000) ........................ 62

*Yong Ki Hong v. KBS America, Inc.,*
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) ..................................................................... 55

*Zhao v. Kaleida Health,*
  2008 WL 346205 (W.D.N.Y. Feb. 7, 2008) ......................................... 42, 48, 56, 58

## Statutes

18 U.S.C. § 1589 ................................................................................................ passim

18 U.S.C. § 1590 ................................................................................................ 28, 51

18 U.S.C. § 1592 ................................................................................................ 28, 52

18 U.S.C. § 1594 ...................................................................................... 28, 52, 53, 54

18 U.S.C. § 1595 ………………………………………………………………..…..28

## Other Authorities

BLACK'S LAW DICTIONARY, 1618 (9th ed. 2009) ...................................................... 38

U.S. PHYSICIANS' DESK REFERENCE (62d Ed. 2008) ................................................ 21

AMERICAN HERITAGE DICTIONARY, Fifth Edition…..……………………...……………65

## Rules

FED. R. CIV. P. 56(c) ............................................................................................ 27

CPLR § 215 ………………………………………………………………………...·63

Defendants Malu Custer Edwards ("Edwards") and Michael Hurley ("Hurley") (together, "Defendants") submit this memorandum of law in support of their motion for summary judgment against plaintiff Felicitas del Carmen Villanueva Garnica ("Plaintiff"). The motion is supported by the Declaration of William H. Newman, dated February 28, 2014 ("Newman Decl.").

## PRELIMINARY STATEMENT

This case is about Defendants, parents who came with their three young children from Chile to New York so that the mother, Edwards, could go to college.  It is also about Plaintiff, a woman whom they hired to accompany them and help care for the children, shortly before their temporary move to New York.

Defendants did not get a chance to know Plaintiff well before coming to New York; they hired her six weeks prior to their move, a decision they have come deeply to regret.  And they did not know her for long, as she left their employ after only eight weeks.  Like many who come to a new country, Plaintiff had a difficult adjustment.  Her flight to New York had not even touched down before she was consumed by the intense but baseless belief that she was in danger.  At first, she blamed the weather, but later she blamed Defendants and their children.

And although she had many theories as to what kind of danger she was in—ranging from isolation and starvation to abuse by the children and even death—Plaintiff admits that Defendants never harmed her or articulated any actual threat of harm.  Plaintiff was so convinced that she was in danger that the absence of any real threats did not matter to her.

Plaintiff's distress eventually became apparent to Defendants.   Although they tried to make Plaintiff feel more comfortable and welcome, such as inviting her to come with the family to restaurants or to the movies for their daughter's birthday, their attempts failed.  But Defendants were nevertheless surprised when she abruptly quit their employment.  And

Defendants were stunned when, years later, Plaintiff filed this lawsuit, telling a bizarre story about abuse that took place only in Plaintiff's imagination.

Plaintiff accuses Defendants of vile and shocking behavior, such as forging and withholding her passport, regularly locking her in a room, preventing her from leaving their apartment, starving her and their own children, depriving her of access to medical care, isolating her from others, and knowingly permitting their children to beat her. Plaintiff even gave interviews to the press, tearfully repeating her allegations of horror, and depicting Defendants as callous elitists, in a story that went viral around the globe. Plaintiff's allegations were so absurd and so far removed from reality that Defendants—who categorically denied them—suspected that her complaint was the product not only of fabrication, but of mental illness.

Plaintiff's deposition bears out Defendants' theory. Under oath, Plaintiff admits that her most incendiary allegations are not true. In direct contravention of her complaint and the interviews she gave to the press, her testimony establishes that:

- Plaintiff was never locked in a room;

- Plaintiff was never prevented from leaving Defendants' home;

- Plaintiff left Defendants' apartment on a near daily-basis and often for many hours at a time;

- Plaintiff had ample food to eat and ample opportunity to purchase and eat it;

- Plaintiff had a valid—not fake—passport and visa;

- Plaintiff had her passport with her at all times while she was in the U.S.;

- Plaintiff was not isolated from others, but was in daily contact with her mother and regular contact with her adult son, and made friends in New York within a short time after her arrival here;

- Defendants did not threaten Plaintiff and she was not afraid of them;

- Plaintiff could have obtained the medical care she now claims she needed but declined multiple opportunities to do so; and

- Plaintiff was offered a plane ticket home to Chile by Defendants, but refused it.

The documentary evidence further establishes that many of Plaintiff's other allegations are also false. But Plaintiff persists in her litigation because the conclusions upon which her claims are based seem true to her, even though she admits that the specific incidents underlying those conclusions did not occur.

For example, Plaintiff really appears to believe that she ate nothing but two bites of a taco, a piece of bread, white pasta and milk for eight weeks. Yet she also admits that she went to restaurants and had fruit, eggs, vegetables, chocolate and other food during that same period of time. Plaintiff really appears to believe that she was terrorized by Defendants' three-year-old toddler, but readily admits that she could have prevented the little girl's so-called attacks. The record is filled with similar examples, but to Plaintiff, there is no contradiction in her story: the worlds of reality and fantasy coexist without distinction.

Defendants understand that, for the purposes of their summary judgment motion, Plaintiff's claims must be viewed in the light most favorable to her. But Plaintiff's subjective, unsupported and admittedly false allegations cannot raise a genuine issue of material fact; the documentary evidence and her own testimony show that her claims are meritless. *See Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 469-71 (S.D.N.Y. 1998) (Sotomayor, J.). But even if Plaintiff's allegations were true, they would not support the causes of action she alleges.

Accordingly, Defendants' should be granted summary judgment for these reasons:

***First***, Plaintiff's claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589-90, *et seq.*, fail as a matter of law because she concedes that Defendants' alleged conduct did not render her functionally unable to leave her eight-week employment. Plaintiff

repeatedly testified that she was not afraid of Defendants and was not afraid she would face negative consequences if she left.  To the contrary, she rejected multiple opportunities to leave, choosing to continue working for Defendants because of her own principles—not because she was threatened or forced to stay.  Indeed, she has not identified a single instance of force, threatened force, physical restraint, threatened physical restraint, or threat of deportation by Defendants, and admits she had her passport in her possession at all times in the United States.

___**Second**___, Plaintiff's claim for negligent infliction of emotional distress ("NIED") fails as a matter of law because it is undisputed that Plaintiff did not fear for her own safety and that her physical safety was never in direct and immediate jeopardy.  It further fails because Plaintiff's testimony, coupled with the documentary evidence, establishes that Defendants' alleged conduct was neither extreme nor outrageous as a matter of law.

___**Third**___, Plaintiff's fraud claim fails as a matter of law because Defendants' alleged misrepresentations are entirely subsumed by the written employment contract between her and Edwards.  Even if were not, Plaintiff fails to allege that Defendants made misrepresentations of present facts.  Finally, Plaintiff cannot establish justifiable reliance on those purported misrepresentations because she received and understood information directly contradicting Defendants' purported misrepresentations about whether she had access to health care,.

## **PROCEDURAL POSTURE**

Plaintiff filed her complaint against Defendants on June 10, 2013 ("Complaint" or "Cmpl.").  Newman Decl. Ex. A, Cmpl. at 1.  She asserted claims pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589-90 *et seq.,* and for breach of contract, NIED, and fraudulent misrepresentation.  Cmpl. ¶¶ 164-208.  Defendants filed their answer denying Plaintiff's claims on August 7, 2013.  *See generally* Newman Decl. Ex. B.

Plaintiff withdrew her breach of contract claim at a status conference before the Court on January 17, 2014; the Court so-ordered the withdrawal on January 23, 2014.  Newman Decl. Ex. C.

## STATEMENT OF UNDISPUTED FACTS[1]

**A.    Defendants Hired Plaintiff Prior To Moving From Chile To New York**

Edwards was in high school when she fell in love with Hurley.  Newman Decl. Ex. H, Deposition Transcript of Malu Custer Edwards ("Edwards Tr.") at 10:21-11:4; 181:2-10.  They married and started a family in Santiago, Chile, disrupting Edwards's plan to go to college.  *Id.*; Newman Decl. Ex. I.  A few years after the birth of their third child, Edwards decided to go back to school.  *See* Cmpl. ¶ 31.

In 2010, Edwards was accepted to Parsons The New School For Design.  *See id.*; Edwards Tr. at 26:2-27:2.  The whole family temporarily moved from Chile to New York in 2011 so that Edwards, then 26 years old, could earn her degree.  Edwards Tr. at 26:19-27:2; Newman Decl. Ex. J, Deposition of Felicitas del Carmen Villanueva Garnica ("Pl. Tr.") at 260:13-25; *see* Cmpl. ¶ 31.

Defendants wanted a nanny to go with them to New York to help care for their three children.  Cmpl. ¶¶ 28, 31; Edwards Tr. at 292:23-293:15; Pl. Tr. at 45:8-23; 65:11-22; 77:5-13.  At the time, Defendants' youngest child, Olympia, was three; Defendants' middle child, Malu, was five; and Defendants' oldest child, Rex, was seven.  Newman Decl. Ex. I.

Plaintiff, who was then 48 years old, also lived in Santiago, Chile.  Pl. Tr. at 10:6-7; 12:16-22.  In 2010, Plaintiff worked part-time as a nanny for a child with hydrocephalus and part-time as a cosmetologist.  Pl. Tr. at 22:9-23:5; 32:5-33:18.  Plaintiff, like Edwards, had a high

---

[1] Defendants dispute the allegations in the Complaint and much of Plaintiff's testimony.  However, those disputes— and Defendants' "side of the story"—are not set forth here because they are not relevant to Defendants' motion, which is based solely on (i) admissions and inconsistencies in Plaintiff's testimony, and (ii) documentary evidence.

school education; Plaintiff had also previously owned her own business for approximately 15 years.  Pl. Tr. at 10:24-11:5; 27:22-28:10; *see also* Edwards Tr. at 180:20-181:10.

Edwards interviewed Plaintiff for the job at Defendants' Santiago home in November 2010.  Pl. Tr. at 46:7-13; Edwards Tr. at 291:18-292:22.  Plaintiff understood that the job would require her to move to the U.S.  Pl. Tr. at 45:8-23; 65:11-22; 77:5-13; 78:25-79:23.  During the interview, Edwards and Plaintiff discussed Plaintiff's potential hours and responsibilities, and settled upon Plaintiff's wages for her work in Chile.  Pl. Tr. at 71:9-14; 72:16-73:5; 75:16-76:24.  Plaintiff claims Edwards told her that she would have to work for Defendants in the U.S. for two years, which Plaintiff agreed to do.  Pl. Tr. at 77:5-13.  She also claims she advised Edwards during her interview that she took medication (Enalapril) for chronic hypertension.  Pl. Tr. at 95:21-96:10.  In response, Edwards allegedly promised to pay for her medication and provide her medical insurance.[2]  Cmpl. ¶ 35; Pl. Tr. at 96:2-10; 97:5-23.

After the interview, Edwards offered to hire Plaintiff on a trial basis.  Pl. Tr. at 78:25-79:10.  Plaintiff accepted the offer.  Pl. Tr. at 79:11-13.  She and Edwards executed a contract governing the terms of her Chilean employment on December 1, 2010.[3]  Newman Decl. Ex. K.

While she worked for Defendants' family in Chile, Plaintiff was not mistreated "in any way."  Pl. Tr. at 86:4-8.  The children's behavior during the month of December was "[r]egular, like any other child[ren]," and the children seemed to accept her; Plaintiff could recall no instance where Defendants' children hit her.  Pl. Tr. at 91:13-21; 92:25-93:4.  Plaintiff did note at the time that sometimes there was not enough food in the house for her or the children, but

---

[2] Plaintiff alleges that Hurley also interviewed her and purportedly discussed the same topics—the upcoming move to the United States, her job responsibilities, and medical care—along with future travel and Plaintiff's potential bonuses.  Pl. Tr. at 47:16-17; 65:15-66:7; 67:2-7.  Plaintiff also testified, however, that Hurley was not involved with the domestic affairs of the household and left that all to Edwards.  *See* Pl. Tr. at 808:6-12.

[3] Plaintiff authenticated her signature on the contract, yet believes that she "never signed" it because she does not recall doing so and does not have a copy of it.  *See* Pl. Tr. at 80:22-81:21; Newman Decl. Ex. K at 3.

attributed that to the chaos of Defendants' impending move to New York.  *Id.* at 87:2-88:16.

Once Plaintiff's trial period ended, Edwards asked whether Plaintiff would accept her offer to continue working for the family in the U.S.  Pl. Tr. at 92:10-93:12.  Plaintiff allegedly stated that her acceptance depended on whether Edwards would pay her wages, insurance, and expenses.  Pl. Tr. at 93:2-24.  Although Edwards purportedly responded "whatever needs to be paid, it will be paid," Plaintiff admits that Edwards made clear that both parties would have to sign a contract governing Plaintiff's employment in the United States.[4]  Pl. Tr. at 93:2-24.  Plaintiff agreed to do so.  Pl. Tr. at 98:5-16.

## B.   Plaintiff And Edwards Executed An Employment Contract Downloaded From The Website Of The U.S. Embassy In Santiago, Chile

Edwards' insistence on a written contract governing her employment relationship with Plaintiff stemmed from her desire to comply with U.S. law for obtaining a visa for Plaintiff. Edwards Tr. at 313:6-315:11; 402:21-403:13.  To this end, Edwards visited the website of the United States Embassy in Santiago, Chile (the "Embassy") in either December 2010 or January 2011.  Edwards Tr. at 402:21-403:13.  The Embassy website informed her that Plaintiff's contract needed to be printed in both Spanish and English in order for Plaintiff to obtain a visa to work for Defendants in the U.S.  *See* Edwards Tr. 479:22-481:17; 489:14-490:8; *see also* Newman Decl. Ex. L.  Edwards downloaded English and Spanish language versions of a sample contract for domestic employees from the Embassy website.  Edwards Tr. 481:9-17; 488:19-489:4; *see also* Newman Decl. Exs. L, M (sample English contract from Embassy website) and N (sample Spanish contract from Embassy website).[5]

---

[4] Plaintiff claims that Edwards also promised her that she would make more money in the United States than she was making in Chile, and that she would work fewer hours than she did in Chile.  Cmpl. ¶ 34; Pl. Tr. at 97:5-23.

[5] The Spanish language version of the contract is only downloadable through the Spanish language section of the Embassy website.  *See* Newman Decl. Ex. O.  Browsing the English language version of the Embassy Website only displays the English language version of the contract.  *Id.* Ex. L.

Edwards filled in the blanks that appeared on the sample English and Spanish language contracts taken from the Embassy website with the appropriate information; Plaintiff and Edwards then executed those contracts, as the Embassy required.  Newman Decl. Exs. L, P and Q; Plaintiff Tr. at 101:13-102:8; 106:2-10; Edwards Tr. at 490:5-491:24.  Plaintiff understood the Spanish version of the employment contract, and did not disagree with any of its terms.[6]  Pl. Tr. at 124:24-125:3; 125:23-126:6; 884:13-25; *see also* Newman Decl. Ex. R.

Plaintiff was not forced to sign the contracts governing her New York employment.  Pl. Tr. at 125:4-22.  Indeed, Plaintiff chose to accept Defendants' offer and go with the family to the United States as their nanny.  Pl. Tr. at 98:5-10.  Plaintiff understood that the only consequence of a refusal to sign the contracts would be that she could not to travel with Defendants to the U.S. Pl. Tr. at 125:4-22.  Edwards gave Plaintiff a copy of both agreements.  Pl. Tr. at 110:4-7, 110:8-111:6.  Edwards understood that she was bound by the contracts governing Plaintiff's employment in New York.  Edwards Tr. at 516:6-13.  Plaintiff similarly understood that the contracts governed her employment in New York.  Pl. Tr. at 109:16-24 (Plaintiff was most "interested in" the medical insurance provision); 117:9-24 (Plaintiff believed she would be paid $10 an hour in the U.S. pursuant to her employment contract).

Plaintiff's employment contract provided that she would be paid $10 per hour, and $15 per hour for overtime.  Newman Decl. Exs. P ¶¶ 4, 5, Q ¶¶ 1, 2.  The parties also agreed that Plaintiff would "normally work eight hours a day, five days a week"; hours in excess of 40 per week would be overtime.  *Id.* Exs. P ¶ 5, Q ¶ 2.  Plaintiff's duties were to be "normal domestic work, including childcare, at the employer's place of residence."  *Id.* Exs. P ¶ 11, Q ¶ 8. Edwards agreed to provide Plaintiff "free room and board," as well as her "medical insurance".

---

[6] Although Plaintiff testified that she executed the contracts "in a hurry" because she was running late to her visa interview appointment at the Embassy, she conceded that she had time to skim the Spanish contract and ensure that it contained a provision for the payment of her medical insurance.  Pl. Tr. at 109:6-24.

*Id.* Exs. P ¶¶ 2, 10, Q ¶¶ 5, 6.  Plaintiff agreed to give Defendants two weeks' notice before

quitting.[7]  *Id.* Ex. P ¶ 6.  Plaintiff also understood that her contract stated that "the telephone

number for police and emergency services in the United States is 911."  Newman Decl. Exs. P ¶

16, Q ¶ 16; Pl. Tr. at 124:24-125:3; 125:23-126:6; 884:13-25.

## C.   Plaintiff Travelled To the United States With Defendants Of Her Own Volition After Receiving A Valid Chilean Passport And A Valid United States Visa

Plaintiff needed to renew her Chilean passport in order to travel with Defendants to New

York.  Pl. Tr. at 127:2-5.  In her Complaint, Plaintiff alleges that Edwards "informed her that her

involvement was not needed to obtain a passport and that Edwards would take care of it herself."

Cmpl. ¶ 41.  But under oath, Plaintiff admits Edwards took her to a government office where

Plaintiff could expedite her passport renewal.  Pl. Tr. at 129:20-130:17; *see also* Edwards Tr. at

562:23-563:8; 563:25-565:11.  And although the Complaint suggests her passport is fake

because she never had her passport photo taken, Plaintiff now admits it was taken while she was

at the passport office.  *Compare* Cmpl. ¶ 41 *with* Pl. Tr. at 130:18-131:3.  The Chilean

government issued Plaintiff's renewed passport on December 2, 2010.  Newman Decl. Ex. S.

Plaintiff also admits that she does not believe her passport—which she uses as a form of photo

identification—is fake.  Pl. Tr. at 133:11-16; 141:3-13.

