**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
FELICITAS DEL CARMEN VILLANUEVA          :
GARNICA,                                 :
                          Plaintiff,     :
                                         :
              - against -                :     Index No. 13-Civ-3943 (AKH)
                                         :
MALU CUSTER EDWARDS aka MALU             :
HURLEY and MICHAEL HURLEY aka            :
MICKY HURLEY,                            :
                          Defendants.    :
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDNATS' MOTION FOR**
**SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

STATEMENT OF FACTS....................................................................................... 4

ARGUMENT............................................................................................................ 9

I.   Standard of Review.......................................................................................... 9

II.   The Evidence Establishes That Defendants Obtained Forced Labor From Ms. Garnica
In Violation Of The TVPRA ........................................................................... 10

    A.   **Ms. Garnica's Labor Was Coerced, Not Voluntary** .................................... 13

    B.   **Defendants Obtained Ms. Garnica's Labor Through Serious Harm And/Or
Threats Of Serious Harm** ........................................................................... 22

        i.   *Defendants Intentional Non Payment Of Ms. Garnica's Earned Wages*............... 23

        ii.   *Defendants Intentionally Subjected Ms. Garnica To Working Conditions Intended
To Compel Her Labor* ........................................................................... 24

        iii.   *Defendants Intentionally Neglected Ms. Garnica's Constant Complaints About
Physical Abuse By Children*.................................................................... 25

        iv.   *Defendants Intentionally Neglected Ms. Garnica's Medical Needs* ...................... 26

        v.   *Defendants Threated Ms. Garnica With The Power And Influence Their Family
Wielded In The United States*.................................................................... 27

        vi.   *Defendants Intentionally Withheld Ms. Garnica's Plane Ticket Home After She
Requested To Go Back To Chile* ............................................................. 29

    C.   **Defendants Obtained Ms. Garnica's Labor Through Abuse or Threatened Abuse
Of The Law Or Legal Process**.................................................................. 30

        i.   *Defendants Intentional Misrepresentations Of Ms. Garnica's Basic Rights As A
Non-Citizen Constitute An Abuse Or Threatened Abuse Of The Law Or Legal
Process* ............................................................................................... 31

        ii.   *Defendants Threats That Ms. Garnica Would Be Fired Are An Abuse Or
Threatened Abuse Of The Law Or Legal Process Because It Impliedly Means She
Would Be Deported* ............................................................................. 33

i

     D.    **Defendants Participated In A Scheme Or Plan Of Coercion And Intimidation To Obtain Ms. Garnica's Labor**...................................................................................... 36

III.    The Evidence Establishes That Defendants Are Liable For Negligent Infliction Of Emtional Distress ................................................................................................... 37

V.    The Evidence Establishes That Defendants Fraudulently Induced Ms. Garnica Into Traveling To The United States As Their Nanny ............................................................ 38

**CONCLUSION** ...................................................................................................... 43

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). ........................................... 9

*Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013)...................................... 10

*Battalla v. State,* 10 N.Y.2d 237 (1961). ...................................................................... 38

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996).....39

*Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).................................................. 9

*Camayo v. John Peroulis & Sons Sheep, Inc.*, 11-cv-01132, 2012 WL 4359086, at *4-5 (D. Co.

    Sept. 24, 2012). ................................................................................. 33, 35

*Canal v. Dann*, 09-03366 CW, 2010 WL 3491136, at *1 (N.D. Cal. Sept. 2, 2010) amended, 09-

    03366 CW, 2011 WL 3903166 (N.D. Cal. Sept. 6, 2011) ................................... 34, 36

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ...................................................... 9

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 10-CV-1341 JFB ETB, 2012 WL

    748760 (E.D.N.Y. Mar. 7, 2012) ................................................................. 23,34,35

*Deerfield Commun. v. Chesebrough–Pond's*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d

    1003 (1986)…...……………………………………………………………………………41

*Elat v. Ngoubene*, CIV. PWG-11-2931, 2014 WL 253411 (D. Md. Jan. 21, 2014)............. passim

*F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). ............................... 10

*Garcia v. Curtright,* No. 6:11-06407-HO, 2012 WL 1831865, *4 (D.Or. May, 17, 2012).......... 12

*Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D. C. 2012)................................. 33

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2004 WL 2754653, at *7 (S.D.N.Y.

    Dec.2, 2004) ......................................................................................... 41

*Nunag- Tanedo v. E. Baton Rouge Parish Sch. Bd*., 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011).................................................................................................................. passim

*Panwar v. Access Therapies, Inc.*, 1:12-CV-00619-TWP, 2013 WL 5486783, at *7 (S.D. Ind. Sept. 30, 2013) ........................................................................................................ passim

*Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995). …………………………….…42

*Perrin v. Hilton Int'l, Inc.,* 797 F. Supp. 296, 300 (S.D.N.Y. 1992)............................................ 38

*Ramos v. Hoyle*, 08-21809-CIV, 2008 WL 5381821, at *4 (S.D. Fla. Dec. 19, 2008) ............... 33

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F. 3d 91, 98 (2d. Cir. 1997) ............................ 38

*Shukla v. Sharma*, 07-CV-2972 CBA CLP, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012), appeal dismissed (June 1, 2012) ................................................................................................... passim

*Stamelman v. Fleishman–Hillard, Inc.,* No. 02 Civ. 8318 (SAS), 2003 WL 21782645 at *5 (S.D.N.Y. July 31, 2003). …………………………………………………………….…40

*Stewart v. Jackson & Nash*, 976 F.2d 86, 88 (2d Cir.1992)……………………………..……39

*United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) *cert. granted, judgment vacated on unrelated grounds,* 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005)...................... 22

*United States v. Calimlim,* 538 F.3d 706, 712, 714 (7th Cir.2008) ........................................ 24, 33

*United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011)..................................... 33, 34, 36

*United States v. Farrell,* 563 F.3d 364, 373 (8th Cir.2009)......................................................... 24

*United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917 (W.D.N.Y. Dec. 2, 2003)... 33

*United States v. Kozminski,* 487 U.S. 931, 948, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) .......... 33

*United States v. Sabhnani,* 539 F. Supp. 2d 617, 620 (E.D.N.Y. 2008) *aff'd*, 599 F.3d 215 (2d Cir. 2010)........................................................................................ 36

*United States v. Veerapol,* 312 F.3d 1128, 1130–21 (9th Cir.2002)............................................ 25

*Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) ............................................................... 11, 12

**STATUTES**

William Willerforce Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589

..................................................................................................................................... passim

Pub.L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008 ............................................................ 11, 22

Pub.L. No. 108–193, § 4(a)(4), 117 Stat. at 2877 ...................................................................... 11

**OTHER AUTHORITIES**

Fed. R. Civ. Proc. 56(a). ........................................................................................................ 2,10

H.R. Conf. Rep. No. 106-939, at 101(2000), as reprinted at 2000 WL 1479163 ...................... 2,10

**INTRODUCTION**

Defendants' seventy-page summary judgment motion – nearly triple the customary page limit for such motions – suffers from greater deficiencies than being a prime example of form over substance; it openly baits bias, relies on grossly offensive *ad-hominen* attacks, and incorrectly cites record evidence and legal precedent.  The character of Defendants' brief – the integrity of the arguments –is the rhetorical equivalent of a sucker punch – distracting the reader from facts which clearly demonstrate good-faith factual disputes and instead taking cheap shots at Plaintiff's mental capacity.

In fact, Defendants *devote only two pages of their brief* to the question of whether they forced Plaintiff's labor through "psychological coercion" despite it being Plaintiff's primary legal theory.  For the remainder of Defendants' brief, instead of addressing Plaintiff's case directly, Defendants attempt to interject credibility arguments into the Court's summary judgment analysis.  In doing so, Defendants describe Ms. Garnica as "mentally ill" and "paranoi[d]" and her testimony as "wholly implausible," "fabricat[ed]" from her "own imagination."  In fact, Defendants are in possession of Plaintiff's mental health records which make no mention of any present or past diagnosis of mental illness.

Unfortunately, this is not the first time Defendants have relied on false *ad-hominen* attacks on the Plaintiff's credibility.  In a sad irony, Defendants themselves are guilty of at least one true act of fabrication in this litigation.  As the Court may recall, at the Initial Conference, Your Honor asked counsel for Defendants how they planned to defend the case.  Pl. 56.1 St. 200.  Counsel for Defendants identified a single defense and presented it adamantly – Plaintiff had fabricated her allegations in the hopes of fraudulently obtaining lawful immigration status for herself and her son.  However, this was demonstrably untrue – her son lives in Chile and is

employed in a stable position with a large international company as an engineer.  No effort was ever made by Plaintiff or anyone else to obtain residency status for her son in the United States. Defendants have subsequently dropped the defense entirely.

Defendants repeatedly harp on this topic in a concerted effort to distract the Court by making this motion about Ms. Garnica's credibility—which is entirely improper on a motion for summary judgment and more appropriately decided by a jury.  Instead of citing to contemporaneous audio recordings that corroborate Ms. Garnica's testimony and blatantly contradict Edwards' testimony, Defendants urge dismissal based on nothing more than their unsupported speculations.  Finally, Defendants attempt to characterize certain errors in translation that occurred during the investigative processes and throughout discovery as Ms. Garnica's untruths, when the fact is Ms. Garnica's version of the events has remained constant throughout.

The proper inquiry on summary judgment is whether there is a genuine dispute as to the material facts, i.e., whether there are good-faith factual disputes regarding the elements of Ms. Garnica's claims that should be submitted to a jury.  Fed. R. Civ. Pro. 56(a).  Plaintiff's claims more than meet this standard.  The facts plainly demonstrate that Plaintiff was psychologically coerced by Defendants into forced labor.  A close and careful examination of the facts – all of the facts, and under the legal theory that Plaintiff has consistently propounded – show that Plaintiff's claims are supported wholly by the plain language of the Trafficking statute and the unequivocal statements of Congress in passing the Act.  The record is replete with references to Defendants' coercive conduct intending to force Plaintiff's labor, including intentionally misrepresenting the duration of Plaintiff's contract (by a whole year), failing to pay her the wages they agreed to pay her (or those required by law), misleading her about the benefits and

protection available to her in the United States, misleading her into believing workers in the United States live on as little as $1,3000 for 30 days of full time work, refusing to address the regular physical assaults committed by her children against Plaintiff, and refusing to provide a return flight to Chile citing her "2 year agreement" on those occasions when she attempted to quit.