Plaintiff also needed a visa in order to work for Defendants in the U.S.  Edwards hired an

agency to schedule Plaintiff's visa interview with the Embassy and coordinate which papers

Plaintiff needed for her interview.  Edwards Tr. 558:20-560:5; 565:15-567:5.  Edwards did not

---

[7] The Complaint alleges that the Spanish and English versions of the contract differ, and implies that Edwards tricked Plaintiff into accepting terms in the English version that were materially different from, and less advantageous than, those in the Spanish version.  *See* Cmpl. ¶ 37.  Besides the language they are written in, there are only two differences between the two contracts: (1) the Spanish-language version requires 30 (not 14) days' notice before quitting (*compare* Newman Decl. Ex. P ¶ 6 *with id.* Ex. Q ¶ 11); and (2) the contractual provisions are not listed in the same numerical order (*compare id.* Ex. P *with id.* Ex. P).  These differences were incorporated in the sample contracts provided by the U.S. Embassy in Santiago, Chile and are immaterial to this dispute.  *Compare id.* Ex. M ¶ 6 with *id.* Ex. N ¶ 11.  We rely on the 14 days' notice provision set forth in the English version in this brief because it is more favorable to Plaintiff. *See infra* at 49, 59.

otherwise prepare Plaintiff for her interview with the Embassy. *Compare* Pl. Tr. at 157:4-18 *with* Cmpl. ¶ 43 ("Edwards prepped the Plaintiff on how to answer very basic questions . . . and to only answer questions Edwards had prepared her for").   Although the Complaint alleges that Edwards instructed Plaintiff to lie to the consulate official and to pretend that she did not understand certain questions, Plaintiff admits under oath that this, too, did not occur. *Compare* Cmpl. ¶ 43 *with* Pl. Tr. 158:11-159:6; 160:24-161:4.

Plaintiff's visa interview took place at the Embassy on January 5, 2011. *See* Newman Decl. Ex. T.   During the interview, she was advised to call 911 or the police if she was ever in trouble. Pl. Tr. at 159:2-160:23.  The Embassy also gave Plaintiff a pamphlet with emergency contact information and information concerning her right to police assistance.[8]  Pl. Tr. 159:10-160:13; 168:20-169:2; Newman Decl. Ex. U at 637, 641. Plaintiff was subsequently issued a B-1 Nonimmigrant Visa.[9]  Cmpl. ¶ 48; *see also* Newman Decl. Ex. S; Pl. Tr. at 141:20-142:3.

Defendants, their children, and Plaintiff left Chile for their trip on January 13, 2011, stopping first in Peru to visit Edwards' father, who lives there.  Pl. Tr. at 194:22-195:8.  They all flew first class. *See* Pl. Tr. at 188:4-15; 191:12-14.  Plaintiff then flew first class with Defendants from Peru to New York on January 16, landing in New York the morning of January 17, 2011.[10]

---

[8] Edwards allegedly tried to throw the pamphlet away after the interview. Pl. Tr. at 169:7-17.  Plaintiff claims this did not cause her to worry about traveling with Edwards to the U.S., as Plaintiff felt that Edwards meant no harm when she allegedly did this. *Id.* at 169:7-170:19.  Regardless, Plaintiff allegedly saved the pamphlet from the garbage and brought it with her to the U.S. *Id.*

[9] After Plaintiff's interview at the Embassy, and after both parties had already executed the contracts, Edwards allegedly highlighted portions of the English-language version for Plaintiff—even though Plaintiff only speaks Spanish. Plaintiff alleges that, while doing so, Edwards purportedly advised her that she did not intend to perform some of her obligations under the contract. Pl. Tr. at 113:7-19.  It is unclear whether Edwards allegedly told Plaintiff the highlighted provisions (a) did or (b) did not apply to her. *Compare* Pl. Tr. at 113:7-19; 114:15-115:4 *with* Cmpl. ¶ 36.  But, even if Edwards did highlight portions of the contract Plaintiff could not read, Plaintiff admits that she did not believe Edwards's purported disclaimer of certain provisions (*see, e.g.*, Pl. Tr. at 118:3-24), and she nevertheless chose to accompany Defendants to the U.S. despite that purported intent to breach the contract. *Id.* at 98:11-16.

[10] Plaintiff's first impression of New York from the plane was that there was "snow, water, water, snow" everywhere. Pl. Tr. at 213:15-215:6.  She immediately wished she could have gone back to Chile because, in the

10

Pl. Tr. at 199:17-25; Cmpl. ¶ 68. Plaintiff travelled to the U.S. with Defendants "of [her] own volition". Pl. Tr. at 98:11-13. She was not forced to come to the U.S. Pl. Tr. at 98:14-16.

## D.     Plaintiff's Employment In New York

The Complaint alleges that Edwards confiscated Plaintiff's passport. Cmpl. ¶ 178. Under oath, Plaintiff admits she had her passport in her possession at all times in the U.S. Pl. Tr. at 212:19-25; 1136:15-20.

Plaintiff worked for Defendants in New York from January 17, 2011 to March 14, 2011—*i.e.*, exactly eight weeks.[11] *See* Cmpl. ¶¶ 68, 152. Plaintiff and Defendants first lived in a short-term sublet on Broome Street.[12] Pl. Tr. at 217:7-18. They moved in early February 2011 into a two bedroom, one bathroom rental apartment on East 75th Street. Pl. Tr. at 219:24-220:7; 221:22-222:24; 399:23-400:2. The 75th Street apartment also had a "little" galley kitchen and one additional living room. Pl. Tr. at 221:22-222:24.

Plaintiff experienced no problems with Defendants or their children during her six-week employment in Chile. *See* Pl. Tr. at 86:4-8; 91:13-21. Yet Plaintiff believes that Defendants and their children immediately transformed into physical and psychological abusers as soon as they stepped off the plane in New York. *See* Cmpl. ¶ 197; *see also* Pl. Tr. at 296:15-297:9; 324:5-20 (children hit her on a daily basis in New York). As described below, Plaintiff's allegations concerning her starvation, her captivity, her isolation, the children' purported abuse, and Defendants' "threats"—the crux of her claims—are simply not true.

---

event of an earthquake, the buildings would crumble and both she and the buildings would be "buried in snow and water." *Id.* She thought "the only way to get out of here alive would be a miracle." Pl. Tr. at 213:15-23.

[11] The Complaint incorrectly alleges that this time period was "approximately three months." *See* Cmpl. ¶ 2.

[12] Although Defendants had arranged for the sublet online prior to their arrival, Defendants could not confirm it was suitable until they arrived in New York. Edwards Tr. at 462:16-463:13. They intended to stay at a friend's apartment if it was not, or if the sublet fell through. Edwards Tr. at 462:2-463:23. Because Edwards did not know whether the family would actually end up staying at the sublet, on the plane flight to New York, Edwards provided the address of her friend's apartment for Plaintiff's customs form; she wanted to provide an address where Edwards "knew [she] could be contacted" by U.S. officials if necessary. Edwards Tr. at 459:15-465:11.

1.  Defendants Bought Food At Regular Intervals And Plaintiff Left The Apartment To Purchase Her Own Food On A Regular Basis

The Complaint alleges Defendants starved Plaintiff and their own children and that there was never enough food in the home for Plaintiff or the children to eat.  Cmpl. ¶¶ 116-119.  But grocery receipts show that Defendants spent at least $1,259 on groceries delivered to their home during Plaintiff's eight-week employment with them in the U.S., including purchases on January 23, February 13, February 19, February 28, and March 10, 2011.  *See* Newman Decl. Ex. X; *see also* Pl. Tr. at 477:6-21 (Defendants gave Plaintiff money to purchase milk, butter, eggs, and bread).  A typical grocery list included eggs, bread, butter, ground beef, chicken, apples, bananas, carrots, tomatoes, and lunchmeat, as well food specifically for their children—such as "Stonyfield Farm Organic YoKids Strawberry/Banana Lowfat Yogurt" and cookies.  *See, e.g.,* Newman Decl. Ex. X at 10.   Under oath, Plaintiff admits that she could eat "whatever food" was available in Defendants' refrigerator and pantry[13] and that the children were fed three meals a day.  Pl. Tr. 1134:6-16; *see also* Pl. Tr. at 473:19-474:18 (Plaintiff "would . . . have eaten" and "would have also" fed the children, eggs, bread, butter, meat, fruit, and yogurt "[i]f [it] had been available" in the home); 469:10-21.

Plaintiff also regularly left the apartment and bought her own food.  *See, e.g.,* Newman Decl. Ex. Y (food purchases on Jan. 30, Feb. 3, 4, 6, 9, 12, 17, and 21); *see also* Pl. Tr. at 556:2-24; 477:15-478:8 (Plaintiff would purchase chocolate, eggs, preserves, and fruit on the way home from dropping Rex and Malu off at school when she was hungry).  Contrary to the Complaint's allegations that on the "rare occasions" when Plaintiff was "able to briefly leave" Defendants' apartment, "Plaintiff was unable to afford to purchase enough food to ward off

---

[13] The only food allegedly off-limits was wine and fine cheese.  Pl. Tr. at 1134:10-16.  None of Defendants' grocery receipts show purchases for these items.  Newman Decl. Ex. X.

hunger, properly nourish herself, or ward off infection and illness," Plaintiff now admits that she left the apartment on a near-daily basis and had money to buy herself sufficient food.[14]  *Compare* Cmpl. ¶ 115 *with* Pl. Tr. at 256:12-16; 483:21-484:16; 641:3-8.   Nor did Plaintiff suffer negative consequences from Defendants for buying food on her own.  Pl. Tr. at 790:22-791:12.

Despite the evidence and her own admissions, Plaintiff also tells a separate and inconsistent story in which she was "starved" and suffered malnutrition at Defendants' hands. She believes that she was starved because Defendants allegedly infrequently shopped for food and only purchased food in small quantities.  *See, e.g.*, Cmpl. ¶¶ 82, 116, 121; Pl. Tr. at 329:9-15.  She testified that she only ate two bites of a taco,[15] a "piece of bread," "white pasta," and milk during her eight-week employment.  Pl. Tr. at 794:12-14; 948:6-13.  According to her, Edwards purposefully did not buy enough food for Plaintiff or the three children in order to prevent them from getting fat.  *See, e.g.*, Pl. Tr. at 482:18-483:9.

Plaintiff does not reconcile her stories.  She could not explain how she was malnourished in light of Defendants' and her own food purchases—which she admittedly did eat or could have eaten—or why she did not buy more food if she was hungry.  *See, e.g.*, Pl. Tr. at 1134:6-16.  She admits that she never told Edwards that she was hungry and needed more food.  Pl. Tr. at 472:13-21.  And although Plaintiff claims that her "starvation" caused her "pain daily from

---

[14] Plaintiff claims Edwards paid her a total of $1,500 for her services in New York.  Newman Decl. Ex. R ¶¶ 19 , 29. (The Complaint claims Edwards paid her only $800. *See* Cmpl. ¶ 96.)  She also testified that she brought approximately $400 or $500 with her to the United States from Chile.  Pl. Tr. at 213:2-11.  She therefore had at least nearly $2,000 cash in hand with which to purchase additional food, and daily opportunity to do so.  *See infra* at 42.

[15] Plaintiff has alleged conflicting stories of an incident involving a taco.  She alleged in the Complaint that she became ill from a taco she once "snuck out and bought" because there was no food kept in the house.  Cmpl. ¶ 122. However, she now says Defendants bought the taco for her from a street vendor, and believes they deliberately bought her a spoiled one. Pl. Tr. at 792:17-794:4; 827:7-13; 1148:23-1149:25; 1120:14-1122:4.  Plaintiff claims that two bites of the taco made her so sick that her "whole body was itching, [her] mouth was red and swollen, [she had] diarrhea, and excruciating stomach pain," along with nausea and vomiting.  Pl. Tr. at 794:12-14; 796:20-797:14. She claims those symptoms lasted from sometime in January 2011 "[a]ll the way until March 17th". Pl. Tr. at 797:3-23.

stomach infections," she also says that her stomach pain was caused by the spoiled taco that she believes Edwards deliberately gave her. *See supra* n. 15.

2. Defendants' Children Were Well Fed And Plaintiff Admits That She Could Have Prevented Them From Hitting Her

Plaintiff likewise tells a story about Defendants' children that is contradicted by documentary evidence and her own testimony. Plaintiff claims that Defendants' children—well-behaved and accepting of her in Chile—began to hit her on a daily basis as soon as the family arrived in New York. *See* Cmpl. ¶ 74; *see also* Pl. Tr. at 296:15-297:9; 324:5-20. Plaintiff repeatedly testified that the children hit her because they were supposedly starving—and testified that they were "starving" because there was little food in the house and that Edwards deprived them of food so they would not "get fat". Compl ¶ 72; Pl. Tr. at 296:15-25; 299:2-10; 303:14-25; 320:23-321:5; 344:25-345:8; 482:18-483:9.

But the children were not starving. *See infra* at 12-13. Nor could Plaintiff explain why, if Defendants also did not purchase enough food for the children in the U.S. as she claims, the children began to hit her only once they arrived in the U.S. *See* Pl. Tr. at 91:13-21.

Plaintiff instead focuses on Olympia, Defendants' three-year-old. Although Olympia was light enough for Plaintiff to pick up, and small enough that she only came up to Plaintiff's waist while Plaintiff was *seated*, Plaintiff claims the toddler hit her with a small plastic chair every day. Pl. Tr. at 296:4-14; 297:7-13; 303:14-25. Plaintiff claims she developed a bruise over time because Olympia hit her every day, in the same spot, with the same small plastic chair. Pl. Tr. at 431:5-432:15. But Plaintiff cannot explain why, if Olympia actually hit her every day, in the same spot, with the same small plastic chair, Plaintiff did not ***simply take the chair away from the little girl.*** Pl. Tr. at 300:5-9; 300:23-301:25. Instead, she says she did not take the chair away because "it was not [Olympia's] fault they were not giving her food." Pl. Tr. at 300:5-9.

14

Plaintiff also claims Malu, Defendants' five-year-old daughter, pushed her every day at breakfast, because she was hungry. Pl. Tr. at 324:5-20. She similarly cannot explain why, if Malu actually pushed her every morning, Plaintiff could not move out of the way or prevent Malu from doing so. *Id.* at 324:5-325:17; 323:9-324:4. But Plaintiff admits that Malu never physically harmed Plaintiff or caused even a bruise.[16] *Id.* at 318:24-319:4; 321:6-8.

Even assuming Plaintiff's testimony that she was subject to the same physical attacks by two "starving" little girls on a daily basis is plausible, Plaintiff herself admits that she allowed Malu and Olympia to purportedly hit or shove her. *See* Pl. Tr. at 300:5-9 (Plaintiff never took small plastic chair away from Olympia), 301:11-20 (Plaintiff never ducked away from Olympia but instead "let her hit" her); 311:23-312:9 (Plaintiff allowed Olympia to hit her because the toddler was only hitting her out of hunger); 337:3-14 (Plaintiff allowed Malu to push her).

Plaintiff also describes two instances in which Defendant's seven-year-old son Rex allegedly acted aggressively; she admits he otherwise was not physically aggressive. Pl. Tr. at 365:18-366:13. According to the Complaint, the first occurred when he purportedly threw a scooter at Plaintiff during a tantrum. Cmpl. ¶ 80. But her testimony is inconsistent: she testified that the scooter hit her in the leg and the head, although she had previously sworn under oath that the scooter only hit her in the leg. *See* Cmpl. ¶ 80; Pl. Tr. at 375:21-25, 376; *but see* Newman Decl. Ex. R at ¶ 31 (affirming that the scooter only hit her leg); Pl. Tr. at 918:2-25 (Plaintiff "forgot" to include in her prior affirmation that the scooter also hit her in the head).

The second incident occurred when Rex purportedly slammed the refrigerator door into her head three times in a row because he was hungry at breakfast, although Plaintiff testified that she knows he did not intend to hurt her. Cmpl. ¶ 81; Pl. Tr. at 344:25-345:14; 364:25-365:6;

---

[16] Plaintiff nevertheless recounts an instance where Malu cried in the car and allegedly knocked Plaintiff's glasses off following the family's red-eye flight to New York. Cmpl. ¶¶ 69-71; Pl. Tr. at 312:21-24.

366:14-17.  Plaintiff claims she could not protect her head after the second or third time he

moved the door even though she was "turning half of [her] body inside the fridge."  Pl. Tr. at

358:6-20 (Plaintiff remained bending over during this alleged assault).  Plaintiff similarly claims

that she could not react fast enough to move her position so that the door would instead hit her

shoulder, arm, or miss her altogether—even though she had enough time to think about standing

up and to say "Rex, Rex, what are you doing?" and to put her head in her hands.  *See* Pl. Tr. at

357:8-358:20; 363:16-364:7.

Indeed, Plaintiff was admittedly much larger, as well as stronger, than all of Defendants'

children, as she could prevent Olympia, Malu, and Rex from hitting or harming one another:

> Q:     Was one of your job responsibilities preventing the children from harming
>        one another?
> A:     Oh, sorry. Of course if they hit each other, they could badly harm each
>        other.
> Q:     How were you able to prevent them from harming one another?
> A:     I get in the middle of them, in between them and I separate them.  Little
>        ones don't fight like that, you don't do that.

*See* Pl. Tr. at 310:22-311:8; 381:25-382:6 (Plaintiff would immediately separate the children

once they started fighting); *see also id.* at 296:4-14; 310:22-25; 312:10-18; 341:16-25.

In an attempt to attribute the alleged behavior of the children to Defendants themselves,

Plaintiff has alleged a story in which Defendants supposedly allowed their three young children

to hit her in order to make her both fear for her job and to leave her job.  Pl. Tr. at 340:2-341:9

(Defendants used the children to make her afraid of being fired and to make her leave).

Sometimes she believes her own story, and sometimes she does not.  *See, e.g.*, Pl. Tr. at 382:15-

22 (does not believe that Edwards purposefully allowed Rex to hit her); 307:24-308:13 (cannot

recall Edwards's intentions); 300:10-15; 307:3-13 (purpose of "starving" the children was to

avoid them getting fat—not to cause them to hit Plaintiff).  But she claims that the abuse leveled

upon her by, principally, a three-year-old, has caused her to suffer from pedophobia.  Cmpl. ¶ 161. Neither the youth of her purported abuser, nor the facts that Plaintiff subsequently worked as a caretaker to young children and lived with young children, has disrupted Plaintiff's insistence on her claim.  Pl. Tr. at 974:4-975:10; 1035:3-1036:9; 1045:4-15; 1046:6-19.

3.  Plaintiff Admits That She Was Never Locked In A Room And That She Had Time Off And Regularly Left The Apartment For Hours At A Time

The Complaint alleges that Hurley "would lock Plaintiff and the children in whichever room she was using to entertain them" and that sometimes she would fall asleep on "the floor of whatever room they were locked in."  Cmpl. ¶ 90; *see also id.* ¶¶ 86-87 (Hurley locked and re-locked Plaintiff in a bedroom with the children).  However, Plaintiff no longer claims that she was locked in a room by Defendants.  *See* Newman Decl. Ex. D; *see also id.* Exs. E, G; Pl. Tr. at 224:9-23 (Plaintiff "can't recall" if Hurley locked the door); 237:6-11; 238:18-22.