In fact, these facts alone support an inference of forced labor, and they are *only those corroborated in the aforementioned audio recordings* capturing Ms. Custer contemporaneously committing many of the acts Plaintiff has alleged or admitting to the same. Defendants simply ignore Plaintiff's legal theory and their own clients' admissions hoping the Court will as well, failing to once reference the contemporaneous recordings.

Defendants' selective review of the Complaint and deposition testimony is not an accurate summation of the allegations and the subsequent evidence. Moreover, the plain facts supporting Plaintiff's claim, the most incriminating of which are corroborated by admissions by Defendants, alone provide a basis for denying Defendants' Motion for Summary Judgment.[2] Taken as a whole, the record evidence in this case creates genuine issues of material fact as to Ms. Garnica's claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589 ("TVPRA") (Count I) , and common law Negligent Infliction of Emotional Distress (Count III) and Fraudulent Misrepresentations (Count IV). While Defendants would like to make this motion about credibility, simply put, Ms. Garnica's credibility, and the credibility of the Defendants, is a matter for the jury to decide. Defendants' Motion for Summary Judgment as to all Counts of the Complaint should be denied.

---

[2] The vast majority of the alleged inconsistencies are either not inconsistent when Ms. Garnica's testimony is considered as a whole, or they do not concern an issue of material fact and are therefore not relevant to this Court's inquiry on a motion for summary judgment.

## STATEMENT OF FACTS

Ms. Garnica was born in rural Rio Bueno, located in southern Chile. She spent the majority of life in the rural town, until she moved to Santiago in 2011.  Pl. 56.1 St. ¶ 104. Plaintiff does not speak any English; the only language she speaks is Spanish.  *Id.* at ¶ 105. Until she was brought to the United States with Defendants to work as their Nanny, she had never left Chile.  *Id.*  Throughout most of her adult life, including the time period she was employed by Defendants, Plaintiff sent a significant portion of her income home to ailing mother who still resides in rural Chile. *Id.* at ¶ 106.   Plaintiff has received no formal education after high school, other than technical classes in cosmetology. *Id.* at ¶ 107.

In late November 2010, the Edwards-Hurley family was desperate to find a nanny to travel with them to the United States for a two-year period while Edwards would be working towards her Associates Degree at the Parsons School in Manhattan.  Pl. 56.1 St. ¶¶ 1, 104. Defendants were desperate because their previous nanny had decided not to travel with them, and the family "needed" a nanny to travel with them so Edwards could study while she was obtaining her degree.  *Id.* at ¶¶ 104-105.  The Defendants were ultimately directed to Ms. Garnica through Nanny House, an agency that Ms. Garnica at worked with and that assists in placing nannies with families seeking to hire such.  *Id.* at ¶¶ 7c.  After being interviewed by Mr. Hurley and Edwards and briefly meeting the children, Ms. Garnica was hired on a "trial basis." *Id.* at ¶¶ 6, 7c.  At some point subsequent to being hired, Ms. Garnica signed an agreement, dated December 1, 2010, to work for the Edwards-Hurley family in Chile.  *Id.* at ¶¶ 7a-7b.

While Edwards explained this period to Ms. Garnica as a "trial period", Edwards nonetheless wasted no time arranging for Ms. Garnica to obtain a new passport and travel visa. *Id.* at ¶¶ 6, 116.  To that effect, on December 2, 2010, the day after Ms. Garnica officially began

working for the Defendants, her Chilean passport was issued. *Id.* at ¶¶ 33, 116. The next day, on December 3, 2010, Edwards exchanged emails with her aunt, Therese Matthews, asking if she had connections at the United States Embassy in Chile (the "Embassy") to insure that during Ms. Garnica visa interviews did not raise suspicion that Ms. Edwards was "smuggling" Ms. Garnica to the US. Ms. Matthews told Edwards that she would ask her contact to "give someone a heads up" in the interview. *Id.* at ¶ 120.

During these emails Edwards also sought assistance in moving forward the date of Ms. Garnica's interview for early December, because the Defendants planned to leave Chile on December 29, 2011. *Id.* at ¶ 121. Due to the demand for visa interviews it was not possible to schedule anything as early as Edwards wanted; therefore, the Defendants postponed their travel by a few weeks. *Id.* With the assistance of Vitranseg, the company hired by the Defendants to assist them in expediting their family's and Ms. Garnica's passports and visas, Edwards put together all the documents necessary for Ms. Garnica to obtain her passport and visa. *Id.* at ¶¶ 122, 133. At Edwards's direction, Ms Garnica signed a number of papers, some of which were in English, all of which she was told were for the sole purpose of obtaining her visa. Included in these papers were the contracts that the Embassy required in order for Ms. Garnica to obtain a B-1 Visa as a Domestic Employee. *Id.* at ¶¶ 122-138. Although the contracts are dated January 1, 2011, Ms. Garnica and Edwards in fact signed both the English and the Spanish versions on January 5, 2011 just minutes before leaving for the Embassy for Ms. Garnica's interview. *Id.* at ¶ 132.[4] The date under Ms. Garnica's signature on the English contract is clearly written in Edwards's handwriting and Ms. Garnica testified that, although she does not recall, she believes she just copied the date written by Edwards under her signature on the Spanish version. *Id.*

---

[4] Ms. Garnica had the day off on January 1, 2011 because of the New Year's Day holiday and therefore could not have singed the contracts on that day. (Pl. Tr. 83:11-16).

Prior to going into the U.S. Embassy Edwards instructed Ms. Garnica to "be careful during the interview" and to be sure to only answer the questions asked of her.  *Id.* at ¶ 133.  Ms. Garnica was issued her B-1 Visa to accompany Edwards on January 6, 2011.  *Id.* at ¶ 38a.

At the time she signed, and throughout the trial period before the Edwards-Hurley family came to the United States, Ms. Garnica insisted that the agreement was executed for superficial reasons only, namely, for the sake of obtaining her passport and work visa and not as governing the terms and conditions of Ms. Garnica's employment in the United States, which Ms. Edwards insisted would be addressed when the family arrived in the United States.  *Id.* at ¶¶ 122-138.

As soon as Ms. Garnica left her interview at the Embassy Edwards took her passport and told Ms. Garnica that she would hold on to it because Ms. Garnica was not accustomed to keeping such documents.  *Id.* at ¶ 139.  Edwards gave Ms. Garnica her passport back when going through immigration in Santiago, but then took it back again.  *Id.* at ¶ 140.  In an apparent attempt to deter forced labor migration, a flight attendant on the plane from Peru to New York abruptly instructed Edwards, who was filling out Ms. Garnica's customs forms and declarations herself with her passport and visa, that she must return the documents to Ms. Garnica.  *Id.* at ¶44a.  The flight attendant told Edwards to return Ms. Garnica's passport and that Ms. Garnica should be the sole individual in possession of her travel documents and work permits during the entire flight at the penalty of being removed from the flight.  *Id.* at ¶44b.  It was only at that point that Ms. Edwards reluctantly gave Ms. Garnica her passport back.  *Id.*  Later, during her deposition, Ms. Edwards admitted to having provided an address on Ms. Garnica's customs form which differed from the one they intended to stay in temporarily in the United States while they found more permanent housing.  *Id.*  Ms. Edwards admitted that the address provided was that of a friend in New York City with whom the family had no intention of staying.  *Id.*

After arriving in New York, in January 2011, Defendants forced Ms. Garnica to work for them, performing various domestic tasks. *Id*. at ¶¶ 108.  Most days she was expected to cook breakfast for the children, prepare the children for school, and walk the two eldest children, Rex and Malu, to school.  *Id.*  Ms. Garnica regularly arranged meals with the small amount of food available in the home, mainly just bread, pasta, and milk.  The children would eat on small chairs, back to back in the small kitchen while they ate, or they would eat using a larger chair as their table top, not on a regular table.  *Id*. at ¶¶ 165-166.  Ms. Garnica also regularly bathed the children, did the laundry, and cleaned the apartment.  *Id*. at ¶¶ 108.

Ms. Garnica received nominal wages for her work which were well below even subsistence levels and was told by Edwards, when she asked why she was not receiving the additional compensation promised to her by Edwards while in the family was in Chile, that Edwards could not afford an American worker which was why she brought someone from Chile. *Id.* at ¶¶ 158-160.  She also told me Garnica that she was making what an average domestic employee made in America, notwithstanding the fact that she was earning only a flat daily fee for a mandatory six day a week, 12 hours per day schedule.  *Id.*  Ms. Garnica's regular rate of pay was in fact well below the federal and New York State minimum wage at the time.  *Id.* at ¶ 198.

Defendants also failed to timely pay Ms. Garnica even those nominal amounts she earned, causing Plaintiff great distress and hardship.  *Id*. at ¶¶ 158.  By a plain and reasonable inference, Defendants knowingly intended to underpay Ms. Garnica and hid their intentions by deferring any clarification of her compensation until Ms. Garnica and the family were no longer in Chile and Ms. Garnica was without the information or resources needed to make uncoerced decisions about whether or not to accept the position.  *Id*. at ¶¶ 138, 158-160.   Defendants

lifestyle, in the upper echelon of Chilean aristocracy, made them assume that they would require a nanny, when in fact, they knew that they could not financially afford a full-time nanny because neither would have any income – Edwards would be a full-time student and Hurley could not work while in New York because he did not have a work visa.  *Id.* at ¶¶ 108-113, 187-188. Hurley ███████████████████████████████████████████████ ██████████████████████ at least two-years in New York, including paying for food, rent on the Upper East Side, ████████████████e, and a full-time live-in nanny.[5]  *Id.* at ¶ 113.

Ms. Garnica was also isolated from the outside world. She was told on multiple occasions that she should not leave the house, that she should not speak with strangers, and that if she left alone she could get lost.  *Id.* at ¶¶ 183-186.  Ms. Garnica was told by Defendants that she did not have access to medical care because she was not an American citizen and that she could be arrested if she attempted to call 911.  *Id.*

Additionally, the children would repeatedly hit, shove, push and slap Ms. Garnica to the point that she had documented bruising.  *Id.* at ¶¶ 168-170.  On one occasion, Rex shoved a metal scooted into Ms. Garnica and it hit her between the eyes.  *Id.*  Finally, on the day Ms. Garncia left Defendants' employ Rex slammed a refrigerator door on Ms. Garnica's head.  *Id.* at ¶170.  Hurley also had a temper and on one occasion demanded that Ms. Garnica, along with the children, remain inside their room and not come out for any reason.  Ms. Garnica was so scared of Hurley's unpredictable temper that she feared he would smother her with a pillow. Pl. Tr. at 386:10-11.