Instead, Plaintiff claims that Hurley, on three occasions, told her to stay in a room with the children she was hired to watch, in a raised tone of voice, because he wanted some peace and quiet to himself.  Pl. Tr. at 224:5-227:21; 238:6-239:22 (though Hurley told only the children to go in the room, Plaintiff went too because he "looked at all of [them]" and she was with the children); 244:17-20; *see also id.* at 240:10-241:8.  She acknowledges that Hurley never suggested he would harm her in any way if she left the room, aside from "his attitude, the way he looked at [her] and raising his voice." Pl. Tr. at 385:6-19.

Plaintiff also claims she was not "afforded any time off while in New York" and was habitually prevented from leaving Defendants' apartment.  Cmpl. ¶¶ 90, 99.  But under oath, she admits that she had "opportunities to leave the home on multiple occasions."  Pl. Tr. at 527:5-12; 525:13-21 (Plaintiff could recall only one instance in which Edwards allegedly denied her permission to leave).  Plaintiff was also alone and out of the house on weekdays in connection

with taking Malu and Rex to and from school, and on daily visits to the park.  Pl. Tr. at 483:21-

484:16; 256:12-16.  In addition, at a minimum, Plaintiff had personal time out of the apartment

for the following hours during her New York employment:[17]

- February 4, 2011: 10:30 am – 7:00 pm (Pl. Tr at 650:10-20; Newman Decl. Ex. R ¶ 24);
- February 6, 2011: 12:20 pm – 4:00 pm (Pl. Tr. at 651:7-12; 654:2-8);
- February 15, 2011: 2:00 pm – 5:00 pm (Pl. Tr. at 564:2-7);
- February 16, 2011: 12:00 pm – 3:00 pm (Pl. Tr. at 653:8-17);
- February 17, 2011: 4:00 pm – 6:00 pm (Pl. Tr. at 655:19-656:6);
- February 19, 2011: 11:00 am – 2:00 pm (Pl. Tr. at 656:10-22);
- February 20, 2011: 10:30 am – 8:00 pm (Pl. Tr. at 656:23-657:10);
- February 21, 2011: 11:00 am – 6:00 pm (Pl. Tr. at 657:11-658:7);
- February 26, 2011: 11:50 am – 4:00 pm (Pl. Tr. at 658:8-20);
- March 4, 2011: 11:30 am – 5:30 pm (Pl. Tr. at 686:13-687:5); and
- March 13, 2011: 11:00 am – 8:30 pm (Pl. Tr. at 698:5-17).

During those hours, Plaintiff was (i) out of the apartment, (ii) not working, (iii) "free to come and

go," and (iv) returned only when ready to do so.  *See* Pl. Tr. at 661:3-17; *see also* 653:18-24.

While enjoying her time off, Plaintiff would run errands, visit museums, walk around, attend

church, or go window shopping.[18]  Pl. Tr. at 491:5-22; 590:8-591:4; 699:7-22; 823:12-24.

4. Plaintiff Admits That She Spoke To Her Family On A Regular Basis, Made Friends, And Refused Edwards's Offer Of Free Phone Calls To Chile

Plaintiff also claims that Defendants attempted to "[i]solate her from others".  Cmpl. at

19; *see, e.g.*, Pl. Tr. at 501:5-10.  But under oath, she admits that she was frequently out of the

apartment for hours at a time—not confined or isolated in the apartment—where she was able to,

---

[17] Plaintiff claims to have kept a list of her daily expenses in her diary; that list demonstrates that she was given time to take care of personal errands outside of the apartment alone on at least January 30, 2011, and on February 3, 4, 6, 9, 10, 12, 14, 15, 16, 17, 19, and 21, 2011.  Newman Decl. Ex. Y; Pl. Tr. at 491:15-21; 556:2-24.  Plaintiff did not produce a diary for March 2011.  *See* Pl. Tr. at 557:14-16 (Plaintiff thinks she kept a record of her expenses incurred in March 2011); Newman Decl. ¶ 27 (Plaintiff did not produce such a record).

[18] In addition to the time off set forth above, Plaintiff was also at home alone in the apartment for approximately two hours on March 5, 2011 after she decided not to join the family trip to the movies.  Pl. Tr. at 691:4-15.

and did, meet and interact with others, whether on personal time or with the children.[19]  *See infra*
at 42-43.  She also spent nearly $300 on two mobile phones and multiple phone cards in less than
three weeks, which she used to speak to her mother on a daily basis and her son.  Pl. Tr. at 585:2-
25; 578:14-579:3; 588:10-24; 817:3-818:3; *see also* Newman Decl. Ex. Y.  Plaintiff need not
have spent money on phones and calling cards:  Edwards invited Plaintiff to call her relatives in
Chile for free from the family's landline.[20]  Pl. Tr. at 505:5-13.

    5.   <u>Plaintiff Rejected Multiple Offers Of Medical Help And Chose Not To Go To A Hospital</u>

      Though Plaintiff contends two bites of a taco she ate in January 2011 made her
continuously ill during her employment, she does not contend that she sought, or was denied, the
attention of a doctor or a hospital to address her illness, and the only symptoms associated with
her alleged lack of Enalapril began on or about March 4, 2011.  *See* Cmpl. ¶¶ 107-111; Pl. Tr. at
733:3-21 (Plaintiff purportedly felt "chest pain" and "unbearable" pain in her arm on March 4).

      Plaintiff believes that Defendants "denied Plaintiff access to health care" for her illnesses
by allegedly advising her that U.S. hospitals would not help a non-citizen.[21] Cmpl. ¶¶ 103-04; Pl.
Tr. at 400:9-18.  At the same, she admits that the pamphlet she was given by the Embassy
advised her otherwise.  *See* Newman Decl. Ex. U at 637, 641; Pl. Tr. at 404:22-405:16 (Plaintiff

---

[19] Though Plaintiff's Complaint alleges that Edwards "prevented" her from talking with strangers, and warned her
not to speak to "the doormen," Plaintiff did talk with strangers, and Defendants' buildings had no doormen.
*Compare* Cmpl. ¶¶ 146-47 *with*  Pl. Tr. at 217:7-18; 221:22-24; 494:21-496:16; 501:15-19; 531:16-22; 563:7-9;
723:19-24; 721:15-25; 1040:13-16.  Indeed, Plaintiff met the man who has been paying all her expenses in New
York since leaving Defendants' home while out on a walk with Olympia on March 11, 2011.  *See* Pl. Tr. at
494:21-496:16.

[20] Plaintiff declined this offer because she did not want Edwards to hear her conversations.  Pl. Tr. at 506:9-13;
582:16-583:13.  She testified that she did not want to use the landline to make phone calls even when she was alone
in the apartment because she was afraid Edwards would eavesdrop on her telephone calls.  *Id.*  But she was also in
Defendants' apartment for hours without Edwards while Edwards was at school.  *Id.* at 260:2-12 (Edwards had
school "every day").

[21] Plaintiff also claims that Hurley told Plaintiff that she could not receive hospital care in the United States until she
had been in the country for four to five years.  Pl. Tr. at 901:16-902:2; Newman Decl. Ex. R ¶ 22.

realized she had a right to medical assistance after reading the pamphlet); 535:6-12 (Plaintiff had read the pamphlet before Feb. 21, 2011).

Indeed, Plaintiff called 311 when she felt ill on March 4, 2011 to determine whether the hospitals would actually assist her. Pl. Tr. at 747:21-748:6; 758:15-18.  The 311 operator advised her that "any hospital [would] provide [her] medical attention" and that she should not be scared to seek help.  Pl. Tr. at 747:21-748:6.  The 311 operator also gave her the location of the nearest hospital.  Pl. Tr. at 747:21-23; 748:24-749:15; 761:19-24.

Although Plaintiff believed the 311 operator, and alleged that Edwards herself advised her to go to a hospital on the day she felt ill, she claims she did not go to the hospital because she did not feel well enough "to walk by [her]self" and because she was "not familiar with the names of the streets" around Defendants' apartment.[22]  Pl. Tr. at 761:25, 762:2-13; 762:25, 763:2-12; 773:7-12; Cmpl. ¶ 109.  But on that same day, Plaintiff felt well enough—and understood New York streets well enough—to leave the apartment for nearly six hours, travel downtown to the offices of the Safe Horizon organization via subway, and return to Defendants' apartment safely.[23]  Pl. Tr. at 737:21-740:19; 762:14-18.  Plaintiff also felt well enough, and familiar enough with the street names, to leave the apartment for nearly nine hours one week later to go for a walk and do some window shopping.  Pl. Tr. at 246:17-247:22; 698:13-699:4; 764:24-765:25.

Plaintiff also claims that Edwards failed to fill her prescription medication for hypertension as promised.  Cmpl. ¶¶ 102-03, 106.  Plaintiff's testimony concerning the date she

---

[22] The streets around Defendants' 75th Street apartment were a numbered grid, which Plaintiff was familiar with because she allegedly walked Rex and Malu to school on 82nd Street every day.  Pl. Tr. at 246:17-247:22.

[23] From Defendants' apartment on 75th Street and 3rd Avenue, the nearest hospital, Lenox Hill, located on 77th Street between Park and Lexington Avenues, is approximately a three block walk.  *See* Newman Decl. Ex. V.  And Lenox Hill is also at least equidistant to the T-Mobile store located at 72nd and 3rd Avenue, which Plaintiff visited "two or three times" between February 4 and March 14, 2011.  Pl. Tr. at 488:19-24; 490:5-14; *see also* Newman Decl. Exs. V, Y.

ran out of Enalapril is inconsistent: she contends that she ran out of it both on February 25, 2011, and on February 7 or 8, 2011.  *See* Pl. Tr. at 487:10-25; 704:4-705:24.  Her testimony concerning when she asked Edwards to buy more Enalapril is similarly inconsistent: the Complaint alleges that she  asked Edwards for it on approximately March 4, 2011, the date "when her symptoms began presenting themselves," but she now claims that she made the request in early February and "reminded" Edwards about it in early March.  *Compare* Cmpl. ¶¶ 107-08 *with*  Pl. Tr. at 706:9-12; 733:9-21.  But Plaintiff admits that in early March 2011, Edwards advised her that she was having the Enalparil shipped to New York via FedEx from South America.[24]  Pl. Tr. at 744:17-745:5.  Edwards requested the medication on March 8, 2011; it arrived on March 15, 2011.  *See* Newman Decl. Ex. AA; Edwards Tr. at 614:3-615:16.

Plaintiff also rejected multiple opportunities to receive medical assistance from other sources.  For example, Plaintiff called the National Human Trafficking Resource Center ("NHTRC") on February 21, 2011 because she believed she needed help.  *See* Pl. Tr. at 530:20-22; 704:4-705:24.  Although the NHTRC offered to pick Plaintiff up immediately and provide "[e]verything that [she] would need if [she] was in trouble," Plaintiff did not accept the NHTRC's offer because she hoped Edwards would "come to her senses" and "treat [her] better." Pl. Tr. at 536:12-22; 538:7-25.  And while Plaintiff was at the Safe Horizon office on March 4, 2011, the same day she purportedly experienced dizziness and "unbearable" pain in her arm, Safe Horizon offered to provide her medical assistance and "all help needed".  Pl. Tr. at 738:19-740:2.  Plaintiff rejected Safe Horizon's offer.  *Id.*  She instead chose to return to Defendants for the sole reason that she hoped Edwards's attitude would improve.  *Id.*  Safe Horizon also advised

---

[24] The medication was not available without a prescription in the U.S. PHYSICIANS' DESK REFERENCE at 2166 (62d Ed. 2008), "Enalapril".

Plaintiff to call if her illness worsened; Plaintiff did not do so, purportedly because she was still "waiting for [Edwards to] change." Pl. Tr. at 759:9-760:5.

> 6.  Plaintiff Does Not Claim That Defendants Physically Harmed, Restrained Or <u>Threatened Her</u>

Plaintiff does not allege that Defendants physically harmed her or threatened to do so. Indeed, she admits that neither Hurley nor Edwards physically abused her. *See generally* Cmpl.; *see also* Pl. Tr. at 330:20-331:4 (testifying that Edwards would not harm her "in any way" if Plaintiff disobeyed her instructions); 409:10-11 (testifying that Edwards never injured her); 840:19-842:12 (Hurley never physically harmed her). She admits that Edwards did not do anything to harm her other than "the lack of food, the taco that made [her] sick, making fun of [her], verbal abuse, and denying [her] medical care or medication." Pl. Tr. at 840:13-18. Hurley likewise did not do anything to harm her "[o]ther than the lack of food, denial of medical care, raising his voice, banging a wall, making a mean face, and making [her] feel like a rat" as well as "not carrying [her] bags at the airport" and "closing the door" of the bedroom. Pl. Tr. at 840:19-842:12; *see also* Pl. Tr. at 230:15-16 (Plaintiff could not recall whether Hurley had ever threatened to harm her); 385:15-21 (testifying that Hurley never suggested he would harm her in any way aside from "his attitude, the way he looked at [her] and raising his voice"). Plaintiff also concedes that Hurley never verbally abused her. *See* Pl. Tr. at 390:14-16.

Though she admits there were no threats of or actual violence or physical harm directed toward her, Plaintiff contends that she was harmed by Edwards's alleged statement that the police[25] and U.S. hospitals would not help her.[26] Cmpl. ¶ 165; *see also* Pl. Tr. at 400:9-18;

---

[25] Asked at her deposition to recount exactly what Edwards had said, Plaintiff admitted that Edwards did not tell Plaintiff she could get arrested if she called 911, as the Complaint contends. *See* Cmpl. ¶ 104 . She now claims Edwards advised her not to call 911 frivolously because the police take such calls very seriously and could easily misinterpret the seriousness of such a call. Pl. Tr. at 757:15-758:9.

840:13-18.  However, Plaintiff admits that she did not believe Edwards's alleged statement.  Pl. Tr. at 901:8-14; *see also* Pl. Tr. at 404:22-405:16.  Indeed, she was advised by a number of sources that she had access both to medical care and the police.  *See supra* at 19-23; Pl. Tr. at 159-160:23 (Embassy advised Plaintiff to call 911 or the police if she was ever in trouble); 168:20-170:19 (same); 537:17-23 (NHTRC advised Plaintiff the police would help her);  915:20-916:11 (Safe Horizon affirmed the police would help her); 404:22-405:16 (Plaintiff realized noncitizens had right to police assistance once she read Embassy pamphlet); Newman Decl. Ex. U at 637, 641; *see also* Newman Decl. Exs. P ¶ 16, Q ¶ 16 (Plaintiff's employment contract provided that "the telephone number for police and emergency services in the United States is 911.").[27]

### 7. Plaintiff Admits She Was Not Afraid Of Defendants And That Her Decision To Continue To Work For Them Was Not Based On Inability To Leave Or Fear Of Leaving

Plaintiff claims that Edwards threatened her nonphysically, on a single occasion, by purportedly describing Edwards's relatives in Chile as both "powerful" and "untouchable," and by telling Plaintiff that she could not quit after only two weeks in the U.S.[28]  Pl. Tr. at 394:7-399:12; 752:9-754:10; 820:4-6; 836:14-837:12; 896:3-11.  Edwards allegedly made these statements when Plaintiff expressed a desire to quit after a purported incident in which Hurley allegedly became upset that Plaintiff had fed the children the "last stale piece of bread" in the apartment.  Pl. Tr. at 394:7-399:12; 752:9-754:10; 836:14-837:12.  Plaintiff, however, did not

---

[26] Plaintiff also believes that she was "forced" to obey Defendants.  Pl Tr. at 777:12-17.  Pressed on why she believes that, she speculated that Defendants had her under video surveillance. Pl. Tr. at 777:18-778:3.  Plaintiffs offers no evidence she was under surveillance; she says "[i]t was evident."  Pl. Tr. at 780:21-781:8.

[27] Though Plaintiff had the contract in her possession in the U.S. (Pl. Tr. at 110:4-111:6), she claims she forgot about that clause.  *Id.* at 405:23-24, 406:2-17 ("What was that [provision], I don't remember.").

[28] There was no other content to the "threat."  *See* Pl. Tr. at 752:9-754: 10.  Although in a prior affidavit Plaintiff swore that Edwards once said that if she "tried to do anything [her] attempts would be in vain," she admits that she thought "nothing" of that alleged statement and was not afraid.  *See*  Newman Decl. Ex. R ¶ 21; Pl. Tr. at 894:9-24.

quit at that time and continued her employment.  Pl. Tr. at 843:4-19.

Plaintiff's decision to remain with Defendants was a matter of choice.  *See* Pl. Tr. at 822:18-23 (Plaintiff did not think anything bad would happen to her if she quit); 1161:3-20 (Edwards did nothing to prevent Plaintiff from leaving at any time); 1162:24-1163:12 (Hurley did nothing to prevent Plaintiff from leaving at any time).  Her decision was not based on fear; she repeatedly affirms that she did not continue to work for Defendants in the United States out of fear and was "not afraid" of them:

> Q:    Were you afraid of either Ms. Custer [Edwards] or Mr. Hurley at the time of your interview?
> A:    No.
> Q:    Did there come a time that you became afraid of either of them? At some later point, did you become afraid of either Ms. Custer [Edwards] or Mr. Hurley?
> A:    No.

*See* Pl. Tr. at 164:12-20; *see also* Pl. Tr. at 338:23-339:5 (she "was not afraid" of losing her job); 340:2-9 (same); 399:2-12 (Plaintiff was not afraid to stand up to Edwards and tell Edwards what she really thought of her); 400:3-8 (Plaintiff was not afraid anything would happen to her if she did not listen to Edwards); 836:14-837:12 (Plaintiff told Edwards she was not afraid); 839:14-18 (Plaintiff told the truth when she told Edwards she was not afraid of her); 840:6-12 (Plaintiff not afraid of Edwards); 842:21-843:3 (Hurley's alleged statements about his lineage did not make Plaintiff afraid).[29]

Plaintiff also admits that she continued to work for Defendants only because she considered it improper to leave her position, based on her own "personal ethical point of view."

---

[29] Despite repeatedly affirming that she was not afraid of Defendants, Plaintiff contradicted her testimony at one point in her deposition, claiming that she became afraid that Hurley would "smother" her with a pillow in the middle of the night.  Pl. Tr. at 386:4-12.  Plaintiff admits that Hurley never verbally abused her and never suggested he would harm her in any way aside from "his attitude, the way he looked at [her] and raising his voice."  *Id* at 840:19-842:12;  385:15-19.  Instead, her fear arose because Hurley allegedly cursed at his wife on one occasion.  Pl. Tr. at 390:14-20.

*See* Pl. Tr. at 393:4-394:6; 308:25-309:5; *see also* Pl. Tr. at 815:23-816:12 (Plaintiff did not leave because running away is for "sneaky people" and she is "not sneaky").  She also claims she continued with Defendants because she hoped their behavior would improve, and so that she would receive what she was due under her contract.  *See, e.g.*, Pl. Tr. at 898:11-899:9; 1158:10-22.