On approximately February 6, 2011 Ms. Garnica told Edwards that she was not happy and wanted to go home; however, Edwards manipulated her and convinced her to stay.  *Id.* at ¶¶

---

[5] The cost of living and raising a family in New York City is, on average, $10,000 per month. However, in looking closer at this data, it is obvious that certain figures are under estimate. For example, a two bedroom on the Upper East Side of Manhattan in 2011 ranged around $4,000 per month.  *See* http://www.epi.org/resources/budget/.

149-151.  Ms. Garnica again told Edwards that she wanted to leave on, at least, February 21, 2011 and March 5, 2011.  *Id*. at ¶¶ 153-155.  When Ms. Garnica finally gathered the courage to leave the Defendants house, she did so in such a hurry that she left without her suitcase and without most of her belongings.  *Id*. at ¶ 194.  Ms. Garnica contacted Safe Horizon when she left and was placed in a hotel for a few nights before a shelter placement could be arranged.  *Id*. at ¶ 196.  After leaving Defendants employ on March 14, 2011, Plaintiff went to the Department of Labor to issue a complaint about the Defendants failure to pay her earned wages. *Id*. at ¶ 197.  The Department of Labor issued a judgment for Plaintiff and required the Defendants to pay $6302.54.  *Id*. at ¶ 198.  Plaintiff has since applied for and was granted a U-Visa for victims of crimes. *Id*. at ¶ 199.

## ARGUMENT

### I.   <u>Standard of Review</u>

Summary judgment is only proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  The Court is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52. A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  The Court should "view the evidence in the light most favorable to [the nonmoving party] and must leave all credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences to the jury."  *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013) (internal quotation marks omitted).

## II.   The Evidence Establishes That Defendants Obtained Forced Labor From Ms. Garnica In Violation Of The TVPRA

The evidence, including all the deposition testimony, credibly shows that Ms. Garnica was a victim of forced labor at the hands of the Defendants, as proscribed in Section 1589(a) of the TVPRA.  Civil liability for forced labor under 18 U.S.C. 1589  requires a finding that (1) the defendant obtained the labor or services of another person; and (2) the defendant did so through one of the following prohibited means (a) through serious harm or threats of serious harm to ... that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to ... that person or any other person; or (c) through the abuse or threatened abuse of the law or the legal process; and (3) the defendant acted knowingly.  *Shukla v. Sharma*, 07-CV-2972 (CBA) (CLP), 2012 WL 481796, *2 (E.D.N.Y. Feb. 14, 2012), appeal dismissed (June 1, 2012) citing *United States v. Sabhnani*, 539 F.Supp.2d 617, 629 (E.D.N.Y.2008).  Not only does Plaintiff's claim fall within the protection of the statute, but the narrow interpretation promoted by Defendants is contradicted by both the plain language of the statute and the legislative history of the bill, both of which reference protection from forced labor coerced through psychological, financial *and* legal manipulations.

While Defendants attempt to argument to the contrary, the statute is very clearly intentionally broad, and defines the term "abuse or threatened abuse of law or legal process" as the use or threated use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action; and the term "serious harm" as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.*; *See also* 18 U.S.C. § 1589, as amended by Pub.L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law).

Even assuming some lack of clarity on the face of the statute, and clearly none exists, the legislative history of the statute demonstrates Congress's intent to broadly define "serious harm" to include the psychological and financial harm suffered by Plaintiff.  According to the legislative history of the original trafficking bill, the term "serious harm...refers to a broad array of harms, including both physical and nonphysical."  H.R.Rep.No. 106-939, 101 (2000) as reprinted at 2000 WL 1479163, at *101.  As such, the TVPRA, and the 2008 amendments, are "intended to address the increasingly subtle methods of traffickers … such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence", and were unambiguously designed to create a more expansive scope of the statue's reach.  H.R.Rep.No. 106-939, at 101; *See also See Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) citing Pub.L. No. 108–193, § 4(a)(4), 117 Stat. at 2877; Pub.L. No. 110–457, § 221, 122 Stat. 5044, 5067 (2008).  Further, the

legislative history indicates that Congress enacted the TVPRA, as modified by the 2003 amendments, intending to provide private public prosecutors and private civil litigators "with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude…"  H.R. Conf. Rep. No. 106-939, at 101, as reprinted at 2000 WL 1479163, at *101; *See also Velez,* 693 F.3d at 324 (acknowledging December 2003 amendment to the TVPRA).

In evaluating a claim under the TVPRA, the Court must determine whether "a reasonable person of the same background and in the same circumstances" was forcibly compelled to provide labor under the plaintiff's particular circumstances.  *See Shukla,* 2012 WL 481796, at *2 (court applied the aforementioned reasonable person standard in deciding that a reasonable jury could find that someone in a similar situation as the plaintiff would have felt compelled to continue working); *See also Garcia v. Curtright,* No. 6:11-06407-HO, 2012 WL 1831865, *4 (D.Or. May, 17, 2012) (noting that "a threat of harm must be considered from the vantage point of a reasonable person in the place of the victim and must be "sufficiently serious" to compel that person to remain with the employer); § 1589(c)(2) (defining "serious harm" under the subjective reasonable person standard).[7]  Defendants fail to fully appreciate that the jury could, and will, consider plaintiff's background and circumstances along with her testimony that she was afraid of Defendants.  Furthermore, there is no set minimum for conduct that is actionable

---

[7] Plaintiff is unable to locate Defendants' referenced out of circuit case which Defendants' contend applies a hybrid "objective and subjective" standard, but, regardless, it is clear that the plain language of the statue and courts in the Second Circuit apply a "reasonable person in the plaintiff's shoes" standard which is more commonly understood as an objective standard than a subjective standard.  Defendants attempt to argue a single "subjective-objective" standard is a logical absurdity.  Setting aside the "reasonable person" test, the standards are mutually exclusive.  Defendants' own arguments demonstrate this – their application of the so-called "subjective-objective" standard clearly assumes only a subjective standard and no objective elements.  Even if a subjective standard applied, it would presumably be probative of coercion and non-dispositive on the matter under the circumstances of the specific circumstances of Plaintiff's forced labor.  Further, Plaintiff would still prevail since her own vulnerabilities as a non-English speaking immigrant in the US for the first time, without any financial or emotional lifeline would necessarily be considered, creating a more complicated analysis of the facts germane to a determination on the existence of coercive force, whether physical or psychological, and unquestionably creating a fact dispute requiring jury determination.  Notably, Ms. Garnica testified more than once that she was afraid and offered a morbid resignation to fate on those occasions when she denied experiencing any fear – "If I die, I die" – which is hardly corroborative of lack of coercive force.

under the TVPRA.  *Elat v. Ngoubene*, CIV. PWG-11-2931, 2014 WL 253411, at *22 (D. Md. Jan. 21, 2014).

### A. **Ms. Garnica's Labor Was Coerced, Not Voluntary.**

Defendants' intentional misrepresentations of Ms. Garnica's legal and contractual rights intended to, and actually did, inspire fear, as did Edwards's insistence that that Plaintiff was trapped in a 2-year contract without any ability to leave which was to coerce Mr. Garnica's continued labor and services.  Defendants contend that § 1589 of the TVPRA does not apply to Ms. Garnica because she purportedly voluntarily came with the Edwards-Hurley family and voluntarily stayed with the family.  Def. Motion 29-33.  Defendants' central argument is that they never physically prevented Plaintiff from leaving their employment and she was not afraid to leave.  While possibly probative of a theory of coercion involving physical force, it is irrelevant to a theory such as Plaintiff's which involves nonphysical coercion. *See Aguirre v. Best Care Agency, Inc.,* 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013) (summary judgment on TVPRA denied, even though no physical force); *Elat,* 2014 WL 253411, at *22 (summary judgment denied even though no physical force); *Nunag- Tanedo v. E. Baton Rouge Parish Sch. Bd*., 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011) (summary judgement deined when financial coercion, not physical forece).

Plaintiff's claim relies primarily on proof that Defendants' knowingly made false representations of Plaintiff's legal protections and contractual rights, and made intentional efforts to socially and financially isolation her, all of which resulted in a sense of dependency on those who were abusing her.   Their assertions ignore evidence of the overwhelming pressure placed on Ms. Garnica arising from the circumstances of her presence in this country, and the totality of her treatment by Defendants.  These assertions also ignore Ms. Garnica's testimony that she

believed she was bound by a two year contract and contemporaneous recordings where Edwards reinforces such after Ms. Garnica requested to go home to Chile. Pl. 56.1 St. ¶ 154. This dispute of material fact alone requires denial of Defendants motion for summary judgment.

Instead, Defendants speculate that simply because Ms. Garnica had limited ability to leave her household and did not fear doing so on those occasions she was permitted to do so, her continued presence was entirely voluntary and thus not a violation of the statute. Factually, it is untrue that Ms. Garnica did not fear the consequences of leaving, as is evident by reviewing the record. *Id.* at ¶¶ 59b, 152, 155, 184. In fact, she repeatedly testified to this and when she denied experiencing fear, she did so with a far more chilling explanation – she was resigned to the hopelessness of her fate – which, according to Defendant's incorrect interpretation of the standard, would itself be highly probative of Plaintiff's subjective experience of coercion. *Id.* at ¶ 152. Legally, Defendant's assertion of the law is also incorrect; nowhere in the statue or legislative history is a fear element required; the statue simply requires a "serious harm" or threat of such to compel a reasonable person to continue to perform labor or services. *See* § 1589(c)(2) (definition of "serious harm" does not include proof of subjective fear).

Subjective experience of fear and the relative degree of physical restraint of movement are, at best, factual issues which may be probative of a plaintiff's credibility in asserting that he or she was coerced, but, standing alone, these facts don't justify or even gives rise to a plausible summary judgment argument. *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011) citing *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) (§ 1589 "is not written in terms limited to overt physical coercion" and "when Congress amended the statute it expanded the definition…to include nonphysical forms of coercion.")