Additionally, Plaintiff rejected multiple opportunities to permanently leave Defendants. *See* Pl. Tr. at 538:16-25; 541:5-9 (rejected NHTRC offer on Feb. 21 because she hoped Edwards would "come to her senses" and "treat [her] better"); 739:4-740:2 (at the Safe Horizon office on March 4, 2011, she rejected Safe Horizon's offer to stay there, because she hoped Edwards's attitude would improve); 916:8-11 (Plaintiff never asked Safe Horizon to pick her up after March 4 because she "was still waiting for the family to change").

By Plaintiff's admission, she was free to come and go from Defendants and their children, and repeatedly chose to stay.  *See* Pl. Tr. at 393:4-394:6; 486:6-12; 537:24-538:25; 541:5-9; 739:4-740:2; 916:8-11.  Also by her own admission, she had nothing to fear from them. *See, e.g.*, Pl. Tr. at 164:12-20; 338:23-339:5; 340:2-9; 399:2-12; 400:3-8; 836:14-837:12; 839:14-18; 840:6-12; 842:21-843:3.  But these admissions do not shake Plaintiff's faith in her story that she was a victim and had no choices.  *See* Cmpl. ¶ 1.

8.  Plaintiff Admits That She Has Already Received All Wages She Claimed She Was Owed Through The New York State Department Of Labor

Plaintiff claims that Edwards did not pay her sufficient wages during her eight-week period of employment.  Cmpl. ¶ 92.  However, Plaintiff has previously sought and received the full amount of her claimed wages through a proceeding with the New York State Department of Labor ("DOL") in 2011.  Cmpl. ¶ 163.  In that proceeding, Plaintiff submitted the number of hours she claimed to have worked and the January 1, 2011 contract she and Edwards executed.

Newman Decl. Ex. W.   The DOL accordingly requested that Edwards pay Plaintiff for all hours

she claimed she worked at the contractual rate of pay.[30]   *Id.*  Edwards did so. Newman Decl. Ex.

W.  Plaintiff concedes that she has been fully paid for her labor.  *Id.;* Pl. Tr. at 1014:10-17.

9.  Plaintiff Left Defendants' Employment On Her First Try And Rejected Edwards's Offer
<u>To Purchase Her A Return Flight To Chile</u>

Plaintiff permanently left Defendants' residence the morning of March 14, 2011,

immediately after the alleged incident with the refrigerator.  Cmpl. ¶ 152; Pl. Tr. at 1159:2-25.

As soon as Plaintiff decided to leave, Plaintiff was able to do so.[31]  Pl. Tr. at 843:7-24; *see also*

Pl. Tr. at 1161:3-20; 1162:24-1163:12.

Plaintiff claims that after she informed Edwards that she was leaving, she heard Hurley

yell from another room, "let her leave then, buy her a flight ticket, go ahead and get out of here!"

Newman Decl. Ex. R ¶ 32; Pl. Tr. at 920:19-921:16.  Plaintiff left before Defendants could

discuss her return ticket with her further.  Pl. Tr. at 843:3-844:17; 850:22-851:13.

But Edwards later sent Plaintiff a text message advising Plaintiff that she had arranged a

return plane ticket for March 28, 2011.  Pl. Tr. at 850:22-851:13; Newman Decl. Ex. R ¶ 33.

Because Plaintiff was not answering Defendants' phone calls or text messages, Hurley also had a

family member call Plaintiff from a Chilean phone number to tell her that Defendants wanted to

purchase a plane ticket for her back to Chile.  Pl. Tr. at 812:4-18; Edwards Tr. at 605:2-607:21.

Plaintiff rejected Defendants' offer.  Pl. Tr. at 922:13-926:23; 931:4-8.

---

[30] During Plaintiff's employment, Edwards was not aware of her obligation to keep detailed records concerning Plaintiff's actual hours worked; Edwards testified that she paid Plaintiff based on an estimate of the hours Plaintiff worked.  Edwards Tr. at 572-3; 622:17-623:11.  She also recalls paying Plaintiff more than Plaintiff claims.  *Id.* at 623:25-624:24.  But because she did not keep a log of Plaintiff's hours worked or a record of her cash payments, she did not have sufficient evidence to dispute Plaintiff's claims to the DOL. *Id.* at 572-73.

[31] Plaintiff claims she had asked for a return ticket "many times" before, but the only date she says she remembers is March 5, 2011.  Pl. Tr. at 897:10-16; *see also id.* at 809:9-811:13.  And although Plaintiff allegedly advised Edwards on that date that she wanted a ticket back to Chile, Plaintiff "did not actually give notice and quit" on March 5, 2011, nor did she tell Edwards a particular date that she wanted to leave.  Pl. Tr. at 864:12-865:25; 866:16-21.  Edwards arranged for a return ticket as soon as Plaintiff actually quit on March 14, 2011.  Pl. Tr. at 850-51.

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of demonstrating that no disputed issue of material fact exists lies with the party seeking summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  An issue of fact is "genuine" if "the evidence is such that a reasonably jury could return a verdict for the nonmoving party." *Id.*

But when the facts alleged in a complaint and a deposition are "so contradictory that doubt is cast upon their plausibility," the court is "authorized to pierce the veil of the complaint's factual allegations, dispose of some improbable allegations, and dismiss the claim"—particularly where plaintiff's opposition to summary judgment relies "almost exclusively" on his own inconsistent testimony. *See Aziz Zarif Shabazz*, 994 F. Supp. at 469-71 (quotations omitted) (awarding defendants summary judgment where plaintiff's allegations "changed significantly" between his complaint, deposition testimony, and opposition papers); *see also Jeffreys*, 426 F.3d at 551 (plaintiff's testimony was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.") (quotation omitted); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d. Cir. 2011) (plaintiff's sworn statements directly contradicted her complaint, interrogatory responses, and other parts of her deposition testimony); *Cruz v. Reiner*, 2013 WL 5676303, at *4-5 (E.D.N.Y. Oct. 16, 2013) (plaintiff's deposition testimony and documentary evidence contradicted his allegations).

Like the plaintiffs in the preceding cases, Plaintiff's testimony is replete with inconsistencies and contradicts her own allegations. Accordingly, she cannot raise a genuine issue of material fact and Defendants are entitled to summary judgment on all her claims.

## II.   PLAINTIFF HAS NOT RAISED A GENUINE ISSUE OF MATERIAL FACT IN SUPPORT OF ANY OF HER CLAIMS PURSUANT TO THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

Plaintiff has asserted claims pursuant to 18 U.S.C. § 1595 alleging violations of 18 U.S.C. §§ 1589, 1590, 1592 and 1594 (a) and 1594 (b) (together, the "TVPA").[32] Cmpl. ¶ 165. Her TVPA claims fail as a matter of law.

### A.   Plaintiff's Admissions That She Was Not Forced To Work For Defendants And That Defendants Engaged In No Conduct Prohibited By The Statute Defeat Her Claim Under 18 U.S.C. § 1589 As A Matter Of Law

A defendant violates 18 U.S.C. § 1589 (the "Forced Labor Statute") when she:

[K]nowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person ("Section 1");
>
> (2) by means of serious harm or threats of serious harm to that person or another person ("Section 2");
>
> (3) by means of the abuse or threatened abuse of law or legal process ("Section 3"); or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint ("Section 4") . . .[33]

---

[32] In paragraphs 187-188 of the Complaint, Plaintiff "alternatively" asserts the exact same causes of action a second time. We only address these causes of action once.

[33] Section 4 of the Forced Labor Statute addresses the same conduct—"serious harm or physical restraint"—that Sections 1 and 2 address. We have seen no case analyzing Section 4 differently from Sections 1 and 2. Thus, Plaintiff's claim under Section 4 fails for the same reason that her claims under Sections 1 and 2 fail. *See infra* at 33-46.

*Id.* Plaintiff's claim fails for two separate reasons.[34] **First**, Plaintiff admits Defendants did not force her to work.  Thus, even if Defendants engaged in any of the means described in the Forced Labor Statute, those means did not compel her to work. **Second**, Plaintiff either does not allege, or the undisputed facts show, that Defendants did not employ those means.[35]

1.   Plaintiff's Claim Pursuant To The Forced Labor Statute Fails As A Matter Of Law Because She Admits Defendants' Alleged Conduct Did Not Compel Her To Continue Working For Them

The crux of a claim pursuant to the Forced Labor Statute is that the defendant knowingly engaged in proscribed conduct that rendered the plaintiff functionally unable to quit her job.  *See, e.g., Pasamba v. HCCA Int'l*, 2008 WL 2562928 at *6 (D. Ariz. June 24, 2008) (holding that a claim pursuant to the Forced Labor Statute requires the allegation that a plaintiff "had no choice but to work.").  Evidence that a former employer behaved badly is insufficient to survive a motion for summary judgment:  Plaintiff must establish that a former employer "compel[ed] her to *remain*" in her job instead of "caus[ing her] to leave" it.  *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179-1180 (9th Cir. 2012) (emphasis in original, brackets in original removed) (affirming summary judgment for defendant on Forced Labor Statute claims because plaintiffs were able to quit their jobs); *see also Spiteri v. Russo*, 2013 U.S. Dist. LEXIS 128379 at *179 n. 54 (E.D.N.Y. Sept. 7, 2013) (dismissing Forced Labor Statute claim because, *inter alia*, plaintiff "freely discontinued working" for defendants); *Alvarado v. Universidad Carlos Albizu*, 2010 U.S. Dist. LEXIS 87662 at *11-12 (S.D. Fla. Aug. 25, 2010) (dismissing Forced Labor Statute claim because plaintiff was able to quit his job).

---

[34]We have located 57 cases in U.S. federal courts that substantively discuss the Forced Labor Statute.  Many of these are criminal cases, and do not analyze factual allegations pursuant to the standards of summary judgment, or are civil cases that followed a criminal case, and so do not analyze factual allegations because the liability of the defendant is *res judicata*.  Because we have found only six civil cases concerning the Forced Labor Statute from courts in the Second Circuit that did not follow related criminal cases, we also cite authority from other Circuits.

[35]The Complaint fails to specify which section of the Forced Labor Statute is applicable to Plaintiff's claims.  As we demonstrate below, none is applicable.

*Headley* is particularly instructive.  Though the plaintiffs were subjected to terrible working conditions (including being pressured into having repeated abortions), the Ninth Circuit determined that their Forced Labor Statute claim failed as a matter of law because "the record overwhelmingly show[ed]" that the plaintiffs voluntarily worked for the defendant because "they believed that it was the right thing to do," not because of any discipline or constraints imposed by the defendants.  *Id.* at 1179-80.  Indeed, the Court determined that the means employed by the defendant had not compelled the plaintiffs to stay, but instead caused them to leave. *Id.*

Plaintiff's testimony here similarly eliminates any possible viability of her claim under the Forced Labor Statute because she admits that she continued to work for Defendants based on her own "ethical point of view," not because of conduct by Defendants.  Pl. Tr. at 393:23-394:6. Plaintiff also admits that Edwards did nothing to prevent her from leaving:

> Q:  Between March 5, 2011 and March 14, 2011 Ms. Custer[36] did not do anything to try to keep you from leaving the job on March 14, did she?
> A:  She didn't do anything neither to get me medication nor to take me to the doctor.
> Q:  But she did not prevent you from leaving their employ?
> A:  No.
> Q:  Prior to March 5, 2011 which was the date you told her you wanted your medication or to go back to Chile, Ms. Custer did nothing to prevent you from leaving her employment, correct?
> A:  No.
> Q:  Is it correct?
> A:  It's correct.

Pl. Tr. at 1161:3-20.

And Plaintiff also admits that Hurley did nothing to prevent her from leaving:

> Q:  And between March 5 and March 14, 2011 Mr. Hurley didn't do anything to stop you from leaving their employment, correct?
> A:  Nothing.
> Q:  Prior to March 5, 2011 Mr. Hurley didn't do anything to stop you from leaving their employment, did he?

---

[36] All references in Plaintiff's transcript to "Ms. Custer" are to Edwards, whose full name is Malu Custer Edwards.

A:      Nothing.

Pl. Tr. at 1163:5-12.

Plaintiff further admits that she was not aware of any negative consequences of leaving:

Q.      Between February 1, 2011 and March 14, 2011, did you think
        something bad would happen to you if you quit your job?
        MR. DAVIS: Objection to form.
A.      No.

Pl. Tr. at 822:18-23; *see also* Pl. Tr. at 820:4-8.

Plaintiff's testimony also establishes that while Defendants' alleged behavior may have prompted her to leave, it did not force her to stay.  *See* Pl. Tr. at 1159:2-25 (Plaintiff left after the refrigerator door was allegedly slammed on her head); 340:2-341:9 (Plaintiff believed Defendants were trying to make her quit); Cmpl. ¶ 82 ("…the constant barrage of abuse and mistreatment, along with Plaintiffs hunger and malnourishment, led Plaintiff to leave the household that day."); *see also* Pl. Tr. at 820:4-8 (Plaintiff did not believe she was unable to quit Defendants' employment).

Moreover, Plaintiff successfully left Defendants on her first attempt to do so:

Q.      Was March 14 the first time you tried to leave Ms. Custer and Mr.
        Hurley's employment?
A.      Yes.

[…]

Q.      And as soon as you decided to leave the employment of Ms. Custer
        and Mr. Hurley, you were able to do so, correct?
A.      Yes.

Pl. Tr. at 843:7-24; *see also* Pl. Tr. at 1159:2-5 (Defendants did nothing to prevent Plaintiff from leaving on the day she left).

Plaintiff's admissions that she was not threatened with and did not believe she would suffer negative consequences if she left Defendants' employ, that she chose to leave—not to

stay—because of the family's alleged behavior, and that she was able to leave as soon as she chose to do so, defeat her claim under the Forced Labor Statute as a matter of law. *Headley*, 687 F.3d at 1179-1180; *Spiteri*, 2013 U.S. Dist. LEXIS 128379 at *179 n. 54; *Alvarado*, 2010 U.S. Dist. LEXIS 87662 at *11-12.

Equally fatal to her claim, Plaintiff admits that she rejected multiple opportunities to leave Defendants' employ because she hoped Defendants' attitude would improve—not because of threats or other compulsion. *See, e.g.,* Pl. Tr. at 536:12-22; 538:7-25; 916:8-11; *see also id.* at 1158:10-22 (Plaintiff's hope that Defendants would "change their ways" was "the only reason that [she] continued to work for [them] even though [she was] unhappy there."). For example, Plaintiff testified that she rejected both NHTRC's offer to pick her up on February 21, 2011 and Safe Horizon's offer to stay at the Safe Horizon office when she was there on March 4, 2011:

> Q.   Did they [the NHTRC] offer to come and pick you up right then and there on February 21, 2011 when you called?
>      MR. DAVIS: Objection to form.
> A.   If I wanted, yes.
> Q.   Why didn't you take them up on that offer?
> A.   I was -- I still had hope that maybe Mrs. Custer will, you know, come to her senses and take care of me and treat me better.

Pl. Tr. at 538:16-25

> Q.   Could you have stayed at Safe Horizon on March 4, 2011 if you wanted to?
> A.   Yes.
> Q.   Why didn't you stay there on March 4, 2011?
> A.   Because I was waiting for Ms. Custer, maybe she will change her mind, change her attitude.

Pl. Tr. at 739:4-11.

Even if Plaintiff's allegations about her working conditions with Defendants were true—although, as demonstrated in our Statement of Facts, they are not—Plaintiff's admission that she voluntarily continued working for Defendants because she was waiting for Edwards to "change

her attitude," not because she was coerced or forced to do so, defeats her Forced Labor Statute claim as a matter of law.  *See Headley*, 687 F.3d at 1177, 1179-1180 (affirming dismissal of Forced Labor Statute claim when one plaintiff never asked to leave defendant and the other plaintiff considered leaving, but then affirmatively decided to stay because he was optimistic about his future with defendant); *Velez v. Sanchez*, 754 F. Supp. 2d 488, 498 (E.D.N.Y. 2010) *modified on other grounds* 693 F.3d 308 (2d Cir. 2012) (granting summary judgment on Forced Labor Statute claim because "[plaintiff's] own testimony demonstrates that she did not feel forced to work…on the contrary, she made a voluntary choice to stay…").

> 2.  Plaintiff's Claim Pursuant To The Forced Labor Statute Fails As A Matter Of Law Because She Admits Defendants Did Not Use Any Of The Means Proscribed By The Forced Labor Statute To Compel Her Labor

The Forced Labor Statute prohibits labor compelled through means specifically proscribed by the statute.  *See* 18 U.S.C. § 1589.  To establish a claim, those means must be both objectively coercive *and* subjectively interpreted by the plaintiff as coercive.  *See David v. Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247 at *74 (E.D. La. Jan. 3, 2012) ("[I]t is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor. The defendant's conduct must also be objectively coercive enough to do so.").  Plaintiff here cannot satisfy either the objective or subject standard.  Her claim fails as a matter of law.

> a.  Plaintiff's Claim Under 18 U.S.C. § 1589(1) Fails Because She Cannot Establish That Defendants Forced Her To Work By Means Of Force, Threats Of Force, Physical Restraint, Or Threats Of Physical Restraint

Section 1 of the Forced Labor statute prohibits employers from compelling the labor of an employee through two means: (1) force or (2) physical restraint.  *See* 18 U.S.C. § 1589(1). Plaintiff does not allege that Defendants ever employed means of force, and her testimony

establishes that they did not.  Further, her allegations concerning physical restraint are insufficient to support her claim.  Her Section 1 claim fails as a matter of law.

      i.      *Plaintiff does not allege that Defendants ever used or threatened to use force against her*

To establish a violation of the Forced Labor Statute pursuant to the "force" component of Section 1, Plaintiff must demonstrate that she had no choice but to work, or face "forceful" consequences; her mere subjective belief that she was forced to work is insufficient.  *See David*, 2012 U.S. Dist. LEXIS 114247 at *74; *compare Shuvalova v. Cunningham*, 2010 U.S. Dist. LEXIS 135502 at *9-10 (N.D. Cal. Dec. 22, 2010) (dismissing TVPA claim because plaintiffs' subjective beliefs about threats imposed by defendant had no basis) *with Swarna v. Al-Awadi*, 2011 U.S. Dist. LEXIS 51908 at *10-11 (S.D.N.Y. May 12, 2011) (holding that an allegation that defendant responded to an attempt by plaintiff to leave his employment by "threateningly pick[ing] up an iron and approach[ing plaintiff] as if he were going to throw it at her" was sufficient allegation of force under the Forced Labor Statute).

The Forced Labor Statute does not define the term "force," and the Second Circuit has not yet considered its meaning in the context of the TVPA.  However, presented with a different statute in which the word "force" was undefined, the Second Circuit supplied "the word[] with [its] ordinary meaning," defining it "broadly as 'power, violence, or pressure directed against a person or thing.'" *Santana v. Holder*, 714 F.3d 140, 144 (2d Cir. 2013).  Those standards are not met here.