Even if the Court were to find that either was probative of whether or not Plaintiff's labor was coerced, they are most certainly not *dispositive* of the question.  None of the seventy-two cases that have interpreted the TVPVA on this question have ever suggested such a reading, and none of them have held accordingly.  Defendant's incorrect understanding of the relevant law is all the more puzzling since the cases interpreting the TVPVA all uniformly hold the opposite – that these inquiries are necessarily factually complicated, requires an analysis of the totality of the circumstances, and is unlikely to raise dispositive factual issues at the summary justice stage. *Aguirre,* 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013) (denying summary judgment); *Elat,* 2014 WL 253411, at *22 (denying summary judgment); *Camayo v. John Peroulis & Sons Sheep, Inc.*, 11-cv-01132, 2012 WL 4359086, at *5 (D. Co. Sept. 24, 2012)(motion to dismiss); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 122 (D.D.C. 2012) (denying summary judgment).

Even if Plaintiff were required to show that she feared the consequences of leaving Defendants' employment, the overwhelming evidence suggests Ms. Garnica *was* afraid of Defendants and the consequences of leaving. Pl. 56.1 St. ¶¶ 59b, 152, 155, 184.  Defendants simply ignore the multiple times that Ms. Garnica testified about such.   According to Ms. Garnica, she feared the consequences of leaving her employ with Defendants, particularly because it meant she would be out on the streets alone in a foreign country where she did not speak the language and her legal status would be revoked.  *Id.*  She made this abundantly clear during her deposition testimony; however, Defendants carefully parse Ms. Garnica's words to create a record that suits their needs.   A careful reading of the record facts is far more complicated.  For instance, in response to a question about the fear she felt, Ms. Garnica stated that "the most that [Edwards] could do was [mistreat] me and then I die. You could imagine, once you die what fear would I have."  Pl. Tr. 895:6-25.   Ms. Garnica's hardened attitude and

strength of sprit doesn't negate the fact that Defendants' actual mistreatment and repeated threats compelled her to continue working.

Furthermore, Ms. Garnica's sense of isolation and the coercive effects of the Defendants' exploitation of the social dynamics between her and Edwards-Hurley family involving class, disparities in financial means, and the Edwards-Hurley family's social and political stature compared with Plaintiff's anonymity, only began to weaken after Ms. Garnica made contact with social service providers – without such individuals she was under the misimpression, intentionally created by Defendants, that she was required to continue working for the Defendants for two-years.  Pl. 56.1 St. ¶¶ 189-191.  This was a subtle but insidious form of manipulation, akin to holding onto someone's passport (which Edwards would have succeeded in doing had Plaintiff not been tipped off to the unacceptability of her actions by the flight attendant) or threatening them with deportation.

According to the record, aside from misrepresenting the commitment, Defendants also coerced Plaintiff's labor, and demonstrated an intent do so, by:

(i)      Attempting to frustrate Plaintiff's access to information and resources which would have given her the independence to avoid forced labor, such as attempting to permanently take and hold her passport and visa, throwing away a pamphlet containing information on social service organizations which assist victims of trafficking and telling her that "Americans are whiners" while disposing of the valuable information.  Pl. 56.1 St. ¶¶ 36a, 183-184.

(ii)     While in Chile Edwards expressly mentioning her concern about being suspected of "smuggling" during the trip to the US and asking for an "insider" at the Embassy to make the visa interview process go smoothly. *Id.* at ¶ 120.

16

(iii)  With respect to Defendant's intent to traffic, of particular value is Plaintiff's proof of Defendant Edwards' intent to deceive U.S. Customs officials and preclude them from access to Plaintiff's whereabouts in the United States by (i) attempting to fill out her customs form for; (ii) objecting when told that they must return the passport and customs form to Ms. Garnica and; (iii) providing them with a knowingly false address which neither the family nor Plaintiff intended to stay. *Id.* at ¶¶ 44a-44b.

(iv)  Intentionally and irresponsibly failing to prepare for the cost of employing, feeding, and providing shelter for a full time nanny and bringing her to the U.S. under the misimpression that they could meet those obligations.  Notably, both Defendants testified that they had ███████████ to support their lifestyle, ████████████████████████████ and care for children, let alone a full time housekeeper when they came to the US.  At the time they came to the US, ████████████████████████████████████████ ██████ *Id.* at ¶¶ 111-113.

(v)  Failing to pay Ms. Garnica a lawful wage and instead paying her consistent with the amount she was paid in Chile, which was not nearly enough to survive in the US.  This was despite promising to pay her "more" while in Chile and even after Edwards had reviewed the Department of website and was made aware of her obligations. [8] *Id.* at ¶¶ 138

---

[8] Before the Department of Labor, Ms. Custer stated that she failed to pay Plaintiff lawful minimum wage and overtime because she was not aware of the law, but in the taped recordings, Defendant makes it clear that she never had any intention to pay Ms. Custer a lawful wage, which is also evident from the fact of her repeated avoidance of the topic of compensation and executing a contractual employment agreement.

(vi)   Telling Ms. Garnica that her grossly inadequate wages were normal and customary in the US.  *Id.* at ¶¶ 158-160.

(vii)   Telling Ms. Garnica that she could not avail herself of health care benefits or access hospitals because of her immigration status. *Id.* at ¶ 183, 185.

(viii)   Telling Ms. Garnica that she was not protected by the police power. *Id.* at ¶¶ 184

(ix)   Failing to timely pay even those wages Defendants intended to pay Plaintiff.

(x)   As for Hurley, berating Plaintiff and insisting that she remain in bedroom with the three children "and not come out" for hours on end.  *Id.* at ¶ 158.

(xi)   Failing to make arrangements for health care or prescription medical coverage as Edwards had promised while still in Chile.  *Id.* at ¶ 186.

(xii)   Maintaining insufficient food in the household and subjecting Plaintiff to unsustainable living conditions, such as sleeping in the same bed with their youngest child. *Id.* at ¶¶ 165-167.

(xiii)   Explicitly threatening Plaintiff when she expressed displeasure with her forced labor and employment conditions, telling her, "We know powerful people in Chile," which was a clear reference to the Edwards-Hurley family's well-known influence in Chilean society, politics, and the press.  *Id.* at ¶¶ 187-188.

(xiv)   Refusing to discipline their children who assaulted Plaintiff causing physical injury. *Id.* at ¶¶ 168-170.

Refusing to purchase and provide Plaintiff with a return ticket to Chile when she indicated a desire to leave her employment and return to Chile, only relenting when Plaintiff had left the home for shelter with Safe Horizon, a turn of events

that made it certain her ordeal would be disclosed to social services agencies and medical professionals. *Id.* at ¶¶ 154-155,195.

Crucially, despite agreeing to do so prior to coming to the US, Defendants' refusal to provide a return flight to her when she asked for one more than a month before her departure was paralyzing for Plaintiff, causing her great fear that she would not be able to return to her home country and was, without question, intended to compel her labor under conditions where she had made it known to Defendants that any further labor for them would be involuntary. Pl. 56.1 St. ¶155. Ms. Garnica pleaded with Defendants to leave their employ because she was unhappy and felt that she was being mistreated. *Id.* at ¶¶ 153-155. Amazingly, despite extensive corroboration of this episode and others, Ms. Edwards denied the incident in her deposition. Edwards Tr. 336:18-337:10. According to an email exchange between Edwards and her father, dated February 6, 2011, she was able to "convince" Ms. Garnica to stay (in fact she had offered no alternatives). Davis Decl. Ex. T. Again, on February 21, 2011, in a recorded conversation, Ms. Garnica begged Edwards to leave, to which Edwards responded, "I told you back in Chile…it's going to be two years." *Id.* at Ex. I at 13:3-14:9. This is just two instances where Ms. Garnica expressed to Edwards that she wanted to leave and Edwards told her that she could not because she had committed to a two year contract. In direct contradiction to this contemporaneous evidence, Edwards testified that she only discussed the two-year period in respect to the length of her course study, not how long Ms. Garnica had to stay employed. Edwards Tr. 336:18-337:10. These allegations have the same import as similar allegations cited in other trafficking cases where an employee expresses a desire to leave, and the family involved threatens to report them to immigration officials, a fact often cited as persuasive in denying

summary judgment.  *See Elat,* 2014 WL 253411, at *21 (collecting cases); *See also United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011).

Reasonable factual inferences based on the record facts also provide support for Plaintiff's claims.  Edwards made clear that she brought a nanny from Chile because she was a student and wasn't going to be earning any money, and because, in New York, the cost of living is more expensive.  Davis Decl. Ex. K at 4:10-19.  It is unclear why Edwards was untrusting of an American nanny watching her children and taking care of her home, but a reasonable inference from the facts suggests that her reason for wanting to bring someone from Chile was because of a desire to pay less than required under U.S. wage and hour law and to be able to control manipulate and utilize her power and influence over a weaker, and less sophisticated Chilean nanny.

Defendants stress the fact that Ms. Garnica was allowed out of the house "freely" for a few short hours on 13 separate occasions, totaling approximately two full days off, as evidence that her choice to return to Defendants home was voluntary.  The fact that Ms. Garnica was able to leave the apartment on occasion does not mean that she could have simply walked away from Defendants employ at any time she desired.  In *Elat v. Ngoubene*, the plaintiff was able to leave the defendants home in the to run personal errands, attend classes, and at one point even returned to her home country of Cameroon and willingly returned back to defendants home in the U.S. *Id.* at  *25.  Even in light of plaintiff's ability to physically leave the defendants home from time to time, the Court in *Elat* denied defendants motion for summary judgment because a reasonable jury could find, when considering all the attendant circumstances, that the plaintiff was compelled to stay.  *Id.*

Similarly, the fact that Ms. Garnica was able to leave Defendants home from time to time does not preclude a finding that Ms. Garnica's labor was compelled.  Ms. Garnica had no money to purchase a plane ticket to Chile and she feared Defendants would never provide her one. Pl.Tr. 387: 12-15; 896:8-11.  Had she left, Ms. Garnica would have been out on the streets in a foreign country in the dead of winter with very little money, no food, no support system, and no access to social services, health care, or medicine. Pl. 56.1 St. at ¶¶ 176-178, 190-192. Furthermore, her immigration status would have been immediately revoked and she would be subject to deportation.  *Id.* at ¶ 156.  Ms. Garnica's lack of financial resources combined with the isolating circumstances, i.e. being in a foreign country, not speaking the language, and knowing no one here, could be viewed by a jury as demonstrating that Plaintiff remained with Defendants involuntarily. *See Elat*, 2014 WL 253411, at *25.