      (a) *Plaintiff has not alleged that Defendants ever used or threatened to use violence against her*

Plaintiff has not alleged that Defendants ever used violence upon her or threatened her with violence.  *See generally* Cmpl.; Pl. Tr. at 385:15-19; 840:13-18.  Plaintiff also admits that

she did not believe that any physical harm would befall her should she disobey Defendants. Pl. Tr. at 385:15-19; 840:13-18; *see also* Pl. Tr. at 869:23-871:8 (Plaintiff cannot recall any punishment leveled against her by Defendants except being asked to stay with their children).

With respect to Hurley, Plaintiff does not complain of any violent acts or threats; she instead simply describes his general demeanor:

> Q    Other than his attitude, the way he looked at you and raising his voice, did Mr. Hurley ever suggest that he would harm you in any way?
>
> A.    No.

Pl. Tr. at 385:15-19.

With respect to Edwards, Plaintiff lists a series of purportedly harmful conduct that does not include any violent acts or threats of violence:[37]

> Q.    Other than the lack of food, the taco that made you sick, making fun of you, verbal abuse, and denying you medical care or medication, did Ms. Custer do anything else to harm you?
>
> A.    Not that I remember.

Pl. Tr. at 840:13-18.

### *(b) Plaintiff's allegations that Defendants' children hit her are insufficient to support her Forced Labor Statute claim*

Plaintiff alleges that due to hunger, Defendants' three-year-old daughter regularly assaulted her, their five-year-old daughter hit her on one occasion and pushed her regularly, and their seven-year-old son assaulted her twice.  Cmpl. ¶¶ 28, 70, 72, 79-81; Pl. Tr. at 320:23-321:8. But the children were not underfed (*see supra* at 12-14), and the only evidence that they hit Plaintiff is her own testimony.  Even if they did, it is wholly implausible that an adult woman could not have stopped such small children from hitting her, particularly in light of her testimony that she was able to stop the children from hitting each other, that Olympia hit her the exact same

---

[37] As explained *infra* at 33-46, these allegations of non-force-based harm are also insufficient to establish a violation of the TVPA.

way every day causing a bruise to develop over time, and that Malu shoved her the exact same way every day without injuring her at all.  *See* Pl. Tr. at 310:22-311:8; 381:25-382:6; 431:5-24; 432:9-15; 320:23-321:8; 324:12-325:15.  In fact, even Plaintiff admits that she could have stopped them from hitting her but chose not to do so.  *See* Pl. Tr. at 310:22-311:8; 381:25-382:6; 300:5-9; 301:11-20; 311:23-312:9; 337:3-14.

But assuming *arguendo* that Plaintiff's testimony that the children assaulted her is plausible, as a matter of law it cannot support her claim under the Forced Labor Statute, because she does not allege that the children's alleged assaults were intended to compel her labor.  *See* Pl. Tr. at 340:2-341:4 (Plaintiff believes Defendants used their children to harm her to make her either quit or fear being fired); 299:2-10; 320:23-321:5; 365:18-366:6 (Plaintiff believes the children hit her because they were starving or hungry); 344:25-345:5 (Plaintiff does not believe Rex intended to harm her); *see also* Cmpl. ¶ 73 (Plaintiff believes the children physically abused her because they were hungry or because they resented Plaintiff); Cmpl. ¶ 82 (Plaintiff left because of the alleged refrigerator incident as well as "the constant barrage of abuse and mistreatment"); Pl. Tr. at 338:4-341:9 (Plaintiff does not believe Defendants used the children to make her unable to quit her job, but instead believes Defendants used the children to make her want to quit her job). Without such an allegation, her claim that her labor was procured by means of force fails as a matter of law.  *See, e.g., Velez*, 754 F. Supp. 2d at 498 (dismissing Forced Labor claim because, *inter alia*, minor incidents of "pushing" and "pull[ing]" could not lead plaintiff to believe she was unable to leave defendants' home).

> *(c) Edwards's alleged threat regarding her family's power is insufficient to support Plaintiff's Forced Labor Statute claim*

Although Plaintiff does not allege Hurley made any specific threats of power or pressure

against her to compel her labor, she claims that Edwards made two such threats.  The first is an
alleged statement about her family's "power":

> Q.    I want to take you back to when you were living in New York with Ms.
> Custer and Mr. Hurley in 2011.  What did Ms. Custer say to you about
> what power her family had? Not what you read on the computer at another
> time.
>
> A.    She told me be very careful with what you say or what you do because
> you know who I am. I come from a very powerful family. And then I
> respond, you think that I'm afraid? I'm not afraid… If somebody sends
> somebody to kill you, you are at peace. If you are planning to do that to
> somebody, she did not answer, she just kept it quiet.

Pl. Tr. at 836:14-837:4; *see also* Cmpl. ¶ 132 ("Edwards stated, 'You don't know the
Custer family, Felicitas, we are very powerful, even here in New York, my grandfather
was able to close St. Patrick's Cathedral just for him alone. I'm sorry, but you have to
stay. You have a two year contract.") (punctuation in original).

Plaintiff concedes that other than allegedly warning her to be careful because her family
was powerful, there was no content to the "threat"—anything beyond that was from Plaintiff's
own imagination, as Edwards said nothing else. *See* Pl. Tr. at 754:5-10 (Plaintiff cannot recall
any other statement that made Plaintiff fear Edwards); 752:9-753:15 (Plaintiff speculates that the
Edwards's alleged statement meant that she would arrange for Plaintiff's son to lose his job, but
Plaintiff admits that Edwards never said anything to suggest that would happen); 820:4-8
(Plaintiff believed she could quit her job); 822:18-23 (Plaintiff did not think anything bad would
happen to her if she quit Defendants' employment).

Further, Plaintiff only recalls one occasion on which Edwards made this reference:

> Q.    So back on February 2nd or 3rd, 2011, Ms. Custer told you that she was
> untouchable; is that correct?
> MR. DAVIS: Objection to form. Mischaracterizes the testimony.
>
> A.    She was powerful.

Q.      And besides telling you that she was powerful and untouchable on February 2nd or 3rd, 2011, did Ms. Custer say anything to you that made you afraid of her?

A.      I don't remember.

Pl. Tr. at 753:23-754:10.

Plaintiff also claims that she felt threatened when Edwards allegedly advised her, in the same conversation as the one referenced above, that she could not quit after working for Defendants for only two weeks.  Pl. Tr. at 394:7-13; Cmpl. ¶¶ 132-133 (alleging Edwards said, "I'm sorry, but you have to stay. You have a two year contract … I'm not going to let you leave.").  But Plaintiff cannot remember whether Edwards said that anything bad would happen to her if she quit.  Pl. Tr. at 394:24-395:3.  Regardless, Plaintiff did not think anything bad would happen to her if she disobeyed Edwards or quit.  Pl. Tr. at 400:3-8; 822:18-23.  And Plaintiff admits that neither Defendant did anything to stop her from quitting.  Pl. Tr. at 1161:3-20; 1163:5-12.

Thus, ***the only allegations of a so-called threat of force applied against Plaintiff to compel her labor*** was a single conversation in which Edwards allegedly warned Plaintiff to be careful because her family was powerful and allegedly advised Plaintiff she could not quit after only two weeks.  But Edwards's alleged statements are not threats of force under the Forced Labor Statute because they do not indicate an intent to inflict harm.  *See* BLACK'S LAW DICTIONARY, 1618 (9th ed. 2009) ("threat").

The statements by themselves do not communicate impending danger or harm, nor were they made in a context that suggests danger.  In *United States v. Davila*, the Second Circuit determined that the statutory term "threat"—which was undefined in the statute at issue there, as it is undefined in the TVPA—required a threat that was "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect

38

of execution." 461 F.3d 298, 302 (2d Cir. 2006) (holding that mailing a white powder with the suggestion that it is anthrax constitutes a threat) (quotation omitted).  Even if Edwards actually told Plaintiff to be careful because her family was powerful, and even if Edwards actually told Plaintiff she could not quit after only two weeks (despite her contract's provision to the contrary), those statements fail to meet *Davila*'s exacting standard.   They are vague statements that do not communicate unequivocally a gravity of purpose, or an immediate prospect that the purpose will be executed.

Edwards's alleged statements are also insufficient under the Forced Labor Statute because Plaintiff was not actually intimidated—*i.e.*, the statements did not compel Plaintiff's continued labor.  *See*  Pl. Tr. at 840:6-12 (Plaintiff was not afraid of Edwards despite her power); 164:12-20 (Plaintiff was never afraid of Defendants); 839:14-18 (Plaintiff truthfully told Edwards she was not afraid of her); 739:4-740:2 (Plaintiff chose to return to Defendants because she hoped Edwards's attitude would improve, not out of fear of her power); 916:8-11 (same).

Even if Edwards made such statements, Plaintiff has provided no connection between them and a threat of force besides her own paranoia.  And subjective fears of force that have no basis are insufficient to sustain a forced labor claim.[38]  *Compare Shuvalova*, 2010 U.S. Dist. LEXIS 135502 at *9-10 (dismissing TVPA claim because plaintiffs' subjective beliefs about threats imposed by defendant had no basis) *with Swarna*, 2011 U.S. Dist. LEXIS 51908 at *10-11 (holding that "threateningly pick[ing] up an iron and approach[ing plaintiff]" as if he were going to throw it at her" is force); *see also David*, 2012 U.S. Dist. LEXIS 114247 at *74 (holding that threats need to be both subjectively and objectively coercive in order to violate the Forced Labor Statute).  Because the only "threats" Plaintiff identifies were not threats of force, and

---

[38] Plaintiff's subjective fear that Hurley might suffocate her in her sleep – even though Plaintiff admits that Hurley never suggested that he would harm her "in any way" other than "his attitude, the way he looked at [her] and raising his voice" – is similarly an insufficient "subjective" fear of force.  Pl. Tr. at 385:6-19; 388:4-19; 390:14-20.

because Plaintiff's labor was not compelled as a result of them, they are insufficient as a matter of law to establish a claim under to Section 1 of the Forced Labor Statute.

      ii.   *Plaintiff cannot establish that Defendants obtained her labor through physical restraint or threats of physical restraint*

Section 1 of the Forced Labor Statute also prohibits labor compelled when defendants "confine[] the plaintiff[] to the space in which they were forced to work." *Samirah v. Sabhnani*, 772 F. Supp. 2d 437, 451 (E.D.N.Y. 2011). In *Samirah*, the plaintiff was able to establish that her labor was compelled by physical restraint because she had no ability to leave the defendants home. *See, e.g., United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010) (recounting testimony from criminal trial whose subsequent civil suit was *Samirah*). But courts reject allegations of physical restraint in the absence of such confinement. *See, e.g., Headley*, 687 F.3d at 1180-81 (plaintiffs' claim failed because they had many opportunities to leave, even though the defendant required them to travel with escorts and suggested that leaving was not permitted).

Plaintiff cannot establish a claim under the "physical restraint" component of Section 1. Although the Complaint makes two allegations which purport to be physical restraint, the undisputed evidence establishes that those allegations are false, and that no physical restraint or threat of physical restraint occurred.

***First,*** the Complaint alleges that Hurley locked Plaintiff in a room with Defendants' children, unable to leave and deprived of food. Cmpl. ¶¶ 86-87, 90-91. This allegation has been withdrawn and Plaintiff admits that Defendants never locked her in any room at any time. *See* Newman Decl. Ex. D; Ex. G ¶¶ 88-89, 93; Pl. Tr. at 237:6-11, 238:18-22. Plaintiff also repudiates her alternative allegation, that Hurley confined her to the bedroom, without a lock, by telling her not to leave. *See* Newman Decl. Ex. G ¶¶ 88-89, 93. She admits that she stayed in the bedroom by choice. Pl. Tr. 240:10-20; *see also id.* at 240:21-241:8 (Plaintiff did not believe

Hurley intended to harm her and only his tone of voice and "a look" suggested to her that he would harm her in any way).

***Second,*** the Complaint alleges that Defendants "Attempt[ed] to Isolate Plaintiff From Others" and "prevented her from speaking with anyone" besides Defendants' family.  Cmpl. at 19 and ¶ 146.  The Complaint also alleges that Edwards "made it clear to Plaintiff that she was not to leave the house without Edwards' permission."  *Id.* ¶ 138.

Under oath, Plaintiff admits that Edwards did not prevent her from speaking with others.  Pl. Tr. at 721:15-18.  Besides reminding her not to speak with strangers—a request which Plaintiff understood was made for the safety of the children, not to isolate her—there was nothing Edwards did to prevent Plaintiff from speaking with others.  Pl. Tr. at 723:19-24; 721:19-25.

Plaintiff also admits that she was not confined to Defendants' apartment or their company.  *See, e.g.,* Pl. Tr. at 527:9-12 (Plaintiff left Defendants' home on "many occasions"); 246:23-247:11 and 486:6-12 (Plaintiff was regularly alone and outside of Defendants' home).  Indeed, her Complaint demonstrates the opposite: she alleges she was physically away from Defendants on numerous occasions.  *See,* *e.g.,* Cmpl. ¶¶ 115, 120, 122, 139, 145, 148.

Plaintiff's testimony further highlights her ability to leave the apartment.  Plaintiff concedes that, on a daily basis, nothing prevented her from leaving Defendants' employment:

> Q.     Ms. Villanueva, after you dropped Rex and Malu off at school[39] and you
>          were alone in the streets of New York, was there anything to prevent you
>          from not returning to the apartment if you chose to do so?
>          MR. DAVIS:  Objection to form.
> A.     No.

Pl. Tr. at 486:6-12; *see also id.* at 525:13-21 (Plaintiff recalls only one instance in which

---

[39] Plaintiff claims she took Rex and Malu to and from school on most school days.  Pl. Tr. at 246:23-247:11.

Edwards allegedly denied her permission to leave the apartment).

And during her eight-week employment, Plaintiff admittedly had "opportunities to leave the home on multiple occasions."  Pl. Tr. at 527:5-12.  Her personal diary and her testimony establish that, at a minimum, Plaintiff freely left the apartment for the following hours:

- February 4, 2011: 10:30 am – 7:00 pm (Pl. Tr at 650:10-20; Newman Decl. Ex. R ¶ 24);
- February 6, 2011: 12:20 pm – 4:00 pm (Pl. Tr. at 651:7-12; 654:2-8);
- February 15, 2011: 2:00 pm – 5:00 pm (Pl. Tr. at 564:2-7);
- February 16, 2011: 12:00 pm – 3:00 pm (Pl. Tr. at 653:8-17);
- February 17, 2011: 4:00 pm – 6:00 pm (Pl. Tr. at 655:19-656:6);
- February 19, 2011: 11:00 am – 2:00 pm (Pl. Tr. at 656:10-22);
- February 20, 2011: 10:30 am – 8:00 pm (Pl. Tr. at 656:23-657:10);
- February 21, 2011: 11:00 am – 6:00 pm (Pl. Tr. at 657:11-658:7);
- February 26, 2011: 11:50 am – 4:00 pm (Pl. Tr. at 658:8-20);
- March 4, 2011: 11:30 am – 5:30 pm (Pl. Tr. at 686:13-687:5); and
- March 13, 2011: 11:00 am – 8:30 pm (Pl. Tr. at 698:5-17).

During those hours, Plaintiff was (i) out of the apartment, (ii) not working, (iii) "free to come and go," and (iv) able to come home whenever she was ready to do so.  *See* Pl. Tr. at 661:3-17; *see also id.* at 653:8-24.  While enjoying her time off and out of the apartment, Plaintiff would run errands—*i.e.*, purchasing over $300 worth of phones and phone cards at T-Mobile or repeatedly wiring money to her family at a Western Union branch, visiting museums, walking around, attending church, or going window shopping.  Pl. Tr. at 699:7-22; 823:12-17; 590:25-591:4; Newman Decl. Ex. Y.   Plaintiff was also out of the house alone nearly every day after she dropped off and before she picked up the children from school.  Pl. Tr. at 483:21-484:16.  Plaintiff cannot nevertheless claim she was habitually prevented from leaving the house, as "[a] court is not obligated to credit a litigant's statement" that "flies so squarely in the teeth of the litigant's own prior unequivocal statements and conduct."  *Zhao v. Kaleida Health*, 2008 WL 346205, at *9 (W.D.N.Y. Feb. 7, 2008) (quotations omitted); *see also Aziz Zarif Shabazz*, 994 F.

Supp. at 469-71; *Jeffreys*, 426 F.3d at 551, 555; *Rojas*, 660 F.3d at 105-06; *Cruz*, 2013 WL 5676303, at *4-5.

Similarly, Plaintiff had ample opportunity to leave even when she was in Defendants' apartment, as she concedes that on multiple occasions, she was alone with no one compelling her to stay.  Pl. Tr. at 392:12-17.  She admits that the only reason she did not leave was her belief that it would not be "proper" to leave unannounced.  Pl. Tr. at 392:18-394:6; *see also id.* at 816:7-21 (Plaintiff did not leave because she considered that "sneaky" and she is not "sneaky").

Plaintiff also was not isolated.  Cmpl. at ¶ 139.  Plaintiff had a cell phone, which she used to speak with her mother on a daily basis while employed with Defendants—although she never once mentioned any trouble.  Pl. Tr. at 588:10-24.  Plaintiff also spoke to her son by telephone, but declined to ask him for help.  Pl. Tr. at 578:22-579:3; 817:3-818:3; 1115:24-1116:4.   She also made friends, including one who offered to help her, and another who has supported her financially for over two years.  Pl. Tr. at 494:21-495:14; 501:15-19; 1040:13-16.

In sum, the undisputed evidence shows that Plaintiff was not physically restrained by Defendants and voluntarily made the decision to stay with them.  Her claims pursuant to Section 1 of the Forced Labor Statute therefore fail as a matter of law.

> b.  Plaintiff's Claim Pursuant To 18 U.S.C. § 1589(2) Fails As A Matter Of Law Because She Admits Her Labor Was Not Compelled By Means Of Serious Harm Or Threats Of Serious Harm

Section 2 of the Forced Labor Statute addresses labor compelled by threats of "serious harm."  18 U.S.C. § 1589(2).  "Serious harm" encompasses "physical and nonphysical harm." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Rep. No. 106-939 at 101 (2000)).  Because the undisputed facts show that Defendants did not compel Plaintiff's labor by causing or threatening her with serious harm, her Section 2 claim also fails as a matter of law.

*i.   Defendants did not threaten or cause physical harm to Plaintiff*

Like Section 1 of the Forced Labor Statute, Section 2 prohibits labor compelled by physical harm or threats of physical harm.  The analysis is the same whether under Section 1 or under the "serious harm" umbrella of Section 2.  Thus, for the reasons set forth *supra* at 34-36, 43-44, Plaintiff cannot establish that Defendants either caused or threatened physical harm to Plaintiff.