Defendants' position also fails to recognize the unique power they had to control Plaintiff's decisions.  Ms. Garnica never denied that she technically could have left Defendants home on multiple occasions, but as is so often the case with victims of psychological abuse, they always hope and believe their abuses will come around and that their circumstances will improve—as Ms. Garnica said, "you have to make –take—you have to step forward. You have to make the decision"—and it isn't an easy decision to make.  Pl. Tr. 538:4-6; 738:19-740:2. Furthermore, as Ms. Garnica testified she was hoping she would be allowed the time off promised and that she would receive the wages she was owed.  *Id.* at 898:11-19; Pl. 56.1 St. at ¶ 191.  Defendants reasoning, namely, that since Ms. Garnica didn't leave when the first opportunity presented itself that her labor was thus voluntary, completely ignores all the truths we have come to learn about the psychosis of psychologically abused individuals.  Leaving was not a decision entered into lightly as Defendants would like this Court to believe.  As noted

above, there were dire consequences both upon leaving and upon staying that Ms. Garnica needed to process and evaluate. Pl. 56.1 St. ¶¶ 155-156, 178.

None of the facts cited by Defendants preclude a claim for forced labor.  While, it is certainly possible to contrast Ms. Garnica's treatment with egregiously cruel cases of coercion and trafficking and postulate that Ms. Garnica's treatment was comparatively benign, "the discussion concerning whether [Ms. Garnica has] stated a valid claim under § 1589 does not end simply because [she does] not allege the same severe physical and psychological harm" as in the worst cases. *Nunag,* 790 F. Supp. 2d at 1145. "The TVPA not only protects victims from the most heinus human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor." *Id.*

Permitting Ms. Garnica to recover from those who obtained and benefited from her forced labor is precisely what Congress created §§ 1589 and 1595 to do.  Considering all these facts, a reasonable jury is likely to believe that the Defendants did and said anything to ensure that Ms. Garnica felt compelled to continue working and that Ms. Garnica did in fact feel compelled to do so.  Ms. Garnica's labor simply was not voluntary under the TVPRA.

B.  **Defendants Obtained Ms. Garnica's Labor Through Serious Harm And/Or Threats of Serious Harm**

Defendants pressured Ms. Garnica into continuing to perform labor through actual and threatened psychological and financial harms.  Such harms include, but are not limited to, not paying Ms. Garnica lawful wages, telling her that she was not a resident and thus not eligible for certain benefits including emergency services and health care, neglecting the fact that the children hit Ms. Garnica to the point of documented bruising, and withholding Ms. Garnica's plane ticket back to Chile after she specifically requested it.

The plain language of the statue makes clear that someone is liable under the TVPRA if they intend "to cause a person in his [or her] employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputation harm—that would compel someone in her circumstances to continue working to avoid that harm." *Dann*, 652 F.3d at 1169-70; *See also Shukla*, 2012 WL 481796, *2; 18 U.S.C. § 1589, as amended by Pub.L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law). As such, an employer cannot intentionally manipulate the situation so that their employee would feel compelled to remain and would obey all of employer's demands. *Nunag,* 790 F. Supp. 2d at 1146.

Serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion." *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) *cert. granted, judgment vacated on unrelated grounds,* 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005) (citing H.R. Conf. Rep. No. 106–939, at 101). Psychological coercion, as envisioned by the statue, may comprehend the overall working conditions an individual is subjected to. *Shukla,* 2012 WL 481796, at *2-3. Ms. Garnica was subjected to a variety of harms that constitute serious harms or threats of serious harms, as envisioned under the statute.

   i.  <u>*Defendants' Intentional Non Payment Of Ms. Garnica's Earned Wages*</u>.

First, Defendants intentionally failed to pay Ms. Garnica her earned wages in violation of state and federal wage and hour laws.[9] *See Panwar v. Access Therapies, Inc.*, 1:12-CV-00619-TWP, 2013 WL 5486783, at *7 (S.D. Ind. Sept. 30, 2013) (court noted that "Congress explicitly

---

[9] Defendants attempt to place the threat of termination within the threat of financial harm, which while true, it is a threat of financial harm, and arguably a significant one, the case law suggesting that the threat of termination is not a serious financial threat is inapplicable here because here the threat of termination is more akin to the threat of deportation—exactly what would have occurred has Ms. Garnica been terminated. *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 10-CV-1341 JFB ETB, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012). Thus, Defendants again fail to comprehend the crux of Plaintiff's argument—that the threat of termination was psychologically abusive and manipulative, and akin to an abuse of legal power and improper use of immigration law.

contemplated that the TVPA could apply where a defendant engages a plaintiff in forced labor by means of violations of labor laws).   Defendants intentionally denied Ms. Garnica her earned wages as a form of psychological manipulation intended to keep Ms. Garnica dependent on them for all of her basic life necessities, including food and shelter.   Defendants' abuse of legal process, and the psychological and financial harm faced by Plaintiff was sufficiently serious.

Moreover Defendants never intended to pay Ms. Garnica pursuant to their written agreement, or at the very least, the statutorily required minimum wage. Davis Decl. Ex. K at 3:4-7.   Edwards told Ms. Garnica that she was earning "the same as an average lady worker" in the United States and that people in the U.S. only make about $1,300 to $1,400 per month" – clearly a coercive attempt by Edwards to assuage Ms. Garnica's concerns over her nominal wages and make her feel compelled to continue working for Defendants.   Pl. Tr. 782: 2-25; Davis Decl. Ex. K at 4:1-3.   By denying Ms. Garnica her wages and blatantly lying to her about her rights under the labor laws, the Defendants clearly benefited from and exploited Plaintiff's services as their nanny and Plaintiff was compelled to continue working with Defendants because she did not have the financial resources to leave and her visa would be revoked if she left voluntarily. *See, e.g., Nunag,* 790 F.Supp.2d at 1144; *Panwar,* 2013 WL 5486783, at *7-8 (violations of the labor law are an abuse of law and serious harm); *Calimlim,* 538 F.3d 706, at 714 (threatening to not pay victims family members was a serious harm).

      ii.    <u>Defendants' Intentionally Subjected Ms. Garnica To Working Conditions Intended To Compel Her Labor.</u>

Ms. Garnica's overall working conditions, including the long hours worked, the sleeping arrangements, and her overall lack of privacy and personal time, was psychologically coercive so as to compel Ms. Garnica to continue working for the Defendants.   Plaintiff worked extremely long hours, generally between 10 to 15 hour days with only two full days off during her entire

employment.[10]  Davis Decl. Ex. EE.  Furthermore, Plaintiff not only shared a room with the three

children, but also shared a bed with the youngest, Olympia.  Pl. 56.1 St. ¶ 162. As such, it is hard

to imagine any time when Ms. Garnica was in the apartment, even at night while in bed, that she

was not "on duty."  *See Shukla,* 2012 WL 481796, at *2-3 (court found that plaintiff, who

worked long hours, slept in a small cramped windowless room, and had his privacy and freedom

restricted, had a plausible claim that he was subjected to serious harm that compelled him to

continue working as envisioned under the TVPRA); *see also United States v. Farrell,* 563 F.3d

364, 373 (8th Cir.2009) (a relevant factor in whether the victims labor was compelled included

testimony that  his rigorous work schedule "precluded sleep at least four times a week"); *United*

*States v. Veerapol,* 312 F.3d 1128, 1130–21 (9th Cir.2002) (considering working conditions,

including "excessive working hours," in analyzing involuntary servitude claim); *Sabhnani,* 539

F. Supp. 2d at 620 (discussing working conditions); *Elat,* 2014 WL 253411, at *25 (plaintiff who

slept in an private addition to the defendants home, which had no heating or cooling system was

considered in determining if subjected to serious harms); *Canal v. Dann*, 09-03366 CW, 2010

WL 3491136, at *1 (N.D. Cal. Sept. 2, 2010) amended, 09-03366 CW, 2011 WL 3903166 (N.D.

Cal. Sept. 6, 2011) (plaintiff slept in the living room where she had no personal space or

privacy).  Ms. Garnica is an adult woman who was forced to share a bed with a four year old

child and a bedroom with two other children.  As such, she was denied even a hint of privacy,

had practically no free-time, and was working essentially around the clock.  Furthermore, at

night, as if she was one of the children, Edwards would request Ms. Garnica turn off her reading

lamp. Pl. 56.1 St. ¶ 163.  The overall working conditions Ms. Garnica was subjected to were

psychologically coercive and constitute a serious harm as envisioned by the TVPRA.

---

[10] Even on her so called days off, Ms. Garnica had a "limit" on how long she was allowed to be out of the
house.  Pl. 56.1 St. ¶

iii. *Defendants Intentionally Neglected Ms. Garnica's Constant Complaints About Physical Abuse By Children*

Defendants neglected Ms. Garnica's constant complaints about the physical abuse she suffered at the hands of Defendants' children, which was psychologically coercive, and viewed by Plaintiff as such. Pl. 56.1 St. ¶ 151, 172. Apparently, according to Defendants, Ms. Garnica should have "ducked away" and was "strong enough" to stop the abuse. None of this is relevant.[11] Whatever Ms. Garnica's reason for not stopping the abuse[12], it does not change the fact that Defendants' ignored Ms. Garnica's complaints entirely. Edwards only response was that the children's behavior was because of all the changes they were experiencing. Pl. Tr. 306-12, 322: 19-22. Furthermore, Defendants ignore entirely the photographic evidence of massive bruises that developed on Ms. Garnica's body due to the physical abuse by the children. Davis Decl. Ex. 23. Regardless of what caused the children's behavior, Defendants' knowingly allowed the children to physically abuse Ms. Garnica so that she would be weak and afraid to leave. Pl. Tr. 338-340.

iv. *Defendants Intentionally Neglected Ms. Garnica's Medical Needs.*

Defendants' intentionally denied Ms. Garnica essential health insurance coverage that was promised to her and blatantly lied to her about her ability to obtain such. Defendants conduct was psychologically coercive and done to compel Ms. Garnica to continue working for them. Defendants also never intended to purchase Ms. Garnica her medications as promised. Pl. 56.1 St. ¶ 186; Davis Decl. Exs. K at 4:17-5:17 . While Defendants claim to have, at a later time, purchased Ms. Garnica's medications from Chile, it is clear from contemporaneous recordings,

---

[11] Defendants attempt to characterize the physical abuse by the children as failing under the TVPRA because it was insufficient to be considered threatened or actual physical. However, Defendants once again fail to comprehend the crux of Plaintiff's arguments—that by neglecting Plaintiff's constant complaints about the abuse she experienced, including after being shown Plaintiff's massive bruises, Defendants were psychologically abusive and manipulative, so as to make Ms. Garnica feel like a lesser human being, deserving of such ill treatment.