*ii.   Defendants did not threaten or cause nonphysical harm to Plaintiff*

Nonphysical harm includes "psychological, financial or reputational harm."  *Dann*, 652 F.3d at 1169.  In each of the 57 cases that substantively discuss the Forced Labor Statute, whenever a court has accepted an alleged nonphysical harm as a "serious harm," the harm has been psychological, financial or reputational.  No other type of harm has been accepted as a "serious harm" pursuant to the Forced Labor Statute.[40]  Plaintiff cannot establish any of these.

***First,*** while "[s]erious harm can include psychological coercion," *United States v. Nnaji*, 447 Fed. Appx. 558, 559 (5th Cir. 2011), Plaintiff identifies no conduct by Defendants that any court has found to constitute psychological coercion.  *See, e.g., United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005) (defining "serious harm" to include "psychological methods of coercion—'such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.") (quoting H.R. Conf. Rep. No. 106-939, at 101); *Velez*, 754 F. Supp. 2d at 498 ("verbal abuse is not actionable under [the Forced Labor Statute] unless it carries with it a threat of force or serious harm"); *Nnaji*, 447 Fed.

---

[40] Several cases include the threat of deportation or police involvement as either psychological harm or generally as "serious harm."  This same threat is addressed by Section 3 of the Forced Labor Statute; we discuss it *infra* at 46-51.

44

Appx. at 559-560 (defendant engaged in "psychological coercion" by keeping plaintiff isolated and physically unable to flee).

Plaintiff does not allege that Defendants threatened harm to third persons in the event she left. *See generally* Cmpl.  She admits she was not restrained. *See supra* at 40-43.  She admits Hurley did not verbally abuse her, and though she contends Edwards did so by "making fun of her," Plaintiff admits that that alleged verbal abuse was unaccompanied by any threat of force. Pl. Tr. 754:5-10; 822:18-23.  And, as discussed *infra* at 46-50, Plaintiff has not alleged or identified any other "dire consequences" that Defendants threatened her with in the event that she left.  Accordingly, she cannot establish that her labor was compelled by psychological coercion.

**_Second,_** Plaintiff identifies no potential financial harm that compelled her to continue working for Defendants.  *See generally* Cmpl.  As a matter of law, moreover, Plaintiff cannot establish serious harm based on a contention that Defendants were driving her to quit to prevent her from receiving her wages owed.  *See* Pl. Tr. at 340:19-24.  Notably, she does not even claim Defendants threatened her with termination or withholding of wages.  Cmpl. generally.

Even if they had, termination of employment is not a serious harm under the Forced Labor Statute.[41]  *See DeSilva v. N. Shore-Long Island Jewish Health Sys. Inc.*, 2012 U.S. Dist. LEXIS 30597 at *25-26 (E.D.N.Y. March 7, 2012) (holding that threats of being fired were not a serious harm); *see also Alvarado*, 2010 U.S. Dist. LEXIS 87662 at *10-12 (holding that termination of immigrant employee was not "serious harm," even though it meant he would have to find a new employer or lose his visa).

---

[41] The Forced Labor Statute prohibits employers from leveraging their power over employees by unreasonably threatening to devastate their finances if they quit.  *See Mairi Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1138, 1146 (C.D. Cal. 2011) (plaintiffs were compelled to work by means of "serious harm" because defendants insisted plaintiffs pay them a previously-undisclosed, exorbitant sum of money if they quit).  It does not shield plaintiffs from any possible negative consequence arising from losing their job.  *Id.* at 1137.

Nor is the potential of losing wages due a serious harm where a plaintiff has other means by which to obtain them. *See Alvarado*, 2010 U.S. Dist. LEXIS 87662 at *11 (dismissing Forced Labor Statute claim because, *inter alia*, plaintiff could have initiated legal action to address a dispute with his employer). Here, Plaintiff could have, and did, enforce her contract to recover wages allegedly due. Cmpl. ¶ 163; Pl. Tr. at 1014:10-17; Newman Decl. Ex. W.

***Third***, while a defendant can violate the Forced Labor Statute by threatening a plaintiff with reputational harm if she quits, *see, e.g., Dann*, 652 F.3d at 1171-1172, Plaintiff does not allege that Defendants threatened or caused harm to Plaintiff's reputation. *See generally* Cmpl.

Plaintiff's failure to identify any harm or threat—psychological, financial or reputational—that could constitute "serious harm" and that compelled her to stay with Defendants[42] defeats her claim pursuant to Section 2 of the Forced Labor Statute as a matter of law.

> c.   Plaintiff's Claim Pursuant to 18 U.S.C. § 1589(3) Fails As A Matter Of Law Because It Is Undisputed That Her Labor Was Not Compelled By Means Of Abuse Or Threatened Abuse Of Legal Process

> > i.   *The only abuse of legal process recognized pursuant to 18 U.S.C. § 1589(3) is deportation, which Plaintiff does not allege*

Section 3 of the Forced Labor Statute prohibits labor compelled by means of abuse of the legal process. 18 U.S.C. § 1589(3). In all cases in which plaintiffs have successfully established a violation of this section, the specific abuse alleged is a threat of deportation. *See, e.g., Alvarado*, 2010 U.S. Dist. LEXIS 87662 at *7-9 (only citing threatened deportation as sufficient to establish abuse of the legal process); *United States v. Garcia*, 2003 U.S. Dist. LEXIS 22088, at *22-23 (W.D.N.Y. 2003) (defining "abuse of legal process" and giving threat of deportation as sole example of conduct meeting the standard); *see also Kiwanuka v. Bakilana*, 844 F. Supp. 2d

---

[42] Plaintiff stated that she believed she could quit her job, but suggested that she was afraid she would not receive a plane ticket home to Chile. Pl. Tr. at 820:4-8. As explained *infra* at 48-49, that is not a threat of serious harm.

107, 115 (D.D.C. 2012); *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1077 (E.D. Wash. 2013).

As under Sections 1 and 2 of the Forced Labor Statute, threats of "adverse but legitimate consequences" do not constitute forced labor.  *Bradley*, 390 F.3d at 151.  For example, warning a foreign employee that her termination could result in her deportation is not an "abuse of the legal process." *See Pasamba*, 2008 WL 2562928 at *5-6 (dismissing Forced Labor Statute claim brought by plaintiff who claimed that her employer had warned her that her termination could result in deportation); *see also Camayo v. John Peroulis & Sons Sheep,* 2012 U.S. Dist. LEXIS 136100 at *15 n.6 (D. Colo. Sept. 24, 2012) (employer does not automatically violate the TVPA by acknowledging the adverse immigration consequences that might befall an employee who is terminated; "the TVPA was not intended to completely muzzle employers or prohibit them from mentioning certain legal realities."); *Alvarado*, 2010 U.S. Dist. LEXIS 87662 at *8-9 (dismissing Forced Labor Statute claim, holding that the statute was not intended to characterize everything that adversely affects an immigrant employee into an abuse of the legal process).[43]

Plaintiff has not alleged that Defendants threatened her with deportation.  *See generally* Cmpl.  Accordingly, Plaintiff's claim pursuant to Section 3 fails as a matter of law.

>    ii.    *Defendants' alleged statements concerning Plaintiff's rights as a noncitizen and a return trip to Chile are not abuses of legal process that coerced her labor*

Though the law recognizes only the threat of deportation as grounds for a Section 3 claim, Plaintiff makes two allegations—concerning her rights as a noncitizen and a return plane ticket home—in support of her claim that purport to be abuses of the legal process.  Both fail because it is undisputed that—even if they could constitute abuse of legal process—neither

---

[43] Only one case exists in which a court has found that advising a plaintiff that quitting her job could result in deportation "may" be a threat of serious harm.  *See Elat v. Ngoubene*, 2014 U.S. Dist. LEXIS 7505 at *85-87 (D. Md. Jan. 21, 2014) (dismissing all claims of forced labor except one because of advice concerning deportation given by an attorney who was plaintiff's cousin). The court there itself admitted that no other cases have allowed the possibility of a threat of serious harm on such scant allegations.  *See id.* at *62-63.

prevented Plaintiff from leaving Defendants' employ.

> (a) *Edwards's alleged statement that Plaintiff could be arrested if she sought emergency services does not support a claim that her labor was forced by an abuse of legal process*

Plaintiff cannot predicate a Section 3 claim on her contention that Edwards told her to never to call 911 or go to a hospital because she would then be arrested.  Pl. Tr. at 756:8-23; 769:23-770:10.

**_First_**, Plaintiff admits that Edwards did not actually tell her that Plaintiff should avoid 911 because she could be arrested; asked to recount the specific words Edwards used, Plaintiff said that Edwards told her not to call 911 frivolously because the police take such calls very seriously and could easily misinterpret the seriousness of such a call.[44]  Pl. Tr. at 757:15-758:9.

**_Second_**, the undisputed evidence establishes that Plaintiff was told, repeatedly, that she could avail herself of emergency services while in the United States.  *See, e.g.*, Pl. Tr. at 159:10-160: 23; 537:17-23; 915:20-916: 7; 747:18-748:6; Newman Decl. Exs. P ¶ 16, Q ¶ 16; U at 637, 641.

**_Third_**, Plaintiff does not contend she continued to work for Defendants out of fear she would be arrested if she sought assistance; she admits she stayed for other reasons.  *See supra* at 29-33.  Thus, Plaintiff cannot establish that Edwards' alleged statements compelled her to continue working.  *See Aziz Zarif Shabazz*, 994 F. Supp. at 469-71; *Jeffreys*, 426 F.3d at 551, 555; *Rojas*, 660 F.3d at 105-06; *Cruz*, 2013 WL 5676303, at *4-5; *Zhao*, 2008 WL 346205, at *9.

> (b) *Defendants' alleged refusal to give Plaintiff a ticket back to Chile does not support a claim that her labor was forced by an abuse of legal process*

---

[44] Plaintiff admits she does not remember if she ever even believed Edwards' alleged statement was true.  Pl. Tr. at 755:3-10; *see also* Cmpl. ¶ 54 and Pl. Tr. at 404:22-405:16 (based on the pamphlet from the Embassy, Plaintiff knew that she had access to emergency help).

Plaintiff's contention that Defendants refused to provide a plane ticket back to Chile for her also fails to give rise to Section 3 claim.  *See* Pl. Tr. at 820:4-8 (Plaintiff feared Defendants would not provide a plane ticket home to Chile for her); 896:8-11 (same).

***First,*** as Plaintiff had the right to demand a ticket from Defendants pursuant to her employment contract, any refusal to provide the ticket is not an abuse of legal process because Plaintiff could have used legal process to properly obtain her ticket.  *See* Newman Decl. Exs. P ¶ 6, Q ¶ 11; *Alvarado*, 2010 U.S. Dist. LEXIS 87662 at * 11 (dismissing Forced Labor Statute claim because, *inter alia*, plaintiff could have initiated legal action to address dispute with his employer).

***Second,*** it is undisputed that Defendants offered to provide Plaintiff with a plane ticket home to Chile—an offer she declined.  Pl. Tr. at 850:22-851:13.

***Third,*** at the time of her alleged request, Plaintiff had not qualified for her return travel home.  She was entitled to a ticket only after two weeks' notice of quitting, and it is undisputed that she did not provide such notice.  Newman Decl. Exs. P ¶ 6, Q ¶ 11; Pl. Tr. at 864:12-24.  An employer may withhold a ticket home if there is a legitimate reason to do so.  *See Bradley*, 390 F.3d at 151 ("employer's 'threat' not to pay for passage home if an employee left early … could be a legitimate stance for the employer").  And once it became apparent that Plaintiff had quit on March 14, 2011, Defendants offered her a ticket home.  Pl. Tr. at 850:22-851:13.

***Fourth,*** Plaintiff admits that she chose not to leave because she hoped things would improve, not because she lacked a plane ticket home.  Pl. Tr. at 739:4-740:2; 916:8-11.

These undisputed facts preclude Plaintiff from establishing that Defendants coerced her labor pursuant to Section 3 of the Forced Labor Statute.  Her claim fails as a matter of law.

iii.   *Plaintiff's knowledge that she was legally in the U.S. prohibits a claim that her labor was forced by an abuse of legal process*

Plaintiff's Section 3 claim further fails because at all times during her employment with Defendants, Plaintiff was in the United States legally and had nothing to hide from any authorities or any reasonable basis to fear authorities.  *See Pasamba,* 2008 WL 2562928 at *6 (dismissing Forced Labor Statute claim because, *inter alia,* plaintiff had "no possibility of deportation."); *cf. Shukla v. Sharma*, 2009 U.S. Dist. LEXIS 90044 at*4-5 and *39-42 (E.D.N.Y. Aug. 14, 2009) (preventing plaintiff from renewing his visa and then threatening that he would be subject to legal consequences if he were caught by authorities constituted forced labor).

Further, Plaintiff had no objective basis for fearing "arrest" or deportation, even had it been threatened, for the additional reason that she was repeatedly informed by third parties about her rights in the United States—which she understood.  *See David*, 2012 U.S. Dist. LEXIS 114247 at *74 (harm pursuant to the Forced Labor Statute needs to be both objectively and subjectively coercive*); see e.g*., Pl. Tr. at 159:10-160:2-23 (Plaintiff informed of her rights to emergency help by the Embassy); Pl. Tr. at 537:17-23 (Plaintiff informed of her rights to emergency help by the NHTRC); Pl. Tr. at 915:20-916: 7 (Plaintiff informed of her rights to emergency help by Safe Horizon); Pl. Tr. at 747:21-748:6 (Plaintiff informed of her rights to medical care by 311 operator); Newman Decl. Exs. P ¶ 16, Q ¶ 16 (Plaintiff informed of her rights to emergency help by her own employment contract); Newman Decl. Ex. U at 637, 641 (Plaintiff informed of her rights to emergency help by Embassy pamphlet she possessed); Cmpl. at ¶ 54 and Pl. Tr. at 404:22-405:16 (Plaintiff believed pamphlet stating she was entitled to emergency help in the United States).

In any event, because Plaintiff admits that she did not continue working for Defendants due to a fear of deportation or arrest (*see supra* at 29-33), she fails to establish subjective

coercion and her claim pursuant to 18 U.S.C. § 1589(3) must fail as a matter of law. *See David*, 2012 U.S. Dist. LEXIS 114247 at *74; *Velez*, 754 F. Supp. 2d at 498 (dismissing Forced Labor Statute claim because "[plaintiff's] own testimony demonstrates that she did not feel forced to work because of [threatened abuse of the legal process]; on the contrary, she made a voluntary choice to stay…")*; Pasamba,* 2008 WL 2562928 at *6 (dismissing Forced Labor Statute claim because "[p]laintiff has not alleged that she continued working for [defendant] because of threats of legal action made during her employment.")

**B.      Plaintiff's Claim Under 18 U.S.C. § 1590 Fails As A Matter Of Law Because It Is Undisputed That Plaintiff Was Not Forced Into Labor**

Section 1590 of the TVPA (the "Trafficking Statute") prohibits transporting people so that their labor can be coerced.  *See* 18 U.S.C. § 1590 ("Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined…").  As explained in *Tanedo v. E. Baton Rouge Parish Sch. Bd*., "the focus of § 1590 is the trafficking of people to perform labor in violation of any provision of the TVPA, including [the Forced Labor Statute]."  2012 U.S. Dist. LEXIS 157725, at *18-19 (C.D. Cal. Aug. 27, 2012).  As demonstrated *supra* in Section A, the undisputed evidence establishes that Plaintiff was not forced to work for Defendants pursuant to any section of the Forced Labor Statute.  Her claim that she was "trafficked" into forced labor therefore fails as a matter of law.[45] *See Shuvalova*, 2010 U.S. Dist. LEXIS 135502, at *10 (allegation that defendants induced plaintiff to come to U.S. with a single false promise is insufficient to support Trafficking Statute claim where remaining allegations focused on conduct in the U.S.).

---

[45] The apparent purpose of separating § 1589 from § 1590 is to punish both the people who traffic vulnerable workers into the United States and the employers who employ them, if they are not the same.  Plaintiff does not allege that Defendants trafficked her into the United States to work for some other employer.  Thus, her Trafficking Statute claim duplicates her Forced Labor Statute claim.  Indeed, we have seen no case permitting a claim under the Trafficking Statute to survive where a claim under the Forced Labor Statute failed against the same defendant.

**C.    Plaintiff's Admission That She Had Her Passport In Her Possession At All Times While In the U.S. Precludes Her Claim Pursuant To 18 U.S.C. § 1592**

A defendant violates 18 U.S.C. § 1592 (the "Documents Statute") when she "remove[s], confiscate[s] or possess[s] a passport or other immigration document in connection with a violation of certain other TVPA sections, including [the Forced Labor Statute and the Trafficking Statute]." *Tanedo,* 2012 U.S. Dist. LEXIS 157725 at *23; *see also* 18 U.S.C. § 1592(a). Plaintiff admits that she had her passport in her possession at all times in New York:

> Q.    You had it [your passport] with you the whole time that you were in New York living with the family?
> A.    Yes.

Pl. Tr. at 212:22-25.

> Q.    If that was the -- did Ms. Custer ever take your passport back while you were in the United States?
> MS. ALPERSTEIN: Objection.
> THE WITNESS: She asked for it but I never gave it to her.

Pl. Tr. at 1136:15-20.

This admission defeats Plaintiffs Documents Statute claim as a matter of law.[46]

**D.    Because Plaintiff Cannot Show That Defendants Intended To Force Her Labor Or Traffic Her To The United States, Her Claim Pursuant To 18 U.S.C. § 1594(a) Fails As A Matter Of Law**

18 U.S.C. § 1594(a) prohibits an attempted violation of any other provision of the TVPA.  The elements of attempt are (1) an intent to engage in the prohibited conduct, and (2) conduct constituting a "substantial step" towards the commission of the substantive offense which strongly corroborates the actor's intent.  *See United States v. Joyce*, 693

---

[46] Her claim fails for the independent reason that she cannot establish a violation of the Forced Labor Statute or the Trafficking Statute, *see supra* 28-51, or any other section of the TVPA.  Without such a violation, her claim under the Documents Statute fails as a matter of law.  *Tanedo*, 2012 U.S. Dist. LEXIS 157725 at *23.

F.2d 838, 841 (8th Cir. 1982) (citing *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980)).

As discussed above, Plaintiff cannot establish a genuine issue of material fact that either Defendant has violated any provision of the TVPA.  Thus, to demonstrate Defendants' intent to violate the TVPA, they would need to allege, and provide evidence of, facts indicating that Defendants intended to violate the TVPA, and then somehow failed to do so.  *See, e.g., United States v. Jungers*, 702 F.3d 1066, 1075-76 (8th Cir. 2013) (upholding conviction pursuant to 18 U.S.C. § 1594(a) for defendant who paid an undercover police officer with the intent of having sex with a child who did not exist).