[12] It is clear from Plaintiff's testimony that one of the reasons she did not stop the abuse was because she understood it was stemming from the children's hunger and therefore she felt sympathetic. Pl. 56.1 St. ¶ 173.

that Defendants did not intend to pay for such medications, and rather expected Ms. Garnica to

cover those costs and find a way to do so without health insurance.

> **Ms. Garnica**: I also wanted to tell you that the other day I went to the pharmacy to buy some medicine.
> **Ms. Edwards**: Yeah…
> **Ms. Garnica**: And that I had to bring them the insurance card. Then she said, "but do you work here"
> **Ms. Edwards**: So they could give you a discount? Or did they say what it was for?
> **Ms. Garnica**: Yes, I told the girl that I did not know what card she was talking about. Then I told her I came to buy [illegible] so she said "but do you work here?". I said, "yes" and she said "But do you have a contract?" I said yes.
> **Ms. Edwrads**:  Yes, but tell them that you live here as a foreigner, and not as a New Yorker.
> **Ms. Garnica**:  Then I said [ilegible]. Then After I said "In what way can I buy medicine if you don't let me?" Then I told her to tell me the name – of the [background noise]
> **Ms. Edwards**: But why dont they send it to you from Chile?
> **Ms. Garnica**: Because it's going to be more expensive.

Davis Decl. Ex. K at 4:17-5:17 and M at 3:6-13.

Contrary to her deposition testimony where, Edwards testified that she just had simply

not gotten around to purchasing health insurance yet (Edwards Tr. 613:8-23) the above

transcription of contemporaneous conversations between Ms. Garnica and Edwards make clear

that Edwards did not intend to pay for Ms. Garnica's medical coverage and instead lied to her

saying she was not eligible for insurance coverage because she was a foreigner.  Furthermore,

Hurly also perpetuated the same misinformation to Ms. Garnica—that she was not entitled to

health insurance because she was a foreigner.

> **Ms. Garnica**:…I went to the pharmacy to see how I could get my medicine, they told me that I needed to bring a [crosstalk] one, what's it called?  A card for the - -
> **Mr. Hurley**:  [interposing] A what? For what? - -
> **Ms. Garnica**: No, insurance they call it here, it's what's called FONASA in Chile.
> **Mr. Hurley**:  Well, tell Malu [phonetic] - - you can ask her.
> **Ms. Garnica**: Good, because they told me that without that card they couldn't - -
> **Mr. Hurley**: [interposing] [crosstalk]
> **Ms. Garnica**: [background noise] They told me I had to bring an insurance card and I told them I didn't know what that was.
> **Mr. Hurley**: Yes, that's for residents.

**Ms. Garnica**: It's for residents, then? [background noise]
**Mr. Hurley**: - - No, it's insurance - - [background noise] a registered number.
**Ms. Garnica**: Yes.
**Mr. Hurley**:  And they're for residents, five years and above.[13]

Davis Decl. Ex. M at 3:6-13.

Not being able to get her medications in the U.S. meant that Ms. Garnica's blood pressure was unregulated and she became increasingly ill over time. Pl. 56.1 St. ¶ 186.  Defendants' claim that Ms. Garnica rejected offers of medical help; however, that completely mischaracterizes her testimony.  First, Edwards refused to assist Ms. Garnica in obtaining medical attention because she was not "going to go to a hospital of poor people" and she further lied to Ms. Garnica and told the police and hospitals would not help her because she was not an American citizen. Pl. Tr. 768:19-773:24; 899:10-25; 938: 9-18; 1162:14-23.  Having never traveled abroad before, and because she trusted Defendants to act in her best interest, she believed what they told her. Pl. Tr. 400: 12-18, 401: 5-9, 404: 5-13; 772:20-24.  Furthermore, Ms. Garnica believed Defendants because at that point she had yet to read the pamphlet she had been given by the Embassy that explained her rights and had not yet reached out to social service providers and after she did reach out she still trusted Defendants they were closest person to her.  Pl. Tr. 404:14-21; 772:20-24.  Ms. Garnica did not seek medical attention or call 911 because she was afraid of what Defendants' reaction would be and afraid that if she called 911 she could be arrested.  Pl. Tr. 750-751.  Finally, Ms. Garnica simply wasn't feeling well enough to go to hospital on her own. Pl. Tr. 748: 12-15.

> v.      *Defendants Threated Ms. Garnica With The Power And Influence Her Family Wielded In The United States and In Chile.*

---

[13] Ms. Garnica testimony supports her position that she was informed by Mr. Hurley that she would need to wait five years until she could receive medical care in the United States. (Garnica Tr. 902: 8-13).

Edwards threats regarding the power and influence of her family also constitutes serious harm.   Ms. Garnica testified that she was concerned about what might happen to her and her family if she left the Defendants' employ, particularly what would happen to her son who had a good job a civil engineer in Santiago, Chile.[14] Pl. 56.1 St. ¶¶ 187-188.  A scheme, plan, or pattern intended to cause a belief of serious harm may refer to intentionally causing the victim to believe that she or her family will face harms such as banishment, starvation, or bankruptcy in their home country. H.R.Rep.No. *106-939, at* 101(2000).  Consequently, Edwards comments that she belonged to a "powerful and [Ms. Garnica] should be very, very careful with what you say or do" and that "if you try to do anything your attempts will be in vain" was clearly a threat.  Pl. 56.1 St. ¶ 187-188.  Edwards went on to tell Ms. Garnica that "my family is a very influential family." Pl. 56.1 St. ¶ 187-188.  The Edwards family is financially and politically influential and has played and still plays a significant role in Chilean politics, especially as owners of its most influential newspaper chain, El Mercurio. Davis Decl. Ex. GG.  El Mercurio played a role in the military coup bringing to power General Pinochet through funds received by the CIA. Davis Decl. Ex. HH.  Defendants are part of a family of power and influence in all parts of Chilean life, and Plaintiff was afraid of what they could do to her, and particularly her son. Pl. 56.1 St. ¶ 188.  To that effect, her son was so scared of the power and reach of the Edwards family that he effectively cut ties with his mother to avoid any negative effects his association with his mother may bring him.  Thus, Defendants threats about the power and influence of their family undoubtedly made Ms. Garnica believe that her or her family would face serious harms. H.R.Rep.No. *106-939, at* 101(2000).

---

[14] Again, Defendants attempt to argue that the threat of the family's power and influence in Chile fails under the TVPRA because it was insufficient to be considered threatened or actual physical.  Once again, Defendants' fail to comprehend the crux of Plaintiff's argument—that the threats about the Edwards family's power, which is known throughout Chile, were psychologically coercive so as to compel Ms. Garnica's continued labor.

> vi.   *Defendants Intentionally Withheld Ms. Garnica's Plane Ticket Home After She Requested To Go Back To Chile.*

Defendants denied Ms. Garnica a plane ticket home to Chile even after she had requested to go home on multiple occasions, beginning about a month before she finally ran way.  Pl. 56.1 St. ¶¶ 154-155.  One of the main reasons Ms. Garnica stayed with Defendants was because she was waiting for Defendants to purchase her a plane ticket home since she didn't have any money to purchase one herself.  Pl. Tr. 387: 12-15.  However, after weeks passed, and Defendants still refused to buy her a return ticket to Chile, Ms. Garnica ultimately made the drastic and courageous decision to leave Defendants employment without most of her belongings, with no place in the U.S. to call home, and with little money to survive. Pl. 56.1 St. ¶¶ 177-178, 193-194.  Only after Ms. Garnica gathered the strength and courage to leave did Defendants' offer her a ticket home for March 28, 2011, 6 weeks after she first requested such. *Id.* at ¶ 101a.   At that point it was too little, too late.[17]

Furthermore, Ms. Garnica had been experience multiple medical complications during her time with Defendants and was advised by Safe Horizon and her subsequent doctors that she should seek the medical care she so desperately required before returning to Chile. Pl. Tr. 939:12-14; 952: 16-25; 956:10-13.  As it turns out she required surgery to place shunt put in her brain, possibly caused by the blunt trauma to her head when the refrigerator door was slammed on it.  Davis Decl. Ex. W.  Additionally, while seeking medical attention, Plaintiff sought counsel of an immigration attorney and was advised that she could and should apply for a U-visa, a special visa for immigrants who are victims of crimes, which she was ultimately granted.  Pl. 56.1 St. ¶ 199.  Finally, through social service providers, Ms. Garnica was advised that she

---

[17] As an indication of how little responsibility Defendants have taken for their conduct, they have repeatedly insisted that they are the victims of Plaintiff's efforts to enforce her statutory rights, including begrudging Plaintiff for failing to provide her 2-week notice.

could seek full payment of wages owed through the New York State Department of Labor, and to do so she needed to stay in the U.S.  Pl. 56.1 St. ¶ 196-199.

Given all of these facts, taken independently and in totality, a jury could certainly conclude Defendants conduct was "sufficiently serious…to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." § 1589(c)(2).

C. **Defendants Obtained Ms. Garnica's Labor Abuse Or Threatened Abuse Of The Law or Legal Process.**

Defendants coerced and manipulated Ms. Garnica into performing labor through abuses and threaten abuses of the law and legal process, including, intentional misrepresentation of her basic and fundamental rights as a non-citizens and threats of terminating her employment which would result in immediate deportation and obfuscation of her immigration status.  In 2008 the TVPRA was amended to clarify that "abuse of legal process" means "the use or threatened use of a law or legal process, whether administrative, civil or criminal, *in any manner or for any purpose for which the law was not designed*, in order to exert pressure on another person." 18 U.S.C. § 1589(c)(1) (emphasis added).

Defendants' argument that the threat of deportation is the only recognized for a claim under this section of the TVPRA is a logical falsity—just because only deportation has been addressed, does not logically lead to the conclusion that it is the only recognized abuse of the law or legal process recognized. However, even if required to show the threat of deportation, Plaintiff can.

       i. *Defendants' Intentional Misrepresentations of Ms. Garnica's Basic Rights As A Non-Citizen Constitute An Abuse Or Threatened Abuse of the Law Or Legal Process*

Frist, Edwards told Ms. Garnica that if she called 911than she would be arrested because she was not an American citizen. Pl. 56.1 St. ¶ 183.  Unlike Defendants characterization of Plaintiff's testimony, she was never asked to "recount the specific words Edwards used" but rather to explain how Edwards "presented" to her the fact that she was under no circumstances to call 911.  Further, she did not testify that Edwards did not want her to call 911 furiously but rather that Edwards did not want her to call 911 because, according to Edwards, the NYPD makes a big deal out of small things, probably things like not paying your nanny proper wages, or lying to your nanny about her fundamental rights, or denying your nanny promised medical care.