The Complaint contains no such allegations; it includes a conclusory statement that Defendants violated 18 U.S.C. § 1594(a).  The Complaint alleges no "substantial step" that Defendants took to violate the TVPA, and Plaintiff identified none in her testimony.  To the contrary, conduct is only a "substantial step" when it is an "appreciable fragment" of the substantive violation that demonstrates definite intent.  *See United States v. Yossunthorn*, 167 F.3d 1267, 1271-72 (9th Cir. 2014).  Because Plaintiff admits that Defendants did not obstruct her ability to leave, it cannot be disputed that no "appreciable fragment" of a TVPA violation occurred.  *See, e.g.,* Pl. Tr. at 1161:3-20; 1163:5-12; 820:4-8; 822:18-23. Her claim that Defendants are liable for attempted forced labor or attempted trafficking fails as a matter of law.

**E. Because Plaintiff Cannot Establish That Either Defendant Conspired To Force Her Labor Or Traffic Her To The United States, Her Claim Pursuant To 18 U.S.C. § 1594(b) Fails As A Matter Of Law**

18 U.S.C. § 1594(b) prohibits two or more parties from conspiring to violate any

other provision of the TVPA.  A defendant violates 18 U.S.C. § 1594(b) when "the defendant agree[s] with another to commit the offense; … knowingly engage[s] in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and [takes an] overt act in furtherance of the conspiracy."  *United States v. Sabhnani*, 539 F. Supp. 2d 617, 628 (E.D.N.Y. 2008).  Plaintiff's conspiracy claim fails as a matter of law for the reasons discussion in Sections A, B, C and D, *supra*, namely, Defendants have not violated any provision of the TVPA, and Plaintiff cannot raise a genuine issue of material fact concerning their alleged intent to do so or an overt act in furtherance of a conspiracy to do so, as neither Defendant did anything to prevent her from leaving their employment.  *See, e.g.,* Pl. Tr. at 1161:3-20; 1163:5-12; 820:4-8; 822:18-23.  Accordingly, her claim pursuant to 18 U.S.C. § 1594(b) fails as a matter of law.

## III. DEFENDANTS SHOULD BE AWARDED SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The elements of an NIED claim are: (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.  *See Romero v. City of New York*, 839 F. Supp. 2d 588, 630-31 (E.D.N.Y. 2012).  Plaintiff must also establish that Defendants breached a duty owed to her[47] which either unreasonably endangered her physical safety, or caused her to fear for her own safety.  *See id.*; *see also Sheila C. v. Povich*, 781 N.Y.S.2d 342, 351 (N.Y. App. Div. 2004) ("*Sheila I*").  Plaintiff's own testimony and the

---

[47] Plaintiff fails to allege or establish that Defendants owed her a "special duty" unique to Plaintiff, which a claim for NIED requires.  *See Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235 (S.D.N.Y. 1989) (awarding defendant summary judgment on NIED claim where plaintiff, defendant's employee, failed to allege a "unique" obligation owed specifically to her; employer did not owe employee a special duty to avoid causing emotional distress); *see also Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (dismissing NIED claim asserted by a visitor against owner of premises because visitor alleged no specific "personal duty" owed to her).

documentary evidence show that Defendants' alleged conduct was neither extreme nor outrageous as a matter of law and that her physical safety was never unreasonably endangered.

## A.    Plaintiff's NIED Claim Fails As A Matter Of Law Because She Cannot Establish That Defendants' Conduct Was Extreme And Outrageous

Under New York law, a claim for NIED must be dismissed unless Defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"— *i.e.*, extreme and outrageous.[48]  *Sheila I*, 781 N.Y.S.2d at 351 (affirming dismissal of NIED claim asserted by a rape victim); *Epifani v. Johnson*, 882 N.Y.S.2d 234, 240-41 (N.Y. App. Div. 2009) (allegations that defendant used "abusive speech" against plaintiff housekeepers, insisted upon "unreasonable and oppressive work rules," and "forced them to perform unreasonable and humiliating tasks" was insufficiently extreme and outrageous support an NIED claim).  Whether the alleged conduct is sufficiently extreme and outrageous to satisfy this "rigorous" standard is ordinarily an issue of law.  *Yong Ki Hong v. KBS America, Inc.*, 951 F. Supp. 2d 402, 425-26 (E.D.N.Y. 2013) (granting summary judgment because conduct was not sufficiently extreme and outrageous); *see also Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. 1993).

Plaintiff alleges that she suffered "physical, psychological, and emotional abuse at the hands of Defendants and Defendants' children."  Cmpl. ¶ 197.  Although her cause of action for NIED does not describe the abuse more specifically, the Complaint generally alleges that Defendants (1) knew their children hit her daily; (2) starved her; (3) habitually prevented her from leaving the home; (4) paid her insufficient wages and did not provide her healthcare; and

---

[48] Case citations concerning the "extreme and outrageous" element, as well as the "severe emotional distress" element, include cases analyzing intentional infliction of emotional distress claims because the same standard governs both negligent and intentional emotional distress claims.  *Robbins v. New York State Electric and Gas Corp.*, 2007 WL 2580502, at *3 (N.D.N.Y. Sept. 4 2007) (stating that extreme and outrageous element is the same for both claims); *Romero*, 839 F. Supp. 2d at 630-31 (both negligent and intentional infliction of emotional distress claims require (1) extreme and outrageous conduct, (2) causation, and (3) severe emotional distress).

(5) threatened her.  *See* Cmpl. ¶¶ 72; 90; 99; 103; 116; 121; 132; 135-36.   Her claim fails

because the undisputed evidence establishes that this alleged conduct either (i) did not occur or

(ii) was neither extreme nor outrageous as a matter of law.

1.    Plaintiff's Claim That Defendants Acted Extremely And Outrageously By
Starving Her Fails Because Plaintiff Indisputably Had Ample Food

Plaintiff's claim that Defendants acted extremely and outrageously by starving her fails

as a matter of law because her own testimony, her own diary, and Defendants' grocery receipts

show that both she and Defendants purchased nutritious food, in sufficient quantities, at regular

intervals.  *See* discussion *supra* at 12-14.  Plaintiff admittedly did eat or could have eaten this

food, and concedes that she frequently left the apartment and bought her own food.  *See* Pl. Tr. at

477:6-21; 1134:6-16; 556:2-24; 478:4-479:3; 641:3-8; Newman Decl. Ex. Y.

This undisputed evidence establishes that Plaintiff was not malnourished or denied food

by Defendants; her conclusory allegations to the contrary are not credible and raise no material

issue of fact.  *See Aziz Zarif Shabazz*, 994 F. Supp. at 469-71; *Jeffreys*, 426 F.3d at 551, 555;

*Rojas*, 660 F.3d at 105-06; *Cruz*, 2013 WL 5676303, at *4-5; *Zhao*, 2008 WL 346205, at *9.

2.    Plaintiff's Claim That Defendants Acted Extremely And Outrageously By
Allegedly Allowing Their Children To Hit Her Fails Because She Admits That
She Allowed The Children's Alleged Behavior

Assuming *arguendo* that Plaintiff's testimony that the children hit her daily is plausible,[49]

as a matter of law Defendants did not act extremely and outrageously by allegedly allowing the

conduct, because Plaintiff herself could have prevented it but chose to allow it.  *See* discussion

*supra* at 14-16.  Plaintiff admits that she allowed Olympia and Malu—little girls aged three and

five—to allegedly push, hit, or shove her; she admittedly declined to simply take the chair away

---

[49] Plaintiff claims the children hit her daily because they were starving.  The undisputed evidence shows that they
were amply fed, and thus the predicate to her contention of abuse is imaginary.  *See supra* at 12-14.  In light of this
and other inconsistencies and improbabilities in Plaintiff's testimony (*see supra* at 2-3), the Court is entitled to
conclude that the supposed daily hitting is also imaginary. *See, e.g., Aziz Zarif Shabazz*, 994 F. Supp. at 469-71.

from Olympia, or move away from Malu.  *See* Pl. Tr. at 300:5-9; 301:11-20; 311:23-312:9; *see also* 303:14-20; 323:4-325:17, 366:11-13.   The 48-year-old Plaintiff, who was physically much taller and larger than the children, also admits that she was strong enough to prevent them from hitting each other—*i.e.*, Plaintiff was strong enough to prevent them from hitting herself.  *See* Pl. Tr. at 310:22-311:8; 381:25-382: 6; *see also id.* at 296:4-14; 312:10-18; 341:16-25.

These admissions contradict Plaintiffs' conclusory statement that Defendants allowed the children to hit her. They also prevent Plaintiff from establishing that Defendants' purported allowance "transcends all possible bounds of decency."[50]  *See Ajulushuku-Levy v. Schleifer*, 2009 WL 4890768, at *5 (E.D.N.Y. Dec. 15, 2009) (alleged sexual harassment did not constitute extreme and outrageous conduct because plaintiff "voluntarily contacted" defendant during the period in which he was allegedly sexually harassing her); *Meroni v. Holy Spirit Ass'n for Unification of World Christianity*, 506 N.Y.S.2d 174, 177 (N.Y. App. Div. 1986) (alleged conduct neither extreme nor outrageous where plaintiffs were "voluntarily participating" in the allegedly outrageous program).

3.  Plaintiff's Claim That Defendants Acted Extremely And Outrageously By Preventing Her From Leaving The Apartment Fails In Light Of Her Admissions That She Regularly Left The Apartment For Hours At A Time

Plaintiff's claim that Defendants acted extremely and outrageously by preventing her from leaving the apartment[51] similarly fails as a matter of law because her testimony establishes

---

[50]Plaintiff admits the two isolated incidents involving Rex, who was not otherwise aggressive, were not intended to harm her.  Pl. Tr. at 344:25-345:5.  The sporadic and spontaneous nature of these alleged incidents—about which Plaintiff's testimony is not consistent (*see supra* at 15-16)—demonstrates that Defendants did not allow or encourage Rex's alleged actions, nor is the alleged failure to prevent two purported tantrums by a young child "beyond all possible bounds of decency" and "utterly intolerable in a civilized community."  *See Sheila I*, 781 N.Y.S.2d at 351.

[51] Plaintiff concedes Hurley never locked her in a room.  *See* discussion *supra* at 17-18.  She claims he asked her three times to stay in a room with the children in a raised tone of voice.  *See* Pl. Tr. at 224:9- 226:14, 237:24-239:22; 243:23-244:20 (Hurley told only the children to go in the room but Plaintiff went because he "looked at all of [them]" and she was with the children).  Even if this occurred, it is neither extreme nor outrageous.  *See Epifani*, 882 N.Y.S.2d at 240-41.

that she was not prevented from leaving the apartment.  *See Aziz Zarif Shabazz*, 994 F. Supp. at

469-71; *see also Jeffreys*, 426 F.3d at 551, 555; *Rojas*, 660 F.3d at 105-06; *Cruz*, 2013 WL

5676303, at *4-5; *Zhao*, 2008 WL 346205, at *9.  As detailed *supra* at 17-19, Plaintiff left the

house on numerous occasions for personal reasons for up to nine hours at a time, and was

regularly out of the house alone in connection with taking Rex and Malu to and from school.

4. Defendants' Alleged Breach Of Their Contractual Obligations Is Insufficient As A Matter Of Law To Constitute Extreme And Outrageous Conduct

Plaintiffs' allegation that Defendants failed to provide Plaintiff sufficient wages and

health insurance is simply an allegation that Edwards breached the January 1, 2011 employment

contract, and does not constitute extreme and outrageous conduct as a matter of law.  *See* Cmpl.

¶ 102; Newman Decl. Exs. P, Q; *Nwagboli v. Teamwork Transp. Corp.*, 2009 WL 4797777, at

*5 (S.D.N.Y. Dec. 7, 2009) (intentional breach of a contract, without more, "cannot be deemed

'truly egregious.'"); *Reid v. Macy's N.E. at Herald Sq., N.Y.*, 2013 WL 1808087, at *5 (N.Y.

Sup. April 17, 2013) (termination of employment and denial of benefits in a discriminatory,

malicious and deliberate manner does not meet "extreme and outrageous" standard").

5. Edwards's Alleged Statements That Her Family Was "Powerful" And That Plaintiff Could Not Quit Are Not "Extreme And Outrageous" As A Matter Of Law

Emotional distress claims have been dismissed as insufficiently extreme and outrageous

where defendants have threatened to use their connections or plaintiff's financial need "as a

weapon to coerce" plaintiffs to accede to defendants' "invalid demands" that plaintiff return to

work.  *See Suto v. Fleishman*, 164 F.3d 820, 828-29 (2d Cir. 1999); *see also Novak v. Rubin*, 514

N.Y.S.2d 523, 524 (N.Y. App. Div. 1987) (defendant's threat to ruin the career of plaintiff's wife

through his industry contacts if plaintiff pursued a claim against him deemed insufficiently

outrageous); *Huzar v. New York*, 590 N.Y.S.2d 1000, 10004 (N.Y. Ct. Cl. 1992) (defendant's

58

threat to have plaintiff fired if she did not drop her worker's compensation claim deemed insufficiently outrageous).  Plaintiff's allegations do not even rise to that insufficient level.  She claims only that Edwards told her—on a single occasion—that her family was "powerful" and warned her to "be careful" in an alleged effort to keep her from quitting.  *See* Pl. Tr. at 394:9-396:13; 753:3-754:10.   Although she claims that Edwards made this statement in the context of advising Plaintiff that she had signed a two-year contract, and so could not quit after only two weeks, the alleged "threat" is completely inchoate, untethered to any specific negative consequence if she did quit.[52]  *See* Pl. Tr. at 394:7-13.  Her claim fails as a matter of law.

**B.     Plaintiff's NIED Claim Fails As A Matter Of Law Because She Admits That She Did Not Fear For Her Immediate Safety And Her Testimony Shows That Her Physical Safety Was Not In Direct And Immediate Jeopardy**

To recover on her NIED claim, Plaintiff must also establish that Defendants breached a duty owed to her which either unreasonably endangered her physical safety, or caused her to fear for her safety.  *Sheila I*, 781 N.Y.S.2d at 351 (affirming dismissal of NIED claim asserted by rape victim because, *inter alia*, no duty was owed).  The threat to Plaintiff's physical safety must also objectively place her safety in "direct and immediate jeopardy" rather than in "danger later arising as a consequence of defendant's action."  *Campoverde v. Sony Pictures Entm't*, 2002 WL 31163804, at *14 (S.D.N.Y. Sept. 30, 2002) (whether physical safety is threated turns on an "objective inquiry" rather than a "subjective evaluation dependent on the plaintiff's state of mind"); *Sheila C. v. Povich,* 768 N.Y.S.2d 571, 578-79 (N.Y. Sup. Ct. 2003) ("*Sheila II*"), *aff'd.*, 781 N.Y.S.2d 342 (N.Y. App. Div. 2004).

---

[52] Courts have also deemed conduct insufficiently outrageous where plaintiffs could have taken steps to protect their interests with materials in their possession. *See Suto*, 164 F.3d at 828.  Plaintiff here had the opportunity to quit and multiple means available to enforce her rights—including her one-year employment contract, which gave her the right to quit on two weeks' notice, and which she later enforced for other purposes.  *See supra* at 25-26.

Plaintiff's NIED claim fails as a matter of law because Plaintiff admits that she did not fear for her own safety and that her physical safety was not unreasonably endangered—*i.e.*, in direct and immediate jeopardy.  *See Sheila I*, 781 N.Y.S.2d at 351.

      1.    <u>Defendants Did Not Cause Plaintiff To Fear For Her Safety</u>

Plaintiff admits that she was "not afraid" of Defendants:

> Q:    Were you afraid of either Ms. Custer or Mr. Hurley at the time of your interview?
> A:    No.
> Q:    Did there come a time that you became afraid of either of them? At some later point, did you become afraid of either Ms. Custer or Mr. Hurley?
> A:    No.

*See* Pl. Tr. at 164:12-20; *see also* Pl. Tr. at 338:23-339:5; 340:2-9; 399:2-12; 400:3-8; 836:14-837:12; 840:6-12.  Nor was Plaintiff afraid of Defendants' young children.  *See* Pl. Tr. at 300:5-9, 310:2-312:9; 337:3-14; 381:25-382:6.  Her admissions establish as a matter of law that she was not afraid of Defendants' family during her eight-week position of employment, and thus did not fear for her own safety.  *Sheila II*, 768 N.Y.S.2d at 578-79.

      2.    <u>Plaintiff's Testimony Establishes As A Matter Of Law That Her Physical Safety Was Never Unreasonably Endangered By Defendants</u>

Plaintiff does not claim that either Hurley or Edwards physically harmed her or threatened her with physical harm.  *See* discussion *supra* at 22-23, 34-35. Instead, she appears to contend that her physical safety was threatened because Defendants allegedly "actively" denied her medical care and police assistance.  *See* Cmpl. ¶103-04; *see also* Pl. Tr. at 400:9-18. Plaintiff's allegations are insufficient to support her NIED claim as a matter of law, for four reasons.

***First***, Plaintiff's physical safety was not placed in "direct and immediate" jeopardy as result of the alleged denial of medical care.  Rather, she claims that her health deteriorated over

an extended period of time.  Compl. ¶¶ 106-107, 155.  This is insufficiently "direct and immediate" to support an NIED claim.  *See Sheila II*, 768 N.Y.S.2d at 578-79.

**_Second,_** there is no evidence that Defendants "actively denied" Plaintiff health care.  To the contrary, the undisputed evidence shows that Plaintiff did not experience medical symptoms until early March 2011, at which time Edwards had Enalapril shipped to the U.S. and allegedly advised Plaintiff to go to the hospital.[53]  *See* discussion *supra* at 19-22; *see also* Cmpl. ¶¶107-08; Edwards Tr. at 614:3-615:16; Pl. Tr. at 744:17-745:5.

**_Third,_** even assuming *arguendo* that Defendants denied her medical care, Plaintiff's admissions that she voluntarily chose to reject multiple opportunities for medical assistance defeat her claim as a matter of law.[54]  In particular, Plaintiff's rejection of every opportunity to receive the assistance she supposedly needed eliminates any causal link between Defendants' alleged denial of healthcare and her claimed injuries.  *See Kenneth S. v. Berkshire Farm Center And Servcs. For Youth*, 829 N.Y.S.2d 715, 715 (N.Y. App. Div. 2007) (dismissing NIED claim because plaintiffs failed to allege injuries that were direct result of defendant's breach of duty; third party's acts broke causal nexus between defendant's conduct and plaintiff's injuries).

**_Fourth,_** Plaintiff's physical safety was never in "direct and immediate" danger because she admits that ***she could have left at any time*** and chose to stay because she considered it improper to leave under her own "personal ethical point of view."  *See supra* 29-33; *see also, e.g.*, Pl. Tr. at 393:4-394:6; 491:11-22; 698:5-699:4.