Second, as described in Section II(B)(iv), *supra*, Defendants both told Ms. Garnica, who suffered from hypertension and took daily medications for such, that health insurance was only for New Yorkers, not foreigners. Pl. 56.1 St. ¶¶ 88d-88e.  As such, Ms. Garnica would not be able to obtain her medication—medication that Defendants had promised to provide—at an affordable price. *Id.* at ¶88c.  Contrary to Edwards deposition testimony, Defendants never intended to purchase Ms. Garnica's health insurance, nor did they intend to purchase her medication. Pl. 56.1 St. ¶ 88d.  If they did, why tell her she was not eligible for health insurance and why ask her if she could have her medications sent to her from Chile.

Third, as described in Section II(B)(i), *supra*, Defendants abused the wage and hour laws by failing to pay minimum wage or overtime, and by deceiving Ms. Garnica into believing she was making the same as an "average women worker" in New York so she would feel compelled to continuing working.  *See Panwar,* 2013 WL 5486783, at *7 (court noted that "Congress explicitly contemplated that the TVPA could apply where a defendant engages a plaintiff in forced labor by means of violations of labor laws).

Under the circumstances, Edwards's statements regarding Ms. Garnica's rights, or lack thereof, as a non-citizen were an abuse of the law and legal process, used to exert pressure on Ms. Garnica and cause her to remain faithful and continue working for Defendants. Weather a reasonable juror would believe that given these facts, Ms. Garnica was pressured into taking some action or refraining from taking some action because of Defendants abuses and threaten abuses of the law and legal process, is again, an intensely factual analysis that requires the parsing of disputed issues of material fact. As such, summary judgment is inappropriate.

> ii. *Defendants Threats That Ms. Garnica Would Be Fired Are An Abuse Or*
> *Threatened Abuse of The Law Or Legal Process.*

Defendants threats that Ms. Garnica would be fired, constituted a classic case of threatened abuse of the law or legal process under Section 1589(a)(3) because in Ms. Garnica's case, if she was fired, she would be deported. *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D. C. 2012) (noting that many courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process). It is immaterial if such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude. *United States v. Kozminski,* 487 U.S. 931, 948, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). Referring to immigration law or legal status in the United States, for the purposes of intimidation and coercion, falls within the ambit of the forced-labor statue. *See Calimlim*, 538 F.3d at 713; *Nunag*, 790 F.Supp. 2d at 1146; *Camayo v. John Peroulis & Sons Sheep, Inc.*, 11-cv-01132, 2012 WL 4359086, at *4-5 (D. Co. Sept. 24, 2012); *Ramos v. Hoyle*, 08-21809-CIV, 2008 WL 5381821, at *4 (S.D. Fla. Dec. 19, 2008) (citing *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917 (W.D.N.Y. Dec. 2, 2003)) (rejecting argument that "a threat to Plaintiffs that they would lose their immigration status if they left Defendants' employment was a "truthful statement and not an abuse of legal process'"). Defendants implied

warnings that she could be arrested because she was not an American, that she would be fired and lose her legal status, and that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make Ms. Garnica believe that she or her family would be harmed if she tried to leave. *See Calimlin,* 538 F.3d at 713 (court found that all the jury needed to convict defendants was implied warnings that plaintiff could be deported and comments that they were the only ones that could legally employ her); *see also Dann,* 652 F.3d 1160, 1172 (holding that "[a] juror could reasonably have concluded that Dann intended to keep Peña Canal in fear of serious immigration consequences" based on the fact that Dann "repeatedly threaten[ed] to send Peña Canal back to Peru," even though "Dann never explicitly threatened deportation"). .

As previously explained, Defendants incorrectly cite cases for the proposition that failing to plead and prove threats of deportation, or other case-specific facts subsequent found to be sufficient to avoid summary judgment, is not dispositive on the issue of forced labor.  This is a logical flaw – Plaintiff simply needs to demonstrate sufficient evidence, from any factual circumstance, that her labor was coerced according to one of the methods outlined in the statute. By analogy, Defendants argue that the threat of deportation was not sufficient to force her labor because Plaintiff testified that she wanted to return to Chile, but courts have found that returning to Chile lawfully and being subjected to deportation are clearly distinguishable.  *See Shukla,* 2012 WL 481796, at *4 (court found that returning to India lawfully and being subjected to deportation are clearly distinguishable).

Finally as mentioned in Footnote 9, *supra*, *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 10-CV-1341 JFB ETB, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012) is inapplicable to the facts presently before the Court.  Defendants' arguments and reliance on

34

*DeSilva*, as they relate to the threat of termination, miss the mark entirely and only address termination in relation to financial harm and not deportation.

First, as a point of clarification, Plaintiff has no obligation to plead and prove any threats. To the extent threats are probative of whether or not Plaintiff's labor was forced, Plaintiff has never claimed that she was threatened with termination; rather, she was threatened with *continued forced employment under abusive circumstances.* Regardless, Plaintiff need not prove or plead threats. So after being subject to intentional isolation, misrepresentations of her contractual obligations (let alone the consequences of breach, which Defendants made seem dire), deprivation of information, money, medical treatment, and medical prescriptions which fostered helplessness, and after Plaintiff actively expressed a desire to leave, she was forced to remain, resulting in her further isolation in an abusive job thousands of miles from her home and family. Second, even if the Court were somehow find the facts of *DeSilva* analogous to those before it, Defendants fail to acknowledge the unusual factual circumstances of the case, namely, claims that *did not* involve immigrant plaintiffs whose legal status in the U.S. depended on their employment with the defendant. The *DeSilvia* decision, while not explicitly nonprecdential, has never been cited in trafficking case and gives every indication that its holding is likely to be limited to its unusual facts. As such, *DeSilvia* is entirely irrelevant and inapposite to Ms. Garnica's claims.

*Alvarado v. Universidad Carlos Albuizu, Inc.*, No. 10-22072-CIV, 2010 WL 3385345 (S.D. Fla., Aug. 25, 2010) is equally misplaced, because that case "did not involve 'threats' of deportation…rather, the employer merely threatened to withdraw support for the employee's application to extend [his] labor certification." *Camayo,* 2012 WL 4359086, at *4-5. Additionally, unlike Ms. Garnica, the plaintiff in *Alvarado* was making $90,000 a year and was

not entirely dependent on his employer for life's basic necessities.  Thus, similar to the court in *Camayo*, where employers threatened deportation, this Court should find *Alvarado*, and the cases cited therein, to be "not particularly persuasive in the circumstances presented here." *Camayo*, 2012 WL 4359086, at *4-5.   Furthermore, there is no set minimum for conduct that is actionable under the TVPRA.   *Elat*, 2014 WL 253411, at *22.  As such, a juror could reasonably conclude that implicit threats of immigration consequences is sufficiently serious and/or even just a single threat sufficient to create an issue of fact.  *See Elat*, 2014 WL 253411, at *21-22; *see also Dann*, 652 F.3d at 1172 (holding that "[a] juror could reasonably have concluded that Dann intended to keep Peña Canal in fear of serious immigration consequences" based on the fact that Dann "repeatedly threaten[ed] to send Peña Canal back to Peru," even though "Dann never explicitly threatened deportation").

### D. Defendants Participated In A Scheme Or Plan of Coercion And Intimidation To Obtain Ms. Garnica's Household Labor.

Along with Defendants threats of serious harm, the totality of the circumstances of Ms. Garnica's time with the Edwards-Hurley family further establishes that the Defendants participated in a "scheme, plan or pattern intended to cause [Ms. Garnica] to believe that, if [she] did not perform…labor or services, [she] or another person would suffer serious harm…" 18 U.S.C. § 1589(a)(4).

As has been described, Defendants pressured Ms. Garnica to stay as a laborer in their home through subtle and implied (but nonetheless real) threats, and through psychological manipulation based on Ms. Garnica's immigration status, health, financial well-being, family, and the specter of the Edwards-Hurley's family's influence in both Chile and the U.S.

To be liable for obtaining labor by means of an unlawful scheme, plan, or pattern, a defendant need not be the driving force behind the manipulation or threats.  For example, the

Second Circuit upheld a forced-labor conviction based on evidence that the defendant shared a home with his wife and two maids; had seen his wife mistreat the maids; and reported anything the maids did improperly to his wife, which the wife would reprimand for outside of the defendant's presence. *Sabhnani*, 599 F.3d at 241-43.  The court noted that "[j]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences," including the inference of an unlawful agreement between two (or more) person from circumstantial evidence. *Id.* at 241-244, 244; *Elat*, 2014 WL 253411, *28 (denying summary judgment against defendants because a reasonable jury could find that, "in collusion with their parents" the defendants acted to prevent plaintiff from leaving their home).

The evidence in this case similarly shows nothing less than a comprehensive scheme by the Defendants to compel Ms. Garnica to work for them.  While Edwards was admittedly the more central actor and took a more active role in taking care of the home, paying expenses, and other such things, Defendant Hurley is not blameless here.  The law does not require a specific showing of Hurley's assent to his wife's plans.  Instead, a jury could and should use its common sense to draw inferences from both Defendants actions, which were entirely consistent with such a scheme.

The evidence in this case shows nothing less than a comprehensive scheme—that began in Chile – by both the Defendants to compel Ms. Garnica to work for them.  Edwards assuredly took the lead in deceiving and manipulating Ms. Garnica, but Mr. Hurley is not blameless here. The evidence shows, that at the very least: (1) Ms. Garnica worked long hours in Defendants home, which both Defendants present; (2) Ms. Garnica told at least one, if not both Defendants that she wanted to return to Chile; (3) Defendants limited Ms. Garnica's contact with those outside their circle of family and friends; (4) Edwards had attempted to maintain control of Ms.

Garnica's passport, and likely would have had the flight attendant not intervened; and (5) Defendants through their children threatened firing Ms. Garnica, which would result in her deportation.