---

[53] Though plaintiff contends she was continuously ill during her employment due to the taco she ate in January 2011, she does not contend that she sought, or was denied, medical assistance for those illnesses, and the only symptoms associated with the alleged lack of Enalapril began on March 4, 2011.  *See* Cmpl. ¶¶ 107-111; Pl. Tr. at 733:3-21 (Plaintiff purportedly felt "chest pain" and "unbearable" pain in her arm on March 4, 2011).

[54] *See* discussion *supra* at 19-22 (detailing Plaintiff's admissions that she knew she could get medical assistance, that she rejected offers of medical assistance from Safe Horizon and NHTRC, that Safe Horizon advised her to call if her illness worsened after March 4, 2011 and she did not do so, and that she declined to go to a nearby hospital).

Because Plaintiff's own testimony and the undisputed evidence establish that her physical safety was not direct and immediate danger, and she did not fear for her own safety, Plaintiff's NIED claim fails as a matter of law.

**C.      Plaintiff's NIED Claim Fails Because The Purported Underlying Conduct Was Allegedly Intentional**

A claim for NIED must be premised upon negligent acts, and is ripe for summary judgment where the alleged underlying conduct was "intentional and deliberate." *See Wahlstrom v. Metro-North Commuter R. Co.*, 89 F. Supp. 2d 506, 531-32 (S.D.N.Y. 2000) (noting that New York courts reject "attempts to transmogrify intentional torts into negligence" and dismissing NIED claim because the conduct was alleged to be "intentional and deliberate").  Here, Plaintiff alleges that the underlying conduct was intentional, and her attempt to repackage it as negligence fails as a matter of law.[55]  *See* Cmpl. ¶¶ 1 (alleging Defendants "intentionally" denied her medical care and food); 72, 135 (alleging Defendants knew their children hit Plaintiff on a daily basis); 90 (alleging Hurley prevented Plaintiff from leaving the house); 103 (alleging Defendants fraudulently—*i.e.*, intentionally—denied Plaintiff access to healthcare); 116 (alleging Edwards rarely purchased enough food); 132; 135-36; 165-66 (alleging Defendants "knowingly" violated 18 U.S.C. § 1589, et al).

**IV.    PLAINTIFF'S FRAUD CLAIM FAILS AS A MATTER OF LAW**

**A.      The Alleged Misrepresentations Are Wholly Subsumed By The Written Employment Contract Between Plaintiff And Edwards**

Plaintiff's fraud claim fails as a matter of law because the alleged misrepresentations are

---

[55] To the extent Plaintiff's allegations could be construed as an intentional tort, Plaintiff's claim fails as a matter of law because the underlying conduct could have been redressed via traditional tort remedies.  *See Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315-16 (S.D.N.Y. 2005) (dismissing NIED claim encompassed by other tort claims); *Deronette v. City of New York*, 2007 WL 951925, at *5-6 (E.D.N.Y. March 27, 2007) (same).  Those torts would also be barred by New York's statute of limitations for intentional torts.  N.Y. C.P.L.R. § 215.

subsumed by the January 1, 2011 written employment contract between Plaintiff and Edwards.[56]

A plaintiff who has entered into a contract with a defendant can only maintain a fraud

action against that defendant in very narrow circumstances.  The Second Circuit has explained:

> To maintain a claim of fraud in such a situation, a plaintiff must either: (i)
> demonstrate a legal duty separate from the duty to perform under the contract; or
> (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the
> contract; or (iii) seek special damages that are caused by the misrepresentation
> and unrecoverable as contract damages.

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)

(citations omitted).  No condition set forth in *Bridgestone/Firestone* is satisfied here.

***First***, Plaintiff fails to allege that Defendants owed her a duty distinct from their

contractual obligations.  *See Bridgestone/Firestone*, 98 F.3d at 20.  The New York Court of

Appeals only permits

> a legal duty independent of contractual obligations [to] be imposed by law as an
> incident to the parties' relationship. Professionals, common carriers and bailees,
> for example, may be subject to tort liability for failure to exercise reasonable care,
> irrespective of their contractual duties.  In these instances, it is policy, not the
> parties' contract, that gives rise to a duty of due care.

*Sommer v. Federal Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992) (citations omitted).  Any

Defendants may have owed Plaintiff was solely due to the contract between the parties: their

"employer-employee relationship".[57]  *See* Cmpl. ¶ 203.  She fails to allege a "separate" legal

duty that would permit her fraud claim. *See G.D. Searle & Co. v. Medicore Commc'ns*, 843 F.

Supp. 895, 909-910 (S.D.N.Y. 1994) (dismissing fraud claim for failure to allege a duty owed to

plaintiff distinct from duties already contained in contract); *Strojmaterialintorg v. Russian Am.*

---

[56] The fact that Plaintiff has withdrawn her breach of contract claim has no bearing on this analysis.  The factual record reflects that the contract governed the employment relationship between Edwards and Plaintiff.  *See* Pl. Tr. 117:9-18; 118:19-24; 775:18-23 (Plaintiff's wages were set by the contract); Edwards Tr. at 516:6-13 (Edwards believed the contract governed her employment relationship with Plaintiff).

[57] Defendants did not owe Plaintiff a fiduciary duty because she was their at-will employee.  *See, e.g.*, *Grappo v. Alitalia Linee Aeree Italiane*, 56 F.3d 427, 432 (2d Cir. 1995).

*Commercial Corp.*, 815 F. Supp. 103, 105 (E.D.N.Y. 1993) (same).

 **_Second_**, Plaintiff fails to allege a single misrepresentation that is collateral or extraneous

to the contract.  *See Bridgestone/Firestone*, 98 F.3d at 20. The following are the supposed

misrepresentations made by Defendants, along with the corresponding contractual term:[58]

| Alleged False Misrepresentation (Cmpl. ¶ 204) | Plaintiff's Employment Contract[59] |
|---|---|
| The "compensation that Plaintiff was to receive in exchange for her labor" | Plaintiff would earn $10 per hour for her work (Newman Decl. Ex. P at ¶ 4)<br><br>Plaintiff would earn $15 per hour for overtime work (*Id.* at ¶ 5) |
| The "nature of the work required" | Plaintiff's duties would be "normal domestic work, including childcare, at the employers' place of residence." (*Id.* at ¶ 11) |
| The "provision of sufficient food" | "The employer shall provide Plaintiff's free room and board."[60] (*Id.* at ¶ 2) |
| The provision of "necessary prescription medications" and "health care" | "The employer shall bear the employee's medical insurance and any reasonable medical expenses." (*Id.* at ¶ 10) |
| The "restraints on personal liberty" | Plaintiff would be free to leave the Defendants' home "at all times" other than regular or overtime working hours.  (*Id.* at ¶ 8) |
| Plaintiff's "work hours" | "The employee shall normally work eight hours a day, five days a week.  Any time |

---

[58] In addition to the allegations set forth below in the chart, Plaintiff alleges that Defendants misrepresented "themselves".  Cmpl. ¶ 204.  This allegation is too vague to be considered a false statement.  And summary judgment is appropriate where the evidence on the record "if incorporated into an amended answer[] would fail to comply with Rule 9(b)'s strictures".  *See Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 413 (E.D.N.Y. 2012).  This false representation cannot support a fraud claim as a matter of law because Plaintiff does not identify what the false representation about Defendants was, who said it, and when—nor can she.  *Id.*

[59] Each of the citations in this table are to the English-language contract between Edwards and Plaintiff.  As mentioned, *supra* at n. 7, each of these provisions has an identical counterpart in the Spanish-language contract.  See Newman Decl. Ex. Q.

[60] "Room and board" is universally understood to encompass food.  *See* THE AMERICAN HERITAGE DICTIONARY of THE ENGLISH LANGUAGE, Fifth Edition; *Merriam-Webster.com*, accessed Feb. 3 2014. http://www.merriam-webster.com/dictionary/room and board; *see also Brae Loch Manor Health Care Facility v. Thompson*, 287 F. Supp. 2d 191, 195 (W.D.N.Y. 2003) (defining "room and board" to include, *inter alia*, food).

| Alleged False Misrepresentation (Cmpl. ¶ 204) | Plaintiff's Employment Contract[59] |
|---|---|
| | worked in excess of 40 hours per week shall be considered overtime…" (*Id*. at ¶ 5) |

Every alleged false statement corresponds to an explicit contractual provision.  Indeed, the purported misrepresentations merely restate the contract.  *See G.D. Searle,* 843 F. Supp. at 909-910 (dismissing fraud claim because it duplicated contract claim); *Strojmaterialintorg*, 815 F. Supp. at 105 (same).

**_Third_**, Plaintiff does not claim that the alleged misrepresentations caused her "special damages" that were unrecoverable as contract damages.  *See Bridgestone/Firestone*, 98 F.3d at 20.  The only actions Plaintiff allegedly took in reliance on the alleged misrepresentations were (i) coming to the United States and (ii) providing her "labor and services" to the Defendants.[61]  Cmpl. ¶ 207.  Plaintiff admits that she has been fully compensated for her "labor and services"— compensation she received by enforcing her contract in a New York State Department of Labor ("DOL") proceeding.  Pl. Tr. at 1014:13-17; 1027:22-1028:2; Newman Decl. Ex. W.  She also admits that she did not incur any out-of-pocket costs as a result of Defendants' alleged misstatements.  Pl. Tr. 1014:13-17; 1027:22-1028:2.

Nor may Plaintiff repackage her attempts to seek "lost profits" and "consequential damages" [62]—including costs purportedly incurred in "passing up other opportunities in reliance on Defendants' [alleged] fraudulent misrepresentations"—as "special damages" not recoverable in contract.  Newman Decl. Ex. BB at 10.  Instead, lost profits are recoverable on a contract

---

[61] Because she had already traveled to the United States by January 17, 2011, no statements made to Plaintiff after that date could serve as the basis for her fraudulent inducement claim.

[62] Neither lost profits nor consequential damages is recoverable in fraud.  *See Reno v. Bull*, 124 N.E. 144, 146 (N.Y. 1919) only damages that are the "actual pecuniary loss sustained as the direct result" of the fraudulent misrepresentation are recoverable; "[a]ll elements of profit are excluded"); *Lama Holding Co. v. Smith Barney Inc*., 668 N.E.2d 1370, 1373 (N.Y. 1996) (a plaintiff can only be compensated "for what they lost because of the fraud, not … for what they might have gained").

claim. *Jill Stuart (Asia) LLC v. Sanei Intern. Co.*, 2013 WL 3203893, at *4 (S.D.N.Y. June 17,

2013) (consequential damages such as lost profits are only recoverable on a contract claim if

"those risks" were foreseeable at the time the contract was made).

As Plaintiff identifies no further "actual pecuniary loss" apart from those purported losses

she recovered by enforcing her contract through the DOL proceeding, she fails to establish the

"special damages" needed for a fraud claim. *See Sudul v. Computer Outsourcing Servs.*, 868 F.

Supp. 59, 63 (S.D.N.Y. 1994) (dismissing fraud claim because the only concrete loss plaintiff

could identify was recoverable pursuant to a breach of contract theory); *Tesoro Petroleum Corp.*

*v. Holborn Oil Co.*, 484 N.Y.2. 2d 834, 835 (N.Y. App. Div. 1985) (same).

Here, as in *Bridgestone/Firestone*, none of the three exceptions exists. Plaintiff's fraud

claim is subsumed by her employment contract, and fails as a matter of law.

**B.      Plaintiff's Fraud Claim Fails As A Matter Of Law Because She Does Not Allege
          That Defendants Made A False Statement Of Present Fact**

Plaintiff's fraud claim fails on the independent ground that she identifies no false

statement of present fact made by Defendants.

The only "false representations" Plaintiff identifies concern "the compensation that

Plaintiff was to receive" and the conditions surrounding a work environment that did not yet

exist. *See* Cmpl. ¶¶ 34, 204; *see also* Pl. Tr. at 47:16-48:4; 65:15-66:7; 67:2-7; 97:5-23.   But

these alleged misstatements were mere promises about Defendants' future performance rather

than statements of present fact.  Under New York law, a false statement sufficient to support a

fraud claim must be one of present fact, known by the defendant to have been false when made;

alleged promises concerning future acts are insufficient to support a fraud claim. *Compare*

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (upholding

fraud claim because defendant's allegations involve "misstatements and omissions of present facts, not contractual promises regarding prospective performance") *with TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-92 (2d Cir. 2005) (dismissing fraud claim because, *inter alia*, defendant's alleged intent not to engage in future performance was not a false statement of present fact).  Accordingly, her fraud claim fails as a matter of law.[63]

### C.   The Undisputed Evidence Establishes That Plaintiff Did Not Reasonably Rely On Defendants' Alleged Misrepresentations Concerning Access To Health Care

Plaintiff repeatedly alleges that Defendants fraudulently denied her access to health care. Cmpl. ¶¶ 1, 103, 204.  To succeed on her fraud claim, however, Plaintiff must have reasonably relied on Defendants' alleged misrepresentations.  *See Dallas Aerospace, Inc., v. CIS Air Corp.*, 352 F.3d 775, 784-85 (2d Cir. 2003).  Even if Defendants had falsely represented her ability to access health care in the United States, the undisputed evidence establishes that Plaintiff was not injured in reasonable reliance on any of those alleged misrepresentations.[64]

Plaintiff chose to disregard multiple reputable third parties who advised her that she was entitled to health care and medical assistance in the United States.  *See, e.g.*, Pl. Tr. at 159:10-160:23; 537:17-23; *see also supra* at 19-22.  But purposely ignoring reputable information to

---

[63] Nor may Plaintiff support a fraud claim based on an attenuated allegation that Edwards did not intend to perform parts of the contract.  *See* Cmpl. ¶¶ 36, 38; Pl. Tr. at 113:7-19.  It is black letter law in this Circuit that "general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim." *Miller v. Holtzbrinck Publishers, L.L.C*, 377 Fed. Appx. 72, 74 (2d Cir. 2010) (dismissing fraud claim where the "essence" of the claim was that defendant did not intend to perform the parties' agreement); *Merriweather v. Metro. Prop. and Cas. Ins. Co.*, 2013 WL 6328143, at *2-3 (E.D.N.Y. Dec. 3, 2013) (same).  While there are cases allowing fraud claims based on an intent not to perform a promise, *see, e.g., Graubard Mollen Dannett & Horowitz v. Moskovitz*, 653 N.E.2d 1179, 1184 (N.Y. 1995), federal courts in the Second Circuit generally do not follow them, and instead regularly apply the law from cases that adopt "precisely the opposite rule."  *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 244-45 (S.D.N.Y. 2006) (explaining that federal courts consistently apply the rule that the intent not to perform a contract does not state a claim for fraud); *Cougar Audio, Inc. v. Reich*, 2000 U.S. Dist. LEXIS 4894 at *20 n.4 (S.D.N.Y. April 18, 2000) (explaining same with example cases).

[64] Plaintiff explicitly admits that she did not rely on Edwards's statement that health care was not available to her—*i.e.*, her decision not to avail herself of health care was not due to a reliance on Edwards.  *See* Pl. Tr. at 901:8-14. However, Plaintiff claims she instead relied upon Hurley's similar alleged misrepresentation.  Pl. Tr. at 901-02.

one's detriment, as Plaintiff admits occurred here, is not reasonable reliance as a matter of law, and thus Plaintiff's claim fails.  *See Thompson v. Marine Midland Bank*, 1999 U.S. App. LEXIS 22960, at *10 (2d Cir. 1999) (upholding summary judgment on fraudulent misrepresentation claim because plaintiff's reliance on misrepresentation, when "practically faced with the [actual] facts," was unreasonable); *see also Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy."); *Frank Crystal & Co. v. Dillmann*, 925 N.Y.S.2d 430, 432 (N.Y. App. Div. 2011) ("Plaintiff may not recover damages for a loss resulting from detrimental reliance when the loss occurred after it was put on notice of the alleged false representation.").

**D.     The Undisputed Evidence Shows Plaintiff Suffered No Injury As A Result Of Any Alleged Misrepresentation**

Plaintiffs' fraud claim also fails for the separate reason that she was not injured as a result of any alleged misrepresentations.  The chart below shows the alleged misrepresentations, together with undisputed evidence that Plaintiff sustained no injury in reliance upon them:

| Alleged False Misrepresentation (Cmpl. ¶ 204) | Undisputed Evidence that No Injury Was Caused by the Misrepresentations |
|---|---|
| The "compensation that Plaintiff was to receive in exchange for her labor" and "work hours" | Plaintiff admits she has been fully compensated for her wages for the hours she claimed she worked  *See, e.g.*, Pl. Tr. at 1014:10-17; *see also* Newman Aff Ex. W. |
| The "nature of the work required" | Plaintiff does not allege that the work she provided in New York differed from the work described in her contract, nor does she identify any injury resulting from any alleged difference.  *See* Newman Aff Exs. P ¶ 11, Q ¶ 8. |
| The "provision of sufficient food" | Plaintiff admits she had enough money to cover her basic nutritional needs. *See* Pl. Tr. at |

| Alleged False Misrepresentation (Cmpl. ¶ 204) | Undisputed Evidence that No Injury Was Caused by the Misrepresentations |
|---|---|
| | 641:3-8.  Further, documentary evidence establishes the sufficiency of food provided to her by Defendants.  *See supra* at 12-14. |
| The provision of "necessary prescription medications" and "health care" | It is undisputed that Edwards actually obtained Plaintiff's prescription. Newman Decl. Ex. AA; Edwards Tr. at 614:3-615:16. Plaintiff also admits that she (i) chose to ignore reputable information concerning her right to health care, and (ii) chose to reject multiple offers of medical assistance.[65]  *See supra* at 19-22; Pl. Tr. at 746:17-21. |
| The "restraints on personal liberty" | Plaintiff no longer claims that she was locked in a room and admits she was free to, and did, leave Defendants' home regularly.  *See* Newman Decl. Ex. D; *see also* Pl. Tr. at 527:5-12. |

Absent injury caused by the alleged misrepresentation, Plaintiff's fraud claim fails as a matter of law.  *Dallas Aerospace*, 352 F.3d at 784.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment on all Plaintiff's claims.

---

[65] Plaintiff's decision to reject multiple offers of medical existence also eliminates her claim because Defendants' allegedly fraudulent statements did not cause her injuries.  *See Nat'l Comm. Bank v. Morgan Stanley Asset Mgmt. Inc.*, 1997 WL 634292, at *7 (S.D.N.Y. Oct. 15, 1997) (an injury is proximately caused if it is "the natural and probable consequence of" the defendant's misrepresentation or if the defendant should "reasonably . . . have foreseen that the injury was a probable consequence of his fraud.") (quotations omitted).

Dated: New York, NY
       February 28, 2014

Respectfully submitted,

BECKER, GLYNN, MUFFLY, CHASSIN
& HOSINSKI LLP

By: _____
     Robin L. Alperstein
     William H. Newman
     Michelle R. Mufich
     299 Park Avenue
     New York, NY 10171

     *Attorneys for defendants Malu Custer
     Edwards and Michael Hurley*