Further, as discussed above in Section II.A-C., *supra*, the evidence as a whole manifests many hallmarks of a prototypical forced labor case: a vulnerable victim brought from a foreign country, explicit and implicit threats, long hours of menial work for little pay, and extreme limitations on contact with those outside the household who might shed light on the abuses and provide assistance in combating them.  The evidence shows Defendants knew and participated in this scheme and obtained labor derived from it.  Ms. Garnica is entitled to a jury determination of their liability.

III. **The Evidence Establishes That Defendants Negligent Infliction Of Emotional Distress.**

Defendants breached a duty owed to Plaintiff which directly and proximately caused her to suffer severe emotional distress.  Under New York law, a plaintiff may recover for emotional distress in the absence of direct physical injury provided that the defendant who caused the harm breached a duty owed directly to the plaintiff.  *Perrin v. Hilton Int'l, Inc.,* 797 F. Supp. 296, 300 (S.D.N.Y. 1992) *citing Battalla v. State,* 10 N.Y.2d 237 (1961).  Here Defendants, as Plaintiff's employer, visa sponsor, and providers, owed Plaintiff a duty of care to ensure that she was not subjected to danger to life or limb.

As is apparent from the forgoing cases and the holdings since *Battalla,* negligent infliction of emotional distress has developed to permit recovery for emotional harm arising from torts that involve danger to life or limb. *Gerson v. Giorgio Sant'Angelo Collectibles, Inc.,* 176 Misc. 2d 388, 391, 671 N.Y.S.2d 958, 960 (Sup. Ct. 1998).  Here, Plaintiff's uncontrolled blood

pressure and the abuse at the hands of the children constituted a danger to life or limb sufficient

to meet the legal standard.

IV.   **The Evidence Establishes That Defendants Fraudulently Induced Ms. Garnica Into Traveling To The United States As Their Housekeeper/Nanny for the Purposes of Forcing Her Labor**

The Second Circuit, in *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F. 3d 91, 98 (2d.

Cir. 1997) has enumerated the elements of a fraud claim under New York law as the following:

"(1) a material misrepresentation or omission of fact, (2) made with knowledge of its

falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5)

that causes damages to the plaintiff."  As Defendants maintain, it is well-settled that at-will

employees can neither challenge their termination in a contract action nor make a "bootstrap"

claim that the firing was in some way tortious.  *See Stewart v. Jackson & Nash*, 976 F.2d 86, 88

(2d Cir.1992).  For this reason, an at-will employee cannot state a fraud claim based on facts

arising out of his or her termination or the employer's failure to perform terms of the

employment agreement.  *Id.*

To maintain a claim of fraud in the employment context, a plaintiff must plead a

fraudulent misrepresentation collateral or extraneous to the contract.  *See Bridgestone/Firestone,*

*Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996).  Plaintiff is capable of

making such a showing.  As the Court is aware, on January 17, 2014, Plaintiff's counsel

indicated their intent to pursue only a fraud theory in litigation given that the existence of a

contract could not be proven and voluntarily dismissed Plaintiff's contract claim.  *See* Docket

Entry 7.  Furthermore, as previously discussed, after scheduling the visa interview, Edwards

carefully coached Ms. Garnica and provided and executed a template "agreement" which

purported to define some of the terms of the employment relationship, including rate of pay,

39

provision of health care and medical benefits, and who would pay for the cost of flying Plaintiff to and from Chile.  At that point, and in other subsequent conversations prior to leaving for the US, Ms. Garnica made it clear that the agreement was illusory and nonbinding with respect to the employment relationship that they were only signing the agreements (in Spanish and English versions) for the purpose of obtaining her visa, and that the two would "discuss" the terms of her employment, including her actual pay when they arrived in the New York.[18]  Pl. 56.1 St. ¶¶ 125-138.  Notably, Ms. Garnica assured Plaintiff that her concerns about agreeing on her rate of pay prior to leaving for the US were unfounded.  Pl. 56.1 St. ¶138.  Plaintiff also testified that, while in Chile, Edwards represented that she intended to obtain medical insurance and prescription coverage in the United States for Ms. Garnica, and made it clear that she would cover all transportation costs including her return flight to Chile.  None of these representations were true and, within a matter of only a few short weeks, Ms. Garnica had already failed to live up to these promises.

As a preliminary matter, given that Plaintiff has and will continue to offer intentionally false representations made to her by Edwards which induced her to come to the United States *and* which were explicitly not part of the employment contract, the statements are collateral and extraneous to the employment relationship and she may pursue a claim for fraudulent inducement.  *See Stamelman v. Fleishman–Hillard, Inc.,* No. 02 Civ. 8318 (SAS), 2003 WL 21782645 at *5 (S.D.N.Y. July 31, 2003).

Further, Plaintiff intends to offer as proof of Defendants fraudulent intent to induce her to migrate to the US for the purposes of forcing her labor Plaintiff's testimony and the

---

[18] In a strikingly similar case, where a Indian Diplomat was indicted on criminal charges, including fraud on the United States government, after telling her nanny to submit documents, particularly a required an employment contract, to the U.S. State Department solely for the purposes of obtaining a visa, which in reality she never intended to honor.

aforementioned contemporaneous recordings which show that Edwards (i) never obtained insurance for Plaintiff and instead deceived her into believing she was not eligible for medical benefits in the US; (2) that within two weeks, Edwards had already failed to timely pay Plaintiff, and when she did, she paid Ms. Garnica a mere $700-$800 for thirty day of work and justified the wage as appropriate notwithstanding her prior comments to the contrary in Chile (a conversation she admits to having had in the audio recordings); (3) never intended to provide her a flight home if she requested on before the end of the employment relationship.  This evidence alone is sufficient to create a fact dispute on the question of fraudulent intent.  *See Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,* 2004 WL 2754653, at *7 (S.D.N.Y. Dec.2, 2004) ("Entering into an agreement that one has no intention of fulfilling can be fraudulent conduct, and sufficiently rapid and egregious breach of an agreement can be evidence that one had no intention of fulfilling it."); *see also Deerfield Commun. v. Chesebrough–Pond's*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) (stating that plaintiff alleges present fact where it claims defendant made a promise with the undisclosed present intention of not performing it).

Additionally, when queried during their depositions, both Defendants stated that they had no intention of working in the United States—Edwards would be a fulltime student, and Hurley would not be able to work because he was accompanying Edwards on her student visa and therefore would not have a work visa. Pl. 56.1 St. ¶¶ 111-113.  Thus, the Defendants knew they would not have a steady source of income while living in New York sufficient to support three young children and three adults. *Id.* █████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ *Id.* ██████████████████████████

██████████ intended to pay for food for three adults and three growing children, rent for a two

bedroom apartment on the Upper East Side of Manhattan, utilities, and a full-time nanny for two-years.  These facts also support an inference that Defendants had no intention of fulfilling their pre-trip agreements with Plaintiff because they simply weren't going to be able to afford a simple lifestyle for themselves with the resources they had, let alone three adults, in Manhattan for two years.

During her deposition, Defendant Edwards admitted that "just hadn't gotten around to purchasing health insurance [for Plaintiff] yet."  The audio taped evidence demonstrates that when Ms. Garnica inquired with Edwards about purchasing her prescription medications since her supply had run out, she was told that such benefits were available for "New Yorkers" only, a justification for not enrolling Plaintiff in an appropriate medical insurance and prescription plan which was wholly at odds with Edwards' claim her deposition that she had simply procrastinated – for three months – in enrolling Plaintiff, a claim that lacks credibility given that in the audiotaped evidence, she makes it clear that Plaintiff is not eligible for enrollment since she is not a "New Yorker".

Plaintiffs may also prove fraudulent intent by identifying a motive for committing fraud and a clear opportunity for doing so, or by identifying circumstances indicating conscious behavior by the defendant.  *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995). Proof of this sort is considered by the Second Circuit to support a "strong inference of fraudulent intent."  *Id.*

Defendants testimony clearly establishes a motive and opportunity to fraudulent induce Plaintiff to travel to the United States with them – their life circumstances (three small children), lifestyle (extravagant), inability to afford living abroad, and last-minute loss of a nanny committed to joining them in their trip clearly establish a motive and opportunity to induce

42

Plaintiff's labor through fraudulent representations.  In a word, they were desperate.  Their short preparation timeframe following their prior nanny's breaking of her commitment and the recruitment and acceptance of the Plaintiffs as an acceptable substitute corroborates this. Following Plaintiff's immediate expression of interest in November 2010, Edwards met with Plaintiff to sign the agreement and interview with the embassy on December 1, 2010, and Plaintiff was issued her passport on December 2, 2010.  On December 3, 2010, Edwards emailed Therese Matthews, asking if she knew anyone at the U.S. Embassy so she could make Ms. Garnica an appointment for a visa interview and believed that "it would be great to have someone on the inside to make sure they don't get the idea that I'm taking her with me in order to leave her in the US!"  Davis Decl. Ex. S. Ms. Matthews responded that she no longer had an insider but would ask the individual she knew at the Embassy if "they can give a heads up" in the interview.  *Id.*  Edwards then replied thanking her aunt, telling her that Ms. Garnica had "only been [working] with us a little while" and therefore she didn't "want [the Embassy] to suspect [she was] "smuggling" her over there." *Id.*

Additionally, this final email which mentions Plaintiff's smuggling concern was sent just days after Ms. Garnica was hired by Defendants in Chile, and, aside from corroborating their motive, shows Defendants conscious behavior in attempting to avoid state authorities, another basis for an inference of fraudulent intent.  Edwards demonstrated "conscious behavior" and made an even more egregiously concerted effort to avoid detection by state authorities by intentionally filling out Plaintiff's custom form for her and including a false address, a crime under federal law.

Seemingly the Defendants found it hard to imagine life without a nanny, irrespective of the fact that they had no means or intention to pay such person required wages.  This motive –

simple greed – is corroborated by numerous record facts, including the casual manner in which

the deprive Plaintiff.  For these reasons, Defendants' motion for summary judgment dismissal

with respect to Plaintiff's fraud claim should be dismissed.

CONCLUSION

The record evidence in this case creates genuine issues of material fact as to Ms.

Garnica's claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §

1589  (Count I), and common law Negligent Infliction of Emotional Distress (Count III) and

Fraudulent Misrepresentations (Count IV) and as such, Defendants' Motion for Summary

Judgment should be denied and this case should go to a jury.

Dated:  April 3, 2014
        Brooklyn, NY

_____/s/_____

Christopher Q. Davis

Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, 3rd Floor
Brooklyn, New York 11217

*Attorney for Plaintiff*