**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FELICITAS DEL CARMEN VILLANUEVA
GARNICA,

                       Plaintiff,

      - against -

MALU CUSTER EDWARDS aka MALU
HURLEY and MICHAEL HURLEY aka
MICKY HURLEY,

                   Defendants.

Index No. 13–Civ–3943 (AKH)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

BECKER, GLYNN, MUFFLY, CHASSIN AND HOSINSKI LLP

299 PARK AVENUE

NEW YORK, NEW YORK 10171

(212) 888-3033

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION ...........................................................................................................................1

ARGUMENT ..................................................................................................................................3

    I.      THE EVIDENCE CITED BY PLAINTIFF FAILS TO RAISE A
            GENUINE DISPUTE OF MATERIAL FACT ........................................................3

          A.      Plaintiff Cannot Avoid Summary Judgment With Her Own
                 Contradictory Testimony; Her Admissions Defeat Her Claims As
                 A Matter Of Law........................................................................................3

          B.      Plaintiff Cannot Raise A Genuine Dispute of Material Fact With
                 Bald Conclusions .......................................................................................6

          C.      The Audio Recordings And Their Transcripts Do Not Corroborate
                 Plaintiff's Claims Because They Are Inadmissible And Immaterial
                 In Light Of Her Own Admissions.................................................................8

               1.      The Audio Recordings And Their Transcripts Are
                        Inadmissible Because They Are Not Authenticated .......................8

                2.      The Audio Recordings And Their Transcripts Are
                        Inadmissible Because They Are Unintelligible And Contain
                        Gaps .............................................................................................9

                3.      The Audio Recordings And Their Transcripts Do Not Raise
                        A Genuine Dispute Of Material Fact In Light Of Plaintiff's
                        Own Admissions...........................................................................11

    II.     PLAINTIFF FAILS TO DISPUTE DEFENDANTS' EVIDENCE THAT
            DEFEAT HER CLAIMS UNDER THE FORCED LABOR STATUTE .............12

          A.      Plaintiff's Labor Was Not Coerced Because She Admittedly Chose
                   To Remain in Defendants' Employ .........................................................13

          B.      Plaintiff Fails To Present A Genuine Dispute Of Material Fact
                 Concerning Any Of Her Three Theories Of Forced Labor.......................15

                 1.      The Evidence Establishes That Plaintiff's Labor Was Not
                        Compelled Through "Psychological Coercion"............................16

                       a.      The Undisputed Facts Show That Defendants'
                               Alleged Misrepresentation Of Plaintiff's Legal And

Contractual Rights Did Not Psychologically Coerce
Her Into Working For Them ..............................................16

b.   The Undisputed Evidence Establishes That Plaintiff
Was Not Psychologically Coerced Into Labor
Through Financial And Social Isolation ..........................17

c.   There Is No Evidence That Alleged Wage
Underpayment And Lack Of Health Insurance
Psychologically Coerced Plaintiff's Labor .......................18

c.   Plaintiff's Allegations Of Poor Working Conditions
Fail To Raise A Genuine Dispute Of Material Fact
That She Was Psychologically Coerced Into Labor ..........19

i.   *Poor Working Conditions Alone Do Not
Violate The Forced Labor Statute—Plaintiff
Must Also Be Threatened* ......................................20

ii.  *Even If  Working Conditions Alone Could
Violate The Forced Labor Statute, Plaintiff
Provides No Evidence That Those
Conditions Existed Or Coerced Her Labor* ..........21

iii. *Plaintiff's Allegation That Defendants Did
Not Discipline Their Children Does Not
Raise A Genuine Dispute Of Material Fact
That She Was Psychologically Coerced Into
Working* ...............................................................23

2.   The Undisputed Evidence Establishes That Plaintiff's
Labor Was Not Compelled By Threats Of Any Of The
Prohibited Means .........................................................................24

a.   Plaintiff's Allegations That Defendants Bragged
About Their Personal Backgrounds Do Not Support
Her Claim That Her Labor Was Coerced By Threats
Of Serious Harm ............................................................24

b.   Plaintiff Fails To Identify Any Threat Of Abuse Of
Law Or Legal Process That Coerced Her Labor ...............25

i.   *The Undisputed Facts Establish That
Plaintiff Was Never Threatened With
Deportation, And That Her Labor Was Not
Compelled By Fear Of Deportation* ......................26

ii. *Plaintiff's Proposed New Theories Of Abuse Of Law Or Legal Process Did Not Reasonably Coerce Plaintiff's Labor In Violation Of The Forced Labor Statute* ................28

(a) Edwards' Alleged Statement About 911 Is Not An Abuse Of Law Or Legal Process That Compelled Plaintiff's Labor ....................................... 28

(b) Wage Underpayment And Lack Of Health Insurance Are Not Abuses Of Law Or Legal Process That Compelled Plaintiff's Labor .................... 29

3. Plaintiff's Labor Was Not Compelled By Means Of Withholding A Plane Ticket ........................................................30

III. PLAINTIFF HAS ABANDONED HER CLAIMS PURSUANT TO THE TRAFFICKING STATUTE AND THE DOCUMENTS STATUTE, AS WELL AS HER CLAIMS CONCERNING ATTEMPT AND CONSPIRACY ......................................................................................31

IV. PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS FAILS AS A MATTER OF LAW ...........................31

V. PLAINTIFF FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT CONCERNING HER FRAUD CLAIM....................................................32

A. The Alleged Misrepresentations Are Wholly Subsumed By The Written Contract..........................................................................................32

B. Plaintiff's Fraud Claim Fails As A Matter Of Law Because She Does Not Allege That Defendants Made A False Statement Of Present Fact ...........................................................................................33

C. Plaintiff Concedes That She Did Not Reasonably Rely On Defendants' Alleged Misrepresentations Concerning Access To Health Care ...........................................................................................34

CONCLUSION..........................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Agristor Leasing-II v. Pangburn,*
    557 N.Y.S.2d 183 (N.Y. App. Div. 1990) ............................................................. 33

*Aguirre v. Best Care Agency,*
    961 F. Supp. 2d 427 (E.D.N.Y. 2013) ................................................................... 12

*Alvarado v. Universidad Carlos Albizu,*
    2010 U.S. Dist. LEXIS 87662 (S.D. Fla. Aug. 25, 2010)........................... 19, 27, 29

*Aziz Zarif Shabazz v. Pico,*
    994 F. Supp. 460 (S.D.N.Y. 1998) ................................................................... 3, 4, 6

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
    98 F.3d 13 (2d Cir. 1996) ................................................................................. 32, 33

*Camayo v. John Peroulis & Sons,*
    2012 U.S. Dist. LEXIS 136100 (D. Co. Sept. 24, 2012)................................ 12, 26

*Canal v. Dann,*
    2010 U.S. Dist. LEXIS 97856 (N.D. Cal. Sept. 2, 2010) ...................................... 20

*Cruz v. Reiner,*
    2013 WL 5676303 (E.D.N.Y. Oct. 16, 2013)....................................................... 4, 6

*David v. Signal Int'l,*
    2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 3, 2012)........................................ 14

*Deravin v. Kerik,*
    2007 WL 1029895 (S.D.N.Y. Apr. 2, 2007) .......................................................... 9

*Desclafani v. Pave-Mark Corp.,*
    2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008)........................................................ 9

*DeSilva v. North Shore-Long Island Jewish Health Sys.,*
    2012 U.S. Dist. LEXIS 30597 (E.D.N.Y. Mar. 7, 2012)....................................... 29

*Elat v. Ngoubene,*
    2014 WL 253411 (D. Md. Jan. 21, 2014)............................................... 12, 14, 15, 20

*Garcia v. Curtright,*
    2012 WL 1831865 (D. Or. May 17, 2012) ....................................................... 15, 16

*Headley v. Church of Scientology Int'l,*
    687 F.3d 1173 (9th Cir. 2012) ......................................................................... 13, 14

iv

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005) ......................................................... 3, 4, 6

*Lanza v. Lewin*,
   2008 WL 4104454 (N.D.N.Y. Sept. 3, 2008) ................................... 9, 10

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
   2004 WL 2754653 (S.D.N.Y. Dec. 2, 2004) ......................................... 34

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
   790 F.Supp.2d 1134 (C.D. Cal. 2011) ................................................. 26

*O'Shea v. Childtime Childtime, Inc.*,
    2002 WL 31738936 (N.D.N.Y. Dec. 2, 2002)........................................ 9

*Panwar v. Access Therapies*,
   2013 WL 5486783 (S.D. Ind. Sept. 30, 2013) ...................................... 30

*Pasamba v. HCCA Int'l*,
   2008 WL 2562928 (D. Ariz. June 24, 2008) ............................. 26, 27, 29

*Point-du-Jour v. American Airlines*,
   2009 U.S. Dist. LEXIS 103064 (E.D.N.Y. Nov. 5, 2009)......................... 8

*Porter v. Quarantillo*,
   722 F.3d 94 (2d Cir. 2013) ................................................................. 8

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 2244 (2d Cir. 2009) ............................................................. 8

*Ramos v. Hoyle*,
   2008 U.S. Dist. LEXIS 102677 (D. Fla. Dec. 19, 2008) ........................ 26

*Rojas v. Roman Catholic Diocese of Rochester*,
   660 F.3d 98 (2d Cir. 2011) .............................................................. 4, 6

*Seivright v. Montefiore Medical Center, Hosp. of the Albert Einstein Coll. of Med.*,
   2014 WL 896744 (S.D.N.Y. Mar. 3, 2014) .................................... passim

*Shukla v. Sharma*,
   2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) ............................. 15, 19, 20

*Shuvalova v. Cunningham*,
   2010 U.S. Dist. LEXIS 135502 (N.D. Cal. Dec. 22, 2010)..................... 25

*Sierotowicz v. New York City Hous. Auth.*,
   2008 U.S. Dist. LEXIS 109493 (E.D.N.Y. Sept. 19, 2008) ...................... 8

*Simon v. Safelite Glass Corp.*,
   128 F.3d 68 (2d Cir. 1997) ...................................................................... 33

*Spiteri v. Russo*,
   2013 U.S. Dist LEXIS 128379 (E.D.N.Y. Sept. 7, 2013) ........................ 14

*Taylor v. City of New York*,
   269 F. Supp. 2d 69 (E.D.N.Y. June 23, 2003) ....................................... 31

*United States v. Bradley*,
   390 F.3d 145 (1st Cir. 2004) ............................................................ 29, 31

*United States v. Calimlim*,
   538 F.3d 706 (7th Cir. 2008) ................................................................. 26

*United States v. Dann*,
   652 F.3d 1160 (9th Cir. 2011) ............................................................... 26

*United States v. Farrell*,
   563 F.3d 364 (8th Cir. 2009) ................................................................. 20

*United States v. Garcia*,
   2003 U.S. Dist. LEXIS 22088 (W.D.N.Y. Dec. 2, 2003) ....................... 26

*United States v. Kozminski*,
   487 U.S. 931 (1988) ............................................................................... 26

*United States v. Peterson*,
   627 F. Supp. 2d 1359 (M.D. Ga. 2008) ...................................... 14, 28, 29

*United States v. Sabhnani*,
   539 F.Supp.2d 617 (E.D.N.Y. 2008) ..................................................... 20

*United States v. Veerapol*,
   312 F.3d 1128 (9th Cir. 2002) ............................................................... 20

*Velez v. Sanchez*,
   754 F. Supp. 2d 488 (E.D.N.Y. 2010) ................................................... 13

**Statutes**

18 U.S.C. § 1589 ........................................................................... 13, 14, 19

18 U.S.C. § 1590 ...................................................................................... 31

18 U.S.C. § 1592 ...................................................................................... 31

18 U.S.C. § 1594 ...................................................................................... 31

## Rules

FED. R. CIV. P. 56 ........................................................................................................... 8

FED. R. EVIDENCE 602 ................................................................................................... 9

FED. R. EVIDENCE 901 ................................................................................................ 8, 9

Local Civil Rule 56.1 ............................................................................................. 1, 6, 7, 33

## Regulations

20 C.F.R. § 656.19 ......................................................................................................... 27

Defendants submit this reply memorandum of law in further support of their motion for summary judgment.[1]  This reply is supported by the Declaration of Michelle Mufich, dated April 30, 2014. ("Mufich Decl.").

## **INTRODUCTION**

Plaintiff admits that she could have quit her job at any time.  She admits that nothing stopped her from quitting.  And she admits that she knew that nothing bad would have happened to her if she had.  Br. at 30-31.  But instead of quitting, Plaintiff affirmatively and repeatedly made the choice to stay.  Br. at 32.

Plaintiff's opposition ignores her multiple admissions that Defendants did nothing to coerce her labor—that, contrary to the allegations in her Complaint, they did not restrain her, use force against her, isolate her, starve her, or threaten her with any negative consequence if she were to quit.  Br. at 29-51.  And her opposition ignores her repeated testimony that she stayed because of her own belief that leaving is for "sneaky people" and because she hoped the job would eventually improve.  Br. at 24-25.

In moving for summary judgment, Defendants do not ask the Court to determine which party tells the more credible story; indeed, ***Defendants do not even present their side of the story***.  Plaintiff's testimony is simply so at odds with the allegations of her Complaint, the documentary evidence, and even itself, that it is inherently implausible and cannot support her claims as a matter of law.

Even if Plaintiff could support her allegations, she cites no evidence connecting them to the legal requirements of a Forced Labor Statute claim.  Instead, she contends that Defendants

---

[1] Previously-defined capitalized terms have the same definitions used in Defendants' opening memorandum of law, dated February 28, 2014 ("Defendants' Brief" or "Br.").  "Opp. Br." refers to Plaintiff's opposition memorandum of law, dated April 3, 2014.   "Davis Decl." refers to the Declaration of Christopher Q. Davis, dated April 3, 2014. "Pl. 56.1 St." and "Plaintiff's 56.1 Statement" refer to Plaintiff's Statement Pursuant to Local Civil Rule 56.1(b), dated April 3, 2014.

"psychologically coerced" her labor, based on a novel theory that mere workplace conditions, unaccompanied by threats, restraint, or force, can constitute psychological coercion.  Opp. Br. 1, 13-22.  Her argument is without legal precedent, and further fails because it rests on conclusory statements and unsubstantiated speculation rather than record evidence.

Plaintiff makes a litany of immaterial, one-off complaints about Defendants—such as that Edwards once allegedly suggested Plaintiff turn off a reading lamp to get some sleep and that Hurley once allegedly told his children to stay in a bedroom.  *See* Opp. Br. at 8, 25.  But she does not, and cannot, cite any evidence connecting those complaints to the allegation that she was psychologically coerced into labor.  *Id*.  Nor does she cite her own bizarre deposition testimony, in which she swore that the clothing Defendants wore was a form of "psychological control."  Pl. Tr. 1167:7-1168:7.  Because she cites no evidence that any of this alleged conduct either could reasonably have, or actually did, "psychologically coerce" her to work for Defendants, she fails to raise a genuine dispute of material fact.

Defendants do not know Plaintiff's motive for filing this lawsuit, or for continuing to insist that Defendants starved and isolated her and that their young children beat her.  It may be due to a mental illness.  Or it may be a way for Plaintiff to maintain a valid immigration status, since she obtained a visa on the basis of the same, unproven allegations.  Or it may be to extract money from Defendants to finance her continued sojourn in New York.

Whether a product of delusion or calculation, Plaintiff's motive is irrelevant: her claims fail as a matter of law because, by her own admission, her labor was not compelled.  Plaintiff also fails to raise a genuine dispute of material fact on her fraud and NIED claims.  Accordingly, Defendants' motion for summary judgment should be granted in its entirety.

## ARGUMENT

## I.   THE EVIDENCE CITED BY PLAINTIFF FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT

As detailed extensively in Defendants' Brief, Plaintiff's own testimony defeats her claims as a matter of law.  *See generally* Br.; *see also, e.g., id.* at 2-3 (summarizing admissions contradicting the Complaint's allegations).  Defendants' Brief relies primarily on Plaintiff's deposition testimony, supplemented with documentary evidence largely produced by Plaintiff herself, to show that summary judgment is required on her claims.  *See generally id.* and Newman Decl.  In response, Plaintiff primarily relies upon her own, contradictory deposition testimony, bald conclusions contradicted by evidence, and transcripts of three unauthenticated and unintelligible audio recordings.  None is sufficient to raise a genuine dispute of material fact.

A.   Plaintiff Cannot Avoid Summary Judgment With Her Own Contradictory Testimony; Her Admissions Defeat Her Claims As A Matter Of Law

Plaintiff attempts to evade the consequences of her fatal admissions by pointing to her own contradictory testimony and arguing that these inconsistencies raise issues of credibility that cannot be determined on a motion for summary judgment.   *See* Opp. Br. at 2.  But, as we detail below, Plaintiff cannot create a genuine dispute of material fact by altering allegations set forth in her Complaint or her deposition testimony, or by selectively using portions of her testimony that support her claim while disregarding the many portions that materially contradict those statements.  Under the law of the Second Circuit, her testimony can only present a genuine, rather than feigned, dispute of material of fact when it does not contradict itself.  *See, e.g., Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005).

3

*Shabazz*, a case Defendants cite and that Plaintiff ignores along with her own admissions, is directly on point.  The plaintiff in *Shabazz* relied almost exclusively on his own testimony in opposition to the defendant's summary judgment motion.  *Shabazz*, 994 F. Supp. at 469-71.  The court rejected that testimony after determining that the plaintiff had changed his testimony "a number of times" during the litigation.  *Id.* at 469.  The court determined that the plaintiff had also "significant[ly] revis[ed]" his story in his opposition to defendants' summary judgment motion.  *Id.* at 470.  After reviewing the extensive changes to the plaintiff's story, the court held:

> [I]n the context of summary judgment, it is my duty to assess the facts presented in a light most favorable to the non-moving party, but not to weigh the credibility of the parties. **However, when the facts alleged are so contradictory that doubt is cast upon their plausibility, I am authorized to pierce the veil of the complaint's factual allegations," dispose of "[s]ome improbable allegations", and dismiss the claim.** Therefore, piercing the veil of the complaint's factual allegations, coupled with plaintiff's contradictory statements, plaintiff's . . . claim cannot survive defendants' summary judgment motion.

*Id.* at 471 (citations omitted) (emphasis added); *see also Jeffreys*, 426 F.3d at 551 (plaintiff's testimony was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint") (quotation omitted); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d. Cir. 2011) (granting summary judgment because plaintiff's sworn statements directly contradicted her complaint, interrogatory responses, and other parts of her deposition testimony); *Cruz v. Reiner*, 2013 WL 5676303, at *4-5 (E.D.N.Y. Oct. 16, 2013) (granting summary judgment because plaintiff's deposition testimony and documentary evidence contradicted his allegations).

Plaintiff's story changed radically in her deposition from the one set forth in her Complaint, just as the plaintiffs' stories changed in *Shabazz, Rojas, Jeffreys* and *Cruz.  See, e.g.,* Br. at 2-3, 11 (Plaintiff admits that she had possession and control of her passport the entire time

4

she was in Defendants' employ in New York, contradicting Complaint's allegation that Defendants improperly possessed her passport in the U.S.); 17 (Plaintiff admits she was never locked in a room, contradicting Complaint's allegation that this happened routinely); 17-18 (Plaintiff admits she regularly left the apartment on her own and that Edwards only once refused a request for time off, contradicting Complaint's allegation that Defendants habitually prevented Plaintiff from leaving their apartment and did not allow her any time off); 20-21 (Plaintiff testifies she asked Edwards for medicine in early February 2011, contradicting the Complaint's allegation that she first asked for it on approximately March 4, 2011); *see also id.* 9-10, 12-15, 19, 20, 22, 24-25; Mufich Decl. Ex. A (chart detailing contradictions).  Plaintiff's admissions contradicting the allegations of her Complaint are fatal to her claims under *Shabazz* and its progeny.  *See, e.g.,* Br. at 27, 42-43, 48, 56-58.

And like the plaintiffs in *Shabazz*, *Rojas, Jeffreys* and *Cruz*, Plaintiff once again changes her story in her opposition papers.  Her Complaint alleges that she suffers from "pedophobia", an "adjustment disorder", "post-traumatic stress" and "severe emotional distress", yet her opposition papers now claim that her mental health records "make no mention of any present or past diagnosis of mental illness."  *Compare* Cmpl. ¶¶ 161, 201 *with* Opp. Br. at 1.  Her Complaint alleges that Defendants were financially powerful, but her opposition contends they were too poor to pay her wages.  *Compare* Cmpl. ¶¶ 23, 123 *with* Opp. Br. at 7-8, 17, 42.  And although she testified that there was only one instance in which Edwards allegedly denied her permission to leave the apartment, Plaintiff's opposition now claims she was told "on multiple occasions that she could not leave the house."  *Compare* Br. at 17-18 *with* Opp. Br. at 8.  Similarly, Plaintiff now claims that she remained in Defendants' employ because she would have otherwise been alone "in the dead of winter with very little money, no food, no support system,

and no access to social services"—contradicting her testimony that she voluntarily chose to remain in Defendants' employ, had at least $1,000 to spend however she wished, was advised of her right to health care, and had—and utilized—multiple social services available to her.[2] *Compare* Br. at 13 n.14, 19-26 *with* Opp. Br. at 21.

Plaintiff's unsubstantiated claim that her "version of the events has remained constant" (Opp. Br. at 2) thus does not withstand scrutiny. Where, as here, a plaintiff changes her story, and provides inconsistent and contradictory testimony, the plaintiff's testimony is insufficient as a matter of law to raise a genuine dispute of material fact—it is too inherently incredible to send to a jury.[3] *Shabazz*, 994 F. Supp. at 469-71; *see also Jeffreys*, 426 F.3d at 555; *Rojas*, 660 F.3d at 105-06; *Cruz*, 2013 WL 5676303, at *4-5.

**B.    Plaintiff Cannot Raise A Genuine Dispute of Material Fact With Bald Conclusions**

To avoid summary judgment, Plaintiff must provide "some hard evidence showing that [her] version of events is not wholly fanciful," as "conclusory allegations or unsubstantiated speculation" are insufficient. *Jeffreys*, 426 F.3d at 554. She cannot rely on bald conclusions, unsubstantiated allegations, or statements directly contradicted by the documentary evidence. *Id.*; *see also* Local Civil Rule 56.1(c)-(d).

Plaintiff fails to provide such "hard evidence." She instead makes factual claims without any evidentiary support at all. *See, e.g.*, Opp. Br. at 20, 29, and 30 (claiming Edwards did not

---

[2] Plaintiff's inconsistencies and contradictions are too numerous to recount fully, but permeate virtually every page of her 1,100-page testimony. They range from the material—those directly relevant to her claims (*see discussion supra* at 4-5)—to the mundane (testifying she had no idea anyone in New York spoke Spanish, but recounting multiple conversations she had in New York that were conducted in Spanish (*compare* Pl. Tr. at 495:6-496:16; 11:14-21 *with id.* 532:4-24)), but the volume is extraordinary. *See generally* Mufich Decl. Ex. A; *see also, e.g.*, Br. at 13, 13 n.15, 15, 16, 19, 19 n.19, 20 n.23, 21, 24-25.

[3] In a last-ditch effort to save her claims, Plaintiff argues that any contradictions in her testimony are a result of "errors in translation." Opp. Br. at 2. As she fails to specify a single translation error, or even to proffer a corrected translation (*see generally* Opp. Br.), her argument is wholly conclusory and fails to raise a genuine dispute of material fact. *See Seivright v. Montefiore Medical Center, Hosp. of the Albert Einstein Coll. of Med.*, 2014 WL 896744, at *9 (S.D.N.Y. Mar. 3, 2014) (disregarding "mere attorney argument" that lacked citation to evidence).

trust American nannies because they would be more difficult to coerce, that Plaintiff's son cut ties with her out of fear of Defendants, and that Defendants' son "possibly" caused Plaintiff to require a shunt in her brain, but citing nothing—not even her own testimony—to support these claims); *see also id.* at 8, 13, 17 n.8, 21, 22, 23, 26, 32, 35-37, 39-40, 41, 42-43.  In a typical passage of her opposition, Plaintiff asserts that she was "isolated" from the outside world (Opp. Br. at 8), yet provides no evidence or testimony to support her allegation or to dispute Defendants' showing that Plaintiff spoke to her family every day, left Defendants' home unsupervised for hours at a time on multiple occasions, ran errands outside the apartment, and met others in New York.  *Compare* Br. at 12-13, 42-43; Pl. 56.1 St. ¶¶ 66-76, 84, 192.

Plaintiff's 56.1 Statement takes a similarly conclusory approach.  She baldly denies 43 of 103 statements without citing any evidence.  *See* Pl. 56.1 St. ¶¶ 3, 9, 11, 12-17, 21-29, 31, 46-54, 56-58, 63, 77, 82, 85, 87, 89-91, 98-100, 103 (all stating only "Deny.").  This practice violates Local Civil Rule 56.1(d), which requires that "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, ***must be followed by citation to evidence which would be admissible***."  Local Civil Rule 56.1(d) (emphasis added).  Each statement Plaintiff denies without evidence must be admitted pursuant to Local Civil Rule 56.1(c) and her purported denials cannot raise a genuine dispute of material fact.

Nor may Plaintiff raise a genuine dispute of material fact with citations that do not support the contentions in Plaintiff's 56.1 Statement, or that are inadmissible.  *See, e.g.*, Defendants' Response to Plaintiff's 56.1 Statement, dated April 30, 2014, ¶¶ 104, 106, 109-110, 112-113, 128, 160-162, 173-176, 178; *see also id.* ¶¶ 36(a), 41(a), 42(a), 44(a), 44(b), 55(a), 59(a), 64(a), 65(a), 79(a), 84(a), 86(a), 88(a), 88(c), 88(d), 88(e), 101(a).

Finally, Plaintiff may not defeat summary judgment by purporting to dispute facts that are not material to her claims. *See* FED. R. CIV. P. 56(a); *see also Point-du-Jour v. American Airlines,* 2009 U.S. Dist. LEXIS 103064, at *6-7 n.2 (E.D.N.Y. Nov. 5, 2009) (granting summary judgment because disputed factual issue was not material to plaintiff's claim); *Sierotowicz v. New York City Hous. Auth.*, 2008 U.S. Dist. LEXIS 109493, at *19-20, 42-43 (E.D.N.Y. Sept. 19, 2008) (same). Plaintiff's 56.1 Statement repeats many of the Complaint's allegations, which Defendants' Brief establishes are immaterial to her claims, *see, e.g.,* Pl. 56.1 St. ¶¶ 116-119, 132-134, 157, 168-171, 173-175, 187; Br. at 29-33, 35-36, and makes new statements that are also immaterial. *See* Pl. 56.1 St. ¶¶ 104-113, 118, 162-163, 182; *infra* at 13-15, 31-34.

**C.      The Audio Recordings And Their Transcripts Do Not Corroborate Plaintiff's Claims Because They Are Inadmissible And Immaterial In Light Of Her Own Admissions**

    1.   The Audio Recordings And Their Transcripts Are Inadmissible Because They Are Not Authenticated

FED. R. CIV. P. 56(e) requires that affidavits proffered in opposition to a summary judgment motion shall set forth such facts as would be "admissible in evidence." FED. R. CIV. P. 56(e). The principles governing admissibility thus "do not change" on a summary judgment motion. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 2244, 264 (2d. Cir. 2009); *see also Porter v. Quarantillo*, 722 F.3d 94, 97-98 (2d Cir. 2013).

The three audio recordings and their transcripts on which Plaintiff relies are inadmissible because the audio recordings have not been authenticated. *See* FED. R. EVIDENCE 901(a). Although Plaintiff's counsel purports to authenticate them (*see* Davis Decl. ¶¶ 12, 14, 16), he fails to, and cannot, properly do so because he does not have personal knowledge as to how the

recordings were made.[4]  *See* FED. R. EVIDENCE 602 ("A witness may testify to a matter only if  . . . the witness has personal knowledge of the matter); *see also* FED. R. EVIDENCE 901(b)(9) (Requiring "[e]vidence describing a process or system and showing that it produces an accurate result" to authenticate that process or system).  And, even if Plaintiff's counsel did have personal knowledge, his assertion that the recordings were "taken by Plaintiff" on certain dates is insufficient.[5]  Davis Decl. ¶¶ 12, 14, 16; *see Deravin v. Kerik*, 2007 WL 1029895, at *10 (S.D.N.Y. Apr. 2, 2007) (refusing to consider audiotape and transcript in opposition to summary judgment because, *inter alia*, "Plaintiff says only that he 'authenticates the tape in his affidavit.' This purported authentication is cursory, however, as Plaintiff has not identified the date the tape was made or stated that he was responsible for recording the conversation.") (citation omitted).

2.  The Audio Recordings And Their Transcripts Are Inadmissible Because They Are Unintelligible And Contain Gaps

The audio recordings and their transcripts are also inadmissible because they are unintelligible due to large inaudible gaps.  Under New York law, if a recording is "so unintelligible that the jury will be forced to speculate as to its contents, it must be excluded from evidence."  *See Lanza v. Lewin*, 2008 WL 4104454, at *19 (N.D.N.Y. Sept. 3, 2008).

The transcript attached as Exhibit M to the Davis Declaration is particularly instructive,

---

[4] Counsel simply declares that the recordings were "taken by Plaintiff," and fails to aver that he was there when the recordings were made, that he has personal knowledge of how Plaintiff made the recordings, whether they were altered, whether portions were deleted, or whether they were made on the dates set forth in his Declaration.  *See* Davis Decl. ¶¶ 12, 14, 16.  Counsel therefore lacks sufficient "personal knowledge" to authenticate the recordings, which he cannot gain through out of court statements from his client.  *See Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, at *2 n.2 (S.D.N.Y. Aug. 22, 2008) (refusing to consider evidence submitted in support of summary judgment because it was not properly authenticated by counsel, who lacked personal knowledge of its authenticity); *see also O'Shea v. Childtime Childtime, Inc.*, 2002 WL 31738936, at *3 (N.D.N.Y. Dec. 2, 2002) (same).

[5] Nor can Mr. Davis properly authenticate the voice of Hurley.  *See* Davis Decl. ¶¶ 14, 16.  Mr. Davis has not heard Hurley speak, as another attorney, Ms. Haskell, took Hurley's deposition.  *See* Davis Decl. Ex. D at 1-2.  Ms. Haskell did not submit a sworn declaration testifying that she identified the voice of Hurley on the recordings.

although each recording is similarly unintelligible.[6]  Plaintiff cites the following exchange:

> Ms. Garnica:   Good, because they told me that without that card they couldn't - -
> Mr. Hurley:   [interposing] [crosstalk]
> Ms. Garnica:   [background noise] They told me I had to bring an insurance card and I told them I didn't know what that was.
> Mr. Hurley:   Yes, that's for residents.
> Ms. Garnica:   It's for residents, then? [background noise]
> Mr. Hurley:   - - No, it's insurance - - [background noise] a registered number.
> Ms. Garnica:   Yes.
> Mr. Hurley:   And they're for residents, five years and above.

*See* Opp. Br. at 27-28.  Plaintiff concludes from this dialogue that Hurley told her that "she was not entitled to health insurance because she was a foreigner."  *See* Opp. Br. at 27.  But this statement appears nowhere on the "transcript" itself, and based on the evidentiary record, neither party can conclude what words were spoken before and after "No, it's insurance," or during "[interposing] [crosstalk]" and "[background noise]."  *Id.*  Nor can Plaintiff establish what "they" or "that" referred to when Hurley said "they're for residents" or "that's for residents."  *Id.*  Further, Hurley seems to actually deny that an insurance card is only for residents—he purportedly responds "***No,*** it's insurance" when Plaintiff asks whether "it" is for residents (*id.* (emphasis added))—yet neither party can conclude from the evidentiary record what he said or meant because the context is lost due to the poor quality of the recording.  Plaintiff cannot submit fragments of a sentence and fill in their substance however she likes to create a factual dispute.  *See Lanza*, 2008 WL 4104454, at *19.

---

[6] *See also, e.g.,* Ex. K at 2:23-3:3 ("FEMALE VOICE 1: They told her it was going to be a lot more - - you should have signed on that.  - - it was going to be more.  But since - - there is the document [crosstalk] [background noise] very complicated, we though - - [cross talk] [background noise]"); Ex. I at 12:2-9 ("[background noise] it's a very delicate thing - - with lots of - - and lots of communication. [background noise] [cross talk] . . . You even told me the other day, told me the day before - - that sure, we'll talk, - - colors.").

3.   The Audio Recordings And Their Transcripts Do Not Raise A Genuine Dispute Of
Material Fact In Light Of Plaintiff's Own Admissions

Even if admissible, the audio recordings and their transcripts are immaterial and thus fail
to raise a genuine dispute of material fact.

Plaintiff claims that the recordings corroborate her allegations that Defendants (i)
intentionally misrepresented the duration of Plaintiff's contract, (ii) failed to pay her sufficient
wages and misled her about the wages to which she was entitled, (iii) misled her about her rights
in the United States, (iv) refused to address their children's alleged physical abuse of her, and (v)
refused to purchase her a return flight to Chile.  Opp. Br. at 3.

The recording transcripts do not corroborate these allegations.  They do not reflect that
Plaintiff asked for, much less was refused, a plane ticket back to Chile.  *See generally* Davis
Decl. Exs. I, K, and M.  They do not reflect that Defendants told Plaintiff she had no right to
medical care or police assistance.  *Id.*  The recordings likewise do not reflect that Defendants
refused to get Plaintiff medication when asked—rather, they suggest that the first time Plaintiff
requested medication from Defendants was on March 4, 2011, and the documentary evidence
shows that Edwards had Plaintiff's medication shipped from South America just a few days later.
*See id.* Ex. K at 4:17-5:15; *id.* Ex. M at 2-3; Newman Decl. Ex. AA.  Nor does Plaintiff once
state in the March 4, 2011 transcript that she felt ill, much less so ill that she needed to go to a
hospital, or that she asked Defendants to take her to a doctor or hospital or that they refused.  *See
generally* Davis Decl. Exs. K, M.  And the transcripts do not reflect that Defendants refused to
address their children's alleged abuse, or even that Plaintiff complained to Defendants that the
children were physically abusive.  *See generally* Davis Decl. Exs. I, K, and M.  In fact, Exhibit I
shows that Edwards was willing to address any concerns about her children head-on: when
Plaintiff complained that seven-year-old Rex said something that was not nice—with no mention

11

of any physical abuse—Edwards said that she "want[ed] to find out what's going on."  Ex. I at 12:13-13:13, 13:20-14:18.

And even setting aside whether the recordings corroborate her story (they do not), they are irrelevant to Plaintiff's claims *because even if the allegations supposedly corroborated by the recordings were true, Plaintiff's claims still fail*.  *See infra* at 13-15, 31-34.  Indeed, Defendants' Brief already treated all of those allegations as true for the purposes of the summary judgment motion, and established that Plaintiff's claims still fail as a matter of law.  *See* Br. at 29-33.  Accordingly, the recordings and their transcripts do not raise a genuine dispute of material fact sufficient to save her Forced Labor Statute claim, given her admission that she voluntarily stayed with Defendants.  Similarly, they cannot not save Plaintiff's fraud claim because, *inter alia*, they do not concern any representations collateral to her employment contract.

## II.   PLAINTIFF FAILS TO DISPUTE DEFENDANTS' EVIDENCE THAT DEFEAT HER CLAIMS UNDER THE FORCED LABOR STATUTE

Plaintiff's opposition suggests that the determination of whether a plaintiff's labor was coerced is so "necessarily factually complicated" that courts "uniformly" refuse to grant summary judgment on claims arising under the Forced Labor Statute.  *See* Opp. Br. at 15.  But the cases she cites do not support her argument,[7] and courts do grant summary judgment on Forced Labor Statute claims where, as here, the evidence establishes the plaintiff's labor was not coerced by physical restraint, force, serious harm, or abuse of law or legal process (the

---

[7] *Elat v. Ngoubene*, 2014 WL 253411, at *29 (D. Md. Jan. 21, 2014), granted summary judgment to defendants on all but one of the plaintiff's Forced Labor Statute claims; *Aguirre v. Best Care Agency*, 961 F. Supp. 2d 427, 460-61 (E.D.N.Y. 2013), concerned a judgment on the pleadings, and *Camayo v. John Peroulis & Sons Sheep, Inc.*, 2012 WL 4359086, at *5 (D. Co. Sept. 24, 2012) concerned a motion to dismiss.

"Prohibited Means"), or threats thereof.  *See* Br. at 29 (citing cases granting defendants summary judgment on Forced Labor Statute claims).  This Court should do so as well.

Plaintiff ignores her repeated admissions that Defendants did not coerce her labor.  Br. at 30-31.  Instead, she lists unrelated workplace complaints and pretends that they are somehow related to her deliberate decision to stay with Defendants.  Opp. Br. at 16-19.  But because Plaintiff admits that Defendants' alleged conduct did not coerce her to stay in their employ, and cannot show how that alleged conduct could have done so, her Forced Labor Statute claim fails as a matter of law.

## A.      Plaintiff's Labor Was Not Coerced Because She Admittedly Chose To Remain In Defendants' Employ

To succeed on a Forced Labor Statute claim, Plaintiff must demonstrate that she was unable to quit for one of two reasons: (1) Defendants physically prevented her from doing so, or (2) Defendants knowingly threatened to use one or more of the Prohibited Means and, as a direct result of such a threat, Plaintiff was coerced into remaining in their employ.  *See* 18 U.S.C. § 1589; *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179-1180 (9th Cir. 2012) (affirming summary judgment on Forced Labor Statute claim); *Velez v. Sanchez*, 754 F. Supp. 2d 488, 498-99 (E.D.N.Y. 2010) (granting summary judgment to defendants on Forced Labor Statute claim), *modified on other grounds,* 693 F.3d 308 (2d Cir. 2012); *see also* Br. at 29-33.

Defendants' Brief details Plaintiff's admissions that she was not prevented from leaving Defendants' employ and that their alleged behavior did not cause her to stay.  *See* Br. at 24-25; 30-31.  To the contrary, she testified that she continued to work for them because of her own "ethical point of view."  *Id.* at 24-25.  Her admissions defeat her claims under the Forced Labor Statute as a matter of law.  *Headley*, 687 F.3d at 1179-1180; *Velez*, 754 F. Supp. 2d at 498.

13

Plaintiff addresses neither *Headley* nor *Velez*.  Instead, she attempts to escape the legal consequence of her admissions by wrongly contending that "there is no set minimum for conduct that is actionable" pursuant to the Forced Labor Statute and that she "has no obligation to plead and prove any threats."[8]  Opp. Br. at 12, 35-36.  Plaintiff is mistaken: the Forced Labor Statute explicitly requires that Plaintiff plead and prove that her labor was coerced by the Prohibited Means or threats thereof.  *See* 18 U.S.C. § 1589(a); *see also, e.g.*, *Headley*, 687 F.3d at 1177, 1179-1180; *Velez*, 754 F. Supp. 2d at 498; *United States v. Peterson*, 627 F. Supp. 2d 1359, 1371 (M.D. Ga. 2008).  Because she admits that she was not actually prevented from leaving her employment, much less because of any of the Prohibited Means, Plaintiff's labor was not coerced and her claim fails as a matter of law.  Br. at 24-25; 30-31.

Nor can Plaintiff salvage her claim by contending that it is irrelevant that she was not actually coerced into working, and that she need only establish that Defendants' alleged conduct would have coerced the labor of an objective person in her situation.  Opp. Br. at 12, 12 n.7.  Each and every case to consider this issue has held that conduct only violates the Forced Labor Statute when it is both objectively and subjectively coercive.  *See, e.g., Headley*, 687 F.3d at 1179; *Peterson*, 627 F. Supp. 2d at 1371; *Spiteri v. Russo,* 2013 U.S. Dist LEXIS 128379, at *179 n.54 (E.D.N.Y. Sept. 7, 2013); *David v. Signal Int'l*, 2012 U.S. Dist. LEXIS 114247, at *74 (E.D. La. Jan. 3, 2012).  This rule is dictated by the plain text of the Forced Labor Statute, which requires that a defendant actually have obtained a plaintiff's labor by the Prohibited Means or

---

[8] *Elat*, 2014 WL 253411, cited by Plaintiff, does not hold that the Forced Labor Statute may be violated in the absence of threats entirely (or in the absence of any other Prohibited Means). It merely rejects the notion that a single threat is *per se* insufficient to prove a Forced Labor Statute claim, noting that no case has so held, while acknowledging that every other case has required more frequent, and more serious, threats than the ones alleged in *Elat*. *Id*. at *21-22. *Elat's* observation that some cases do not explicitly describe a minimum standard necessary to meet the elements required by the Forced Labor Statute, *id.* at 22, cannot be read as holding that any conduct at all could violate the Forced Labor Statute.  *See, e.g., Headley*, 687 F.3d at 1179 (the "text [of the Forced Labor Statute] requires that serious harm befall an employee if she did not continue to work or a threat that compels her to remain").

threats thereof.  *See* 18 U.S.C. § 1589(a).  Indeed, ***none of the cases Plaintiff herself cites to suggest otherwise permits a claim in the absence of an allegation that the plaintiff's labor was actually coerced***.[9]  *See Shukla v. Sharma*, 2012 WL 481796, at *4-5 (E.D.N.Y. Feb. 14, 2012) (finding that plaintiff was "too mortally scared to reach out to the Indian embassy for help"); *Garcia v. Curtright*, 2012 WL 1831865, at *4 (D. Or. May 17, 2012) (denying motion to dismiss where plaintiff alleged "she was forced to work . . . because defendant Curtright threatened her"); *Elat*, 2014 WL 253411, at *23 (denying summary judgment where plaintiff testified that after defendant's threat, "she was afraid of going back to Cameroon").

Plaintiff's repeated admissions that she was not compelled to work for Defendants by any of the Prohibited Means or threats thereof defeat her claim as a matter of law.

**B.      Plaintiff Fails To Present A Genuine Dispute Of Material Fact Concerning Any Of Her Three Theories Of Forced Labor**

Plaintiff's opposition describes three theories of how Defendants allegedly compelled Plaintiff to work for them: (i) she was psychologically coerced, (ii) she was threatened with one of the Prohibited Means, and (iii) she was denied a plane ticket home.  As set forth *supra* at 13-15 and in Defendants' Brief, none of the alleged conduct actually coerced Plaintiff into working for Defendants—*i.e.*, none of Defendants' alleged conduct was subjectively coercive because Plaintiff admittedly worked for Defendants voluntarily.

But even assuming *arguendo* that the alleged conduct was subjectively coercive, none of Plaintiff's three theories is supported by record evidence and none of Defendants' alleged

---

[9] Plaintiff fails to address the cases cited in Defendants' Brief establishing that threats need to be subjectively and objectively coercive to violate the Forced Labor Statute.  *See, e.g.,* Br. at 29, 33, 34, 39, 50-51.  While her counsel was unable to locate one of those several cases, Opp. Br. at 12 n.7, all of the cases Defendants cited are available on Westlaw and/or Lexis using the citations provided in the body of Defendants' Brief and in the Table of Authorities.

conduct was objectively coercive.  Thus, even without Plaintiff's repeated admissions that her labor was not coerced, her claims still fail as a matter of law.[10]

1.  The Evidence Establishes That Plaintiff's Labor Was Not Compelled Through <u>"Psychological Coercion"</u>

Plaintiff claims that her "primary legal theory" is that her labor was compelled by means of "psychological coercion."  Opp. Br. at 1.  But Plaintiff wholly ignores relevant case law, set forth in Defendants' Brief, which limits the spectrum of "psychological coercion" to threats of deportation, physical restraint, or harm to third persons.  *See* Br. at 44; *see, e.g., Garcia*, 2012 WL 1831865, at *4 ("[N]ot all bad employer-employee relationships constitute forced labor.").

Plaintiff admits that Defendants did not threaten her with deportation, physically restrain her, or threaten a third person with serious harm.  Br. at 33-51; Opp. Br. at 21, 35.  Because these admissions defeat her claim as a matter of law, Plaintiff instead offers a series of arguably unpleasant working conditions and suggests—without legal support—that each was "psychological manipulation." Opp. Br. at 2, 16-19.  But none of this alleged conduct was objectively or subjectively coercive, even were it legally cognizable as psychological coercion.

a.  The Undisputed Facts Show That Defendants' Alleged Misrepresentation Of Plaintiff's Legal And Contractual Rights Did Not Psychologically Coerce Her Into Working For Them

Plaintiff alleges that Defendants psychologically manipulated her by allegedly advising her that her contract was for two years rather than one.[11]  Opp. Br. at 13-14.  However, the

---

[10] Plaintiff also fails to raise a genuine dispute of material fact that Defendants intended to coerce her labor, which is equally fatal to her claim.  *See, e.g., Garcia*, 2012 WL 1831865, at *4 ("The employer must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work. In other words, under [the Forced Labor Statute], the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her.").  Her argument that Defendants' intent to force her labor can be inferred from the mere fact that they hired a Chilean instead of an American, Opp. Br. at 20, if adopted, would subject nearly all employers of visa holders to potential trafficking claims merely for hiring them—which is plainly absurd.

[11] Plaintiff provides no legal support for her argument that this alleged misstatement "was a subtle but insidious form of manipulation, akin to holding onto someone's passport … or threatening them with deportation."  Opp. Br. at 16.  Nor is the comparison accurate.  Holding on to Plaintiff's passport would have rendered her unable to identify

deposition testimony she cites does not show that this distinction mattered; indeed, it makes no reference at all to "psychological coercion" and barely references her contract.  *See id., citing* Pl. 56.1 St. ¶ 154.  The contention that the alleged misstatement about the duration of the contract was psychologically coercive is thus "mere attorney argument" that cannot be considered on a summary judgment motion.  *Seivright*, 2014 WL 896744, at \*9; *supra* at 6-8.

Even if it could be considered, Plaintiff cites no evidence supporting her contention. Plaintiff did not stay with Defendants for either two years (the term purportedly stated by Edwards) or one year (the term explicitly set forth in her contract), so any statement about the contract's duration plainly had no relevance to her decision to stay for eight weeks.  Pl. 56.1 St. ¶ 45.  Moreover, during the entire time Plaintiff worked for Defendants, she possessed a copy of her contract, which explicitly stated that it had a term of one year and that she could quit at any time.  Pl. Tr. at 291:20-292:2; Newman Decl. Ex. P ¶¶ 6, 12; *id.* Ex. Q ¶¶ 11-12.  Accordingly, the undisputed evidence establishes that Defendants' alleged statement that Plaintiff's contract was for two years rather than one neither psychologically "manipulated" her into working for them, nor objectively could have done so, even if misstating a contractual term could legally constitute psychological harm under the Forced Labor Statute—which it cannot.  Br. 44-45.

      b.  The Undisputed Evidence Establishes That Plaintiff Was Not Psychologically Coerced Into Labor Through Financial And Social Isolation

Plaintiff also argues that her Forced Labor Statute claim "relies primarily on proof that Defendants' [sic]… made intentional efforts to socially and financially isolation [sic] her, all of which resulted in a sense of dependency on those who were abusing her."  Opp. Br. at 13.  This

---

herself to authorities, prove her legal immigration status, or travel.  And a threat of deportation would carry with it the specter of arrest, incarceration, and inability to avail herself of the protection of the state.  By contrast, no legal consequences could flow from misstating one term of a contract, which Plaintiff possessed and could said otherwise.  *See* Newman Decl. Ex. P ¶ 12; *Id.* Ex. Q ¶ 12.

argument is wholly conclusory; she cites no evidence in support of it and it must be rejected. *Seivright*, 2014 WL 896744, at \*9. Further, it is directly contradicted by the evidence.

Plaintiff admits that she spoke to her family every day, left Defendants' home unsupervised for hours at a time on multiple occasions, and met people in New York. Br. at 42-43; Pl. 56.1 St. ¶¶ 66-76, 84, 192. She also had money—over $1,000 at a minimum—to spend however she wished. Br. at 13. She chose to spend it on phones, a lottery ticket, snacks (Red Bull, candy, chocolate), and her employed adult son. *Id.* at 12-13, 18-19; Newman Decl. Ex. Y; Davis Decl. Ex. BB at 1-2. She was also repeatedly made aware of places she could go if she did not want to stay with Defendants. Br. at 50. She was not dependent on them for shelter or care.

Plaintiff also admits she *repeatedly* declined to leave Defendants and stay elsewhere when assistance was offered to her; she chose to keep working for them.[12] Br. at 20-21, 25, 29-33, 61 n.54. She adduces no evidence that raises a genuine dispute of material fact that she was socially or financially isolated; indeed, her admissions show that she was not. Nor does she present evidence to support her conclusory statement that she ever felt "a sense of dependency" on Defendants. Opp. Br. at 13.

c.   There Is No Evidence That Alleged Wage Underpayment And Lack Of Health Insurance Psychologically Coerced Plaintiff's Labor

Plaintiff argues that Defendants could not afford to pay her,[13] and so they "intentionally denied" her earned wages "as a form of psychological manipulation intended to keep Ms. Garnica dependent on them for all of her basic life necessities, including food and shelter." Opp.

---

[12] Nor can Plaintiff now pretend that she did not understand the information she was repeatedly provided about assistance or the decisions she repeatedly made. She was not an unsophisticated, uneducated country bumpkin; she was a high school graduate (from a "good school"), had run her own business for over fifteen years (including several in the capital city of Chile), and fully understood the nature of the assistance she repeatedly refused. Pl. Tr. 27:17-28:20, 401:5-14; Br. at 19-23, 25.

[13] Plaintiff's argument contradicts her contention that Defendants were "financially" powerful. *Compare* Opp. Br. at 17 *with id.* at 29. Regardless, it is undisputed that Defendants fully compensated Plaintiff for her wages, so it cannot be the case that Defendants were unable to pay her. Br. at 26; Pl. 56.1 St. ¶ 198.

18

Br. at 24.  But they cite no evidence that Defendants had such an intention, and the argument must be rejected.  *Seivright*, 2014 WL 896744, at *9; *supra* at 6-8.

Additionally, by her own admission, Plaintiff was not dependent on Defendants for food or shelter (Br. at 21, 25, 56), nor did she continue to work with them out of a feeling of dependency.  Br. at 21, 24-25, 29-33, 56.  These admissions foreclose any dispute that the alleged underpayment coerced her labor, even were the Court to accept that "dependency" or underpayment could constitute psychological coercion under the Forced Labor Statute.[14]

Nor is Defendants' failure to provide Plaintiff's health insurance (*see* Opp. Br. at 26) grounds for a Forced Labor Statute claim.  Br. at 45-46.  This claim must be rejected because Plaintiff provides no evidentiary support for her contention that the lack of health insurance was intended to be, or was, "psychologically coercive."  Opp. Br. at 26; *Seivright*, 2014 WL 896744, at *9; *supra* at 6-8.  Indeed, she does not explain why a lack of health insurance prevented her from leaving, rather than causing her to do so, and her admissions that she repeatedly declined offers of medical assistance and chose to stay establish that the lack of insurance did not "psychologically coerce" her labor.[15]  Br. at 21.

> d.  Plaintiff's Allegations Of Poor Working Conditions Fail To Raise A Genuine Dispute Of Material Fact That She Was Psychologically Coerced Into Labor

Plaintiff's argument that her working conditions with Defendants were so bad that they

---

[14] Plaintiff also alleges that Defendants misled her "into believing workers in the United States live on as little as $1,3000 [sic] for 30 days of full time work…"  Opp. Br. at 3. (Plaintiff actually testified that the amount was $1,400 per month.  *See* Pl. Tr. at 782:14-25.)   Even if Plaintiff had believed this statement (she admits she had no idea how people in the United States could live on so little money (Pl. Tr. 785:14-786:6)), or could reasonably have done so, she offers no reason how the statement could have coerced her to stay in Defendants' employment, or that it did so.

[15] Indeed, if Plaintiff were correct that an employer psychologically coerces her employees into forced labor by not providing health insurance, then approximately 30% of all employees in the United States were victims of forced labor in 2010.  *See* https://www.census.gov/prod/2013pubs/p70-134.pdf.  This absurd result is not the intent of the Forced Labor Statute.  *See Alvarado*, 2010 U.S. Dist. LEXIS 87662, at *9 (S.D. Fla. Aug. 25, 2010) ("Taking the logic of [plaintiff's] argument a step further, virtually all … [actions] that adversely affect employees could be characterized as [violations of the Forced Labor Statute]. Such a result is at odds with the stated purposes of the Act, which is limited to preventing human trafficking.").

were "psychologically coercive" also fails to raise a dispute of material fact.

> i. *Poor Working Conditions Alone Do Not Violate The Forced Labor Statute—Plaintiff Must Also Be Threatened*

Putatively unpleasant working conditions alone cannot violate the Forced Labor Statute. *See* 18 U.S.C. § 1589(a). *Shukla*, 2012 WL 481796, which Plaintiff cites for the proposition that "[p]sychological coercion, as envisioned by the statue, may comprehend the overall working conditions an individual is subjected to" (Opp. Br. at 23), does not even mention "psychological coercion." Nor does it hold that bad working conditions alone are violations of the Forced Labor Statute. *Id.* It notes merely that "[a] worker's employment and living conditions may provide **support** for a jury's conclusion that a defendant's **threats** plausibly compelled the victim to serve." *Id.* at *2-3 (holding that poor working conditions provided context for defendant's threat to have plaintiff "sent away") (emphasis added). Not only are Plaintiff's working conditions not comparable to those faced by the *Shukla* plaintiff (whose bedroom was a "cramped, dirty, rat-infested, windowless space next to a public bathroom," and who worked 17-hour days), but bad working conditions are irrelevant to a Forced Labor Statute claim in the absence of threats. *Id.* at *3; *See* Br. at 31-51.

The other cases Plaintiff cites likewise fail to support her claim. *See* Opp. Br. at 25. Like *Shukla*, each case holds merely that working conditions are probative of the coercive effect of a defendant's threats. *See United States v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009) ("the Farrells threatened the workers with physical force, arrest, and imprisonment"); *United States v. Veerapol*, 312 F.3d 1128, 1131 (9th Cir. 2002) (defendant told plaintiff "that if she left, [he] would kill her"); *United States v. Sabhnani*, 539 F. Supp. 2d 617, 621 (E.D.N.Y. 2008) (defendant "threatened to hurt [plaintiff] and her children if she ran away" and "threatened to have [her] husband in Indonesia arrested if she ran away and told her that the police would shoot

her if she left the [defendant's] house," and plaintiffs "testified that [defendant] threatened to kill

them"); *Canal v. Dann*, 2010 U.S. Dist. LEXIS 97856, at *4 (N.D. Cal. Sept. 2, 2010) (defendant

withheld passport and "threatened [plaintiff] with deportation and arrest"); *Elat,* 2014 WL

253411, at *19 (plaintiff was told "that she could be deported if she left the [defendants']

home").

Because Plaintiff admits that she did not stay with Defendants because of any threats,

and, moreover, identifies none, her allegations about workplace conditions fail to raise a genuine

dispute of material fact on her Forced Labor Statute claim.  *See* Br. at 36-40.

> ii. *Even If Working Conditions Alone Could Violate The Forced
> Labor Statute, Plaintiff Provides No Evidence That Those
> Conditions Existed Or Coerced Her Labor*

Even if working conditions alone could be sufficient to violate the Forced Labor Statute,

the five complaints Plaintiff makes about her working conditions are either demonstrably untrue

or are not plausibly coercive.

***First,*** even if Plaintiff's allegation that she shared a bed with a three-year-old were true,[16]

she offers no evidence that sharing a bedroom with Defendants' children coerced her to continue

to work for Defendants, or how it could have done so.  Opp. Br. at 25.  The contention that it was

psychologically coercive is thus "mere attorney argument" and must be rejected.  *Seivright*, 2014

WL 896744, at *9.

***Second,*** Plaintiff's work schedule cannot constitute a violation of the Forced Labor

Statute.  Plaintiff alleges that she worked "essentially around the clock" and "had practically no

free-time," which was "psychologically coercive."  Opp. at 25.  But she again points to no

---

[16] Her claim that she shared a bed with the three-year-old is false.  Plaintiff submitted a photograph of the bedroom, depicting two single beds and a pull-out couch large enough for two.  *See* Mufich Decl. Ex. D.  Plaintiff also testified that the two oldest children shared a bed, leaving a full bed and a pull out couch for the youngest child and for Plaintiff.  Pl. Tr. at 451:20-452:22.  If Plaintiff actually shared a bed with the toddler, she did so by choice.

evidence showing that her alleged work schedule was psychologically coercive, or how it could be, and her bald conclusion must be rejected.  *Seivright*, 2014 WL 896744, at *9; *see supra* at 6-8.

Further, Plaintiff's characterization of her work schedule is contradicted by her own daily journal, in which she claims to have recorded when she started and stopped working each day. Pl. Tr. at 641:13-642:25. The journal reflects that she worked an average of 12 and a half hours per day[17]—the same hours that she says she worked for Defendants while in Chile, when she voluntarily chose to accompany them to New York.  *See* Mufich Decl. Exs. B; C; Pl. Tr. 73:22-25; 84:10-14.  But not all of this time was spent actively working, because she considers practically any time she spent awake in the house—including time spent in bed or watching television—to be work time.  *See, e.g.*, Opp. Br. at 25; Pl. Tr. at 258:8-22.  Further, Plaintiff admits that the journal inflates the number of hours she worked.  Pl. Tr. at 663:6-668:21; 681:18-682:9.  By her own admission, her working hours were far from "around the clock."  *See also* Br. at 18, 20.

***Third*,** Plaintiff's allegation that "Edwards would request Ms. Garnica turn off her reading lamp" cannot constitute a violation of the Forced Labor Statute.  Plaintiff admits that this request occurred only once, and that Edwards was merely encouraging her to get some sleep.  Pl. Tr. at 387:9-388:3.  Plaintiff cites no evidence to explain how this request could have psychologically coerced her into remaining in Defendants' employment and prevented her from leaving, much less that it actually did.  Opp. Br. at 25.

***Fourth*,** Plaintiff's allegation that she was starved is directly contradicted by the documentary evidence that Defendants spent at least $1,239 on groceries during Plaintiff's eight-

---

[17]This figure includes a fifteen minute lunch break on days in which Plaintiff did not record leaving the apartment. *See* Pl. Tr. at 777:3-5 (Plaintiff testified that she got fifteen-minute lunch breaks every day); *but see* Pl. Tr. at 662:24-663:5 (Plaintiff also testified that she was never given lunch breaks).

week employment with them in New York,[18] as well as by her own testimony that she had the time and resources to purchase her own food and that she in fact did so.  Br. at 12-13.  She also fails to present evidence that the alleged starvation psychologically coerced her to continue working.  Opp. Br. at 18.  Her conclusory claim of starvation fails to raise a genuine dispute of material fact that her labor was coerced.  *Seivright*, 2014 WL 896744, at *9; *supra* at 6-8.

**_Fifth,_** Plaintiff's allegation that Hurley "had a temper" and "on one occasion demanded that Ms. Garnica, along with the children, remain inside their room and not come out for any reason" (Opp. Br. at 8) is contradicted by her admission that Hurley's "demand" was directed at his children, and that he did nothing that reasonably suggested that any harm would befall her if she left the room.[19]  Br. at 17.  She also fails to explain how this alleged incident, which she admits took place only once, could have, or did, psychologically coerce her labor.  Opp. Br. at 8.  Accordingly, she fails to raise a genuine dispute of material fact. *See supra* at 6-8.

> iii. *Plaintiff's Allegation That Defendants Did Not Discipline Their Children Does Not Raise A Genuine Dispute Of Material Fact That She Was Psychologically Coerced Into Working*

Plaintiff contends that "Defendants' [sic] knowingly allowed the children to physically abuse Ms. Garnica so that she would be weak and afraid to leave."  Opp. Br. at 26.  But Plaintiff contradicts herself on the very same page, admitting that the alleged beatings by a three-year-old girl and two alleged incidents involving a seven-year-old boy did not render her, a larger adult,

---

[18] Plaintiff's 56.1 Statement ¶ 53 denies the purchases reflected on Defendants' receipts but provides no support for her denial.  However, she admits Defendants spent "approximetly$1,1000" [sic] on groceries. *Id.*  ¶ 174.  Since she fails to present evidence that she could not get enough to eat and also admits that Defendants' receipts reflect actual grocery purchases, her criticism of Defendants for purchasing "more expensive items such as organic yogurt and kosher meat," *id.*  ¶ 175, is irrelevant.  In any event, Plaintiff admits that she compared the prices Edwards paid with prices at local grocery stores that she visited on her own and determined that the groceries purchased by Defendants were "the cheapest."  Pl. Tr. at 475:5-477:12.

[19] Plaintiff originally alleged that Hurley locked her in a bedroom, but later withdrew that allegation. Br. at 17. She now admits she chose to accompany the children into the room when Hurley allegedly told them to stay there.  *Id.*

weak and afraid to leave.[20]  *Id.* at 26 n.11.  Instead, "the crux of Plaintiff's arguments [is] that by neglecting Plaintiff's constant complaints about the abuse she experienced, including after being shown Plaintiff's massive bruises, Defendants were psychologically abusive and manipulative, so as to make Ms. Garnica feel like a lesser human being, deserving of such ill treatment."  *Id.*

Plaintiff likewise submits no evidence that Defendants' supposed neglect was intended to, or did, make her feel like a lesser human being.  *Id.*  And Plaintiff also fails to present any evidence explaining how this "neglect" coerced her into staying.  *Id.*  The argument is, again, nothing but attorney speculation that cannot raise a dispute that Defendants psychologically coerced her labor.  *See Seivright*, 2014 WL 896744, at *9; *supra* at 6-8.

2. The Undisputed Evidence Establishes That Plaintiff's Labor Was Not Compelled By Threats Of Any Of The Prohibited Means

    a. Plaintiff's Allegations That Defendants Bragged About Their Personal Backgrounds Do Not Support Her Claim That Her Labor Was Coerced By Threats Of Serious Harm

Plaintiff argues that Edwards made "threats regarding the power and influence of her family [which] constitutes serious harm."  Opp. Br. at 29.  Even if this were true, vague claims of power and influence, unaccompanied by an actual threat, cannot be threats of serious harm.  Br. at 36-40.  But Plaintiff's actual testimony is that, on one occasion, Edwards said that her family was powerful; no harm of any kind was mentioned.[21]  Opp. Br. at 23.

---

[20] Though Plaintiff submits 18 photographs of bruises purportedly caused by Defendants' children (Opp. Br. at 26, citing Davis Decl. Ex. 23), ***she admits they depict the same three bruises***.  Pl. Tr. 417:23-418:24; 427:12-24.  She submits no photographs of bruises allegedly caused by Defendants' son with his scooter on March 5, 2011 or with a refrigerator door on March 14, 2011, even though she was photographing her purported injuries during that very time frame so as to "document" them.  *See* Pl. Tr. at 344:25-345:14 (testifying about injuries allegedly sustained in a refrigerator incident); 369:21-24 (testifying about injuries allegedly sustained in a scooter incident); 414:18-415:21, 417:4-22, 418:9-24 (testifying about photographs P000018-21); 418:25-420:7, 427:12-25 (testifying about photographs P000022-33); 430:11-20 (testifying about photographs P000034-35); Davis Decl. Ex. 23.

[21] Plaintiff argues that Edwards' alleged statement enabled Defendants to "exploit[]" the "social dynamics between [Plaintiff] and Edwards-Hurley family [sic] involving class, disparities in financial means, and the Edwards-Hurley family's social and political stature compared with Plaintiff's anonymity."  Opp. Br. at 16.  Besides the suggestion

24

Plaintiff also fails to address her repeated admissions that she was not afraid of the Edwards-Hurley family, and thus that her labor was not coerced by any alleged "threat."  Br. at 23-24.  Instead, she claims she speculated about "what might happen to her and her family if she left the Defendants' employ, particularly what would happen to her son who had a good job as a civil engineer in Santiago, Chile."  Opp. Br. at 29.  Plaintiff admits Defendants never made any statement about her son, or about what might happen to her and her family if she left Defendants' employ.  Pl. Tr. at 753:3-754:10; Br. at 23-24.  Her concerns stem entirely from her own imagination.[22]  Br. at 37-40.  Nor does she connect the actual statement she alleges Edwards said—"be very careful with what you say or what you do because you know who I am"—to the unspecified fears described in her opposition.[23]  *Id.* at 36-40.  She thus raises no genuine dispute of material fact that her labor was coerced through a threat of serious harm.  *Id.*; *Shuvalova v. Cunningham*, 2010 U.S. Dist. LEXIS 135502, at *9-10 (N.D. Cal. Dec. 22, 2010) (threat of serious harm requires a rational basis).

> b.  Plaintiff Fails To Identify Any Threat Of Abuse Of Law Or Legal Process That Coerced Her Labor

Plaintiff concedes that the only abuse of law or legal process that courts have recognized as coercive under the Forced Labor Statute is the threat of deportation.  Opp. Br. at 31.  She further concedes that Defendants never threatened her with deportation.  *Id.* at 35.  Plaintiff

---

that it was a threat, she does not explain what this "exploitation" was or how it forced Plaintiff to work for Defendants.

[22] Plaintiff argues that because the Edwards family is powerful, according to a Wikipedia article she cites, and because the newspaper Edwards's grandfather owned received money from the CIA forty years ago, Plaintiff feared that if she left, the Edwards family would visit some unstated harm upon her or her son, despite her admissions that she felt no such fear and that Defendants did not discuss her son.  *Compare* Opp. Br. at 29 with Pl. Tr. at 164:16-20; 399:2-12; 400:3-8;752:9-753:12; 839:14-18; 840:6-12.

[23] Plaintiff also claims that "Edwards [sic] comments that … 'if you try to do anything your attempts will be in vain' was clearly a threat."  Opp. Br. at 29.  But at her deposition, Plaintiff disagreed: she testified both that she thought "nothing" of Edwards' alleged statement and that she was not afraid of it.  Br. at 23 n.28.

therefore resorts to proposing novel theories of abuse of law or legal process that are supported by neither legal authority nor evidence.

> i.   *The Undisputed Facts Establish That Plaintiff Was Never Threatened With Deportation, And That Her Labor Was Not Compelled By Fear Of Deportation*

Plaintiff admits that Defendants never threatened her with deportation. Opp. Br. at 35. Unable to meet the plain legal standard, she argues that they referred to her immigration status and that "[r]eferring to immigration law or legal status in the United States, for the purposes of intimidation and coercion, falls within the ambit of the forced-labor statue [sic]." *Id.* at 33.

No legal authority exists for this extraordinary proposition. *See* Br. at 47; *see, e.g., Pasamba v. HCCA Int'l*, 2008 WL 2562928, at *5-6 (D. Ariz. June 24, 2008) (holding that employer's warnings about deportation and threats of legal action did not violate the Forced Labor Statute). All the cases Plaintiff involve a defendant who actually threatened to deport the plaintiff.[24] Opp. Br. at 33; *United States v. Calimlim,* 538 F.3d 706, 709 (7th Cir. 2008) (victim was told repeatedly by the defendants and their children that "if anyone discovered her she could be … deported"); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1139 (C.D. Cal. 2011) (defendant "threatened to deport" plaintiffs); *Camayo*, 2012 U.S. Dist. LEXIS 136100, at *15 ("defendants threatened to have [plaintiffs] sent back to Peru"); *Ramos v. Hoyle*, 2008 U.S. Dist. LEXIS 102677, at *12 (D. Fla. Dec. 19, 2008) (defendants "threatened to report Plaintiffs for detention and deportation if they tried to escape…"); *United States v. Garcia*, 2003 U.S. Dist. LEXIS 22088, at *27 (W.D.N.Y. Dec. 2, 2003) (defendants allegedly threatened

---

[24] *United States v. Kozminski*, 487 U.S. 931, 948 (1988) does not support the proposition that threats of deportation violate the Forced Labor Statute even "if such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude." Opp. Br. at 33. The Forced Labor Statute was passed after, and specifically to overturn, *Kozminski, see United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011). In any event, the quote cited by Plaintiff concerned the interpretation of threats made to mentally retarded adults, which is not an issue presented here. Opp. Br. at 33; *Kozminski*, 487 U.S. at 948.

plaintiffs with being deported by the INS if they attempted to leave).  Plaintiff's admission that she was not threatened with deportation defeats her claim that her labor was coerced by abuse of law or legal process.

Nor may she establish a claim on the theory that her labor was coerced because leaving Defendants' employment would have subjected her to "immediate deportation."[25]  Opp. Br. at 15, 31; *see Alvarado v. Universidad Carlos Albizu*, 2010 U.S. Dist. LEXIS 87662, at *10-12 (S.D. Fla. Aug. 25, 2010) (immigrant employee did not violate the Forced Labor Statute, even though it meant he would have to find a new employer or lose his visa); *Pasamba*, 2008 WL 2562928, at *5-6 (dismissing Forced Labor Statute claim notwithstanding immigration consequences of termination of employment).  Moreover, Plaintiff cites no evidence that she feared immediate deportation or would have been subject to it.[26]  *Id.*  at 21, 31.

Further, Plaintiff had no basis to fear deportation.[27]  The pamphlet provided by the United States Embassy in Santiago which she carried with her at all times (the "Pamphlet") and which she "read … and read … and read … again" said explicitly:

> **Will I be deported if I report the abuse I have experienced?**
> There are programs created to provide protection to people who have filed a complaint or reported abuse committed against them. You should not be afraid to seek help even if your legal status is uncertain.

---

[25] To hold otherwise would mean that every holder of a work visa in the United States is a victim of the Forced Labor Statute because quitting or termination would end their immigration status—a proposition *Alvarado* and *Pasamba* both reject.

[26] The only evidence Plaintiff cites is her 56.1 Statement, which itself only cites to a copy of her visa and says nothing about a fear of deportation.  Opp. Br. at 21; Pl. 56.1 St. ¶ 156.  Plaintiff also claims simultaneously that she was afraid of deportation because "Defendants coerced and manipulated Ms. Garnica into performing labor through … threats of terminating her employment…" and that she "has never claimed that she was threatened with termination."  *Compare* Opp. Br. at 31 *with id.* at 35.  Regardless, she presents no evidence that Defendants ever threatened to terminate her.  Opp. Br. at 31, 33-34.

[27] In fact, her contract with Edwards contained a provision (mandated by 20 C.F.R. § 656.19) that required either party to provide at least two weeks' notice in the event either terminated the employment relationship.  Newman Decl. Ex. P ¶ 6; Q ¶ 11.  Thus, in the event that the employment relationship were terminated, Plaintiff would have had at least two weeks of valid immigration status during which she could legally return to Chile.

Newman Decl. Ex. U at P000642 (emphasis in original); *See also Id*. at P000637-43; Pl. Tr. at 405:9-16; 535:6-12.

In light of her testimony that she repeatedly read this material and spoke to several public assistance organizations, Plaintiff fails to dispute that she did not reasonably believe she was at risk of being deported.  Br. at 21, 50.  Her labor was therefore not coerced by an abuse of law or legal process.  *See Peterson*, 627 F. Supp. 2d at 1371.

> ii.   *Plaintiff's Proposed New Theories Of Abuse Of Law Or Legal Process Did Not Reasonably Coerce Plaintiff's Labor In Violation Of The Forced Labor Statute*

Plaintiff proposes two new types of abuse of law or legal process that have never been recognized by federal courts before as violations of the Forced Labor Statute.  Not only are they without legal basis, they also did not reasonably compel Plaintiff's labor.

> (a)   Edwards' Alleged Statement About 911 Is Not An Abuse Of Law Or Legal Process That Compelled Plaintiff's Labor

Plaintiff alleges that her labor was coerced because "Edwards told [Plaintiff] that if she called 911than [sic] she would be arrested because she was not an American citizen."[28]  Opp. Br. at 32.  But Plaintiff admits was told repeatedly by reputable sources, whom she believed, that she could legally call 911.  Br. at 50.

Further, when asked at deposition to recount what Edwards had specifically said, Plaintiff told a different story.  Pl. Tr. 757:15-758:9.  She admitted that Edwards simply cautioned her that 911 was for serious matters only; Plaintiff claims Edwards allegedly said not to call 911 because

---

[28] Plaintiff also alleges that Defendants told her that she "was not protected by the police power." Opp. Br. at 18. Her only citation for this allegation is testimony in which Plaintiff alleges that Edwards told her not to call 911.  The two are not synonymous: police assistance is accessible by other means than calling 911, such as speaking with a police officer or visiting a precinct. *See, e.g.*, http://www.nyc.gov/html/nypd/html/home/contact_information.shtml. She also alleges that Defendants told her she could not legally visit a hospital. Opp. Br. at 18. *But see* Cmpl. ¶ 109 (alleging the opposite).  This allegation, and the one concerning the police, must be rejected because she admits that was advised repeatedly of her rights to medical care and police assistance, including by the Pamphlet, and could not have reasonably believed these alleged statements.  Br. at 50.

"the NYPD makes a big deal out of small things," not that Edwards told her she would be arrested for calling 911 based on her immigration status. *Id.*; Opp. Br. at 32. Thus, by Plaintiff's own admission, Edwards' alleged statement did not reasonably cause Plaintiff to believe that her immigration status forced her to hide from the police. Even if it did, Plaintiff does not offer any evidence to suggest that Edwards' alleged statement had any role in her decision to continue working for Defendants. *See* Opp. Br. at 32; *Peterson*, 627 F. Supp. 2d at 1371.

          (b) Wage Underpayment And Lack Of Health Insurance Are Not Abuses Of Law Or Legal Process That Compelled Plaintiff's Labor

Plaintiff alleges that Defendants' alleged underpayment of her wages and her lack of health insurance were abuses of law or legal process. Opp. Br. at 32. But wage underpayments are not an abuse of law or legal process under the Forced Labor Statute. *See DeSilva v. North Shore-Long Island Jewish Health Sys.,* 2012 U.S. Dist. LEXIS 30597, at \*23-24 (E.D.N.Y. Mar. 7, 2012) (wage underpayments do not violate the Forced Labor Statute); *Alvarado,* 2010 U.S. Dist. LEXIS 87662, at \*7 (violating a labor regulation is not abuse of law or legal process).

Plaintiff cannot distinguish *DeSilva* on the ground that its plaintiffs were not immigrants. Opp. Br. at 35. *DeSilva*'s holding that the Forced Labor Statute is not the correct legal remedy for wage underpayment has nothing to do with the immigration status of its plaintiffs. *DeSilva,* 2012 U.S. Dist. LEXIS 30597, at \*25. And the authority *DeSilva* cites for its holding is *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), which had Jamaican immigrant victims. *Id.* Further, other cases with immigrant plaintiffs have held that violations of labor laws do not themselves constitute violations of the Forced Labor Statute. *See, e.g., Pasamba*, 2008 WL 2562928, at \*5-6 (dismissing Forced Labor Statute claim brought by an immigrant nurse because the substance of the allegation was wrongful termination).

Nor may Plaintiff distinguish *Alvarado* on the ground that the plaintiff "was not entirely dependent on his employer for life's basic necessities."  Opp. Br. at 36.   By her own admission, neither was Plaintiff.  Br. at 21, 56; *see also Peterson*, 627 F. Supp. 2d at 1372-1373 (dismissing Forced Labor Statute claim brought by a prisoner who was dependent on the state for life's basic necessities).  And like the plaintiff in *Alvarado*, Plaintiff could have enforced her legal rights through the appropriate channels – and actually did so.[29]  Opp. Br. at 9.

3.   Plaintiff's Labor Was Not Compelled By Means Of Withholding A Plane Ticket

Plaintiff cannot raise a genuine dispute of material fact by arguing that her labor was coerced by Defendants' alleged withholding of a plane ticket, on the grounds that she "didn't have any money to purchase one herself" and without a ticket, "she would be out on the streets alone in a foreign country where she did not speak the language and her legal status would be revoked."[30]  Opp. Br. at 15, 30.  Plaintiff's citations do not address, much less support, these assertions.  *See, e.g.,* Opp. Br. at 15, citing Pl. 56.1 St. ¶ 59b ("Plaintiff was afraid she would get in trouble for giving the children pieces of her chocolate and other sweets that she purchased for herself."), ¶ 152 ("Plaintiff was afraid of Defendants, and at one point resigned to the hopelessness of her fate.").

Moreover, her own testimony contradicts them entirely.  ***First****,* she admits she could have asked her son for a ticket, but didn't, "[b]ecause he was very busy." Pl. Tr. at 817:3-16.  ***Second,*** she received repeated offers of assistance (made in Spanish) that confirmed that she would not be

---

[29] *Panwar v. Access Therapies,* cited by Plaintiff to suggest that labor law violations violate the Forced Labor Statute (Opp. Br. at 23) actually holds that a "plaintiff may not simply re-label a claim based entirely upon allegations that the defendant violated [immigration and labor laws] as a TVPA claim; there must be some additional threat of harm involved."  2013 WL 5486783, at *7 (S.D. Ind. Sept. 30, 2013).

[30] As of 2007, the New York City metropolitan area population has 3.3 million Spanish speakers. *See* http://www.census.gov/prod/2010pubs/acs-12.pdf.  All New York City agencies (including the police) provide services in Spanish. http://www.nyc.gov/html/lg/html/about/about.shtml.  Plaintiff's inability to speak English did not prevent her from leaving Defendants' employment.

"out on the streets alone."  Opp. Br. at 15; Br. at 21-22, 24; Pl Tr. at 11:14-21.  Plaintiff also fails

to respond to Defendants' showing that the alleged lack of a plane ticket cannot support her

claim under the Forced Labor Statute.[31]  *See* Br. at 49; *see also Bradley*, 390 F.3d at 151

("employer's 'threat' not to pay for passage home if an employee left early … could be a

legitimate stance for the employer").

## III.   PLAINTIFF HAS ABANDONED HER CLAIMS PURSUANT TO THE TRAFFICKING STATUTE AND THE DOCUMENTS STATUTE, AS WELL AS HER CLAIMS CONCERNING ATTEMPT AND CONSPIRACY

Defendants' Brief explains why Plaintiff's claims pursuant to 18 U.S.C. §§ 1590, 1592,

1594(a) and 1594(b) fail.  Plaintiff does not attempt to defend these claims, and thus fails to raise

a genuine dispute of material fact concerning them.  Defendants are entitled to summary

judgment on them all.  *See Taylor v. City of New York*, 269 F. Supp. 2d 69, 75 (E.D.N.Y. June

23, 2003) (federal courts may deem a claim abandoned when a party moves for summary

judgment and the opposing party fails to address the claim in any way).

## IV.   PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS FAILS AS A MATTER OF LAW

Plaintiff offers only a token response to Defendants' showing that her NIED claim fails

as a matter of law.  *Compare* Br. at 54-62 *with* Opp. Br. at 38-39.  She fails to raise a genuine

dispute of material fact.  ***First***, an employer does not owe an employee a specific, unique duty to

avoid causing emotional distress.  *See* Br. at 54 n.47.  ***Second***, Plaintiff's failure to contest that

Defendants' alleged conduct was neither extreme nor outrageous defeats her NIED claim as a

matter of law.  *See Taylor*, 269 F. Supp. 2d at 75; Br. at 54-59.   ***Third***, Defendants' alleged

conduct—lack of blood pressure medication and allowing their children to hit her—did not place

---

[31] Plaintiff admits that she was required to provide two weeks' notice before qualifying for a return plane ticket, but suggests that referencing this contractual requirement is "begrudging." Opp. Br. at 30 n. 17.  Plaintiff provides neither support nor explanation for this statement.

Plaintiff's physical safety in "direct and immediate jeopardy." Br. at 59-60. Rather, Plaintiff's blood pressure became uncontrolled *over time*, and her supposed abuse at the hands of Defendants' small children allegedly caused her to develop three bruises *over time*.[32] *Id.* at 59-61. Her injuries are thus insufficient to recover on a claim for NIED. *Id.*

## V.   PLAINTIFF FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT CONCERNING HER FRAUD CLAIM

### A.   The Alleged Misrepresentations Are Wholly Subsumed By The Written Contract

Plaintiff's fraud claim fails as a matter of law because the alleged misrepresentations are subsumed by her written employment contract. *See* Br. at 62-66; *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). A plaintiff who has entered into a contract with a defendant can only maintain a fraud claim against that defendant in three narrow circumstances—none of which Plaintiff meets here. *See* Br. at 62-66; *Bridgestone/Firestone*, 98 F.3d at 20. Indeed, Plaintiff concedes that she cannot meet two out of the three circumstances, as she fails to contest (i) that Defendants did not owe her a duty separate and apart from their contractual duties, and (ii) that she did not incur "special damages" unrecoverable in in contract. *Compare* Br. at 63, 65-66 *with* Opp. Br. at 39-44.

Nor can she raise a dispute that she meets the third exception by arguing that she "has and will continue to offer intentionally false representations" collateral to the contract. *See* Opp. Br. at 40. Plaintiff must meet Defendants' evidence with actual record evidence, now; she cannot avoid summary judgment by offering to provide unspecified evidence to the Court at some time in the future. *See supra* at 6-8. Because the alleged misrepresentations she identifies concern obligations explicitly set forth in her employment contract, *i.e.*, her rate of pay, her medical care, and her transportation costs to Chile, Plaintiff's fraud claim merely describes an

---

[32] Nor can the alleged acts of Defendants' children form the basis of Plaintiff's NIED claim. *See* Br. at 56-57.

alleged breach of contract and fails as a matter of law.  *Compare* Br. at 64 *with* Opp. Br. at 40-41; *see also* Newman Decl. Ex. P ¶¶ 3-6, 10.

Because her contract bars her fraud claim, Plaintiff attempts to characterize the contract as "illusory" and deny its existence.  *See* Opp. Br. at 6, 39-40.  This effort cannot save her claim. Having previously enforced her contract through an administrative action with the DOL, recovering wages based on the contractually-specified hourly rate, Plaintiff is judicially estopped from denying that it is a binding contract.[33]  *See* Newman Aff. Ex. W; Pl. 56.1 St. ¶ 198 ("The [DOL] issued a ***judgment*** for Plaintiff and required the Defendants to pay $6302.54.") (emphasis added);[34] *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71-73 (2d Cir. 1997) (estopping plaintiff from arguing a factual position inconsistent with one he took successfully in prior administrative proceeding); *see also Agristor Leasing-II v. Pangburn*, 557 N.Y.S.2d 183, 185 (N.Y. App. Div. 1990) ("[A] party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it.").

**B.     Plaintiff's Fraud Claim Fails As A Matter Of Law Because She Does Not Allege That Defendants Made A False Statement Of Present Fact**

Plaintiff's fraud claim independently fails because she identifies no false statement of present fact.  Her conclusory allegation that Edwards never intended to perform the contract is not actionable in this Circuit. *Bridgestone/Firestone, Inc.*, 98 F.3d at 20 (general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support

---

[33]Further, the undisputed evidence contradicts this legal conclusion: both parties contemporaneously understood that the contract governed her employment relationship.  *See* Pl. Tr. 118:9-18 (Plaintiff believed that her salary would be the contractual wage, $10); 775:18-23 (Plaintiff expected to be paid in New York "what the contract says, $10 an hour"); *see also* Edwards Tr. 516:6-13 (Edwards believed the contract governed his employment relationship with Plaintiff).

[34]Plaintiff also denies—without citation to evidence—that (i) she submitted to the DOL the employment contract executed by her and Edwards, (ii) Defendants paid the fees and penalties imposed by the DOL, and (iii) she has been fully paid for her labor.  *Compare* Def. 56.1 St. ¶¶ 93-96 *with* Pl. 56.1 St. ¶¶ 93-96, 198.  Under the Local Rules of this District, paragraphs 93-96 of Defendants' 56.1 Statement should be deemed admitted.  *See* Local Rule 56.1(c), (d); *see also supra* at 6-8.

a fraud claim); Br. at 67 n.63.[35]  And Plaintiff does not contest Defendants' showing that every other allegedly false representation she identifies either was not false or resulted in no injury to her. *Compare* Br. at 68-69 *with* Opp. Br. at 39-44.  Accordingly, she fails to raise a genuine dispute of material fact that Defendants made false statements that caused her injury, and her fraud claim fails as a matter of law.

## C.   Plaintiff Concedes That She Did Not Reasonably Rely On Defendants' Alleged Misrepresentations Concerning Access To Health Care

Finally, the undisputed evidence shows that Plaintiff could not have reasonably relied on Defendants' alleged misrepresentations concerning lack of access to health care.  Br. at 67-68.  The testimony Plaintiff herself cites shows that she believed that the 311 operator and the Pamphlet correctly informed her of her right to medical and emergency assistance.  *See* Opp. Br. at 28; Br. at 19-20.  Her admissions are fatal to her ability to establish reasonable reliance.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set out in their opening brief, Defendants respectfully request that the Court grant their motion for summary judgment.

---

[35] *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2004 WL 2754653 (S.D.N.Y. Dec. 2, 2004) is inapposite, as it did not concern common law fraud, but to the extent it contradicts *Bridgestone/Firestone*, the latter case controls.  *See* Br. at 67 n.63 (citing cases rejecting fraud claims based on intent not to perform).

Dated: New York, New York
April 30, 2014

Respectfully submitted,

BECKER, GLYNN, MUFFLY, CHASSIN
& HOSINSKI LLP

By:_____
Robin L. Alperstein
William H. Newman
Michelle R. Mufich
299 Park Avenue
New York, NY 10171

*Attorneys for defendants Malu Custer
Edwards and Michael Hurley*

Dated: New York, New York
April 30, 2014

Respectfully submitted,

BECKER, GLYNN, MUFFLY, CHASSIN
& HOSINSKI LLP

By: _____
Robin L. Alperstein
William H. Newman
Michelle R. Mufich
299 Park Avenue
New York, NY 10171

*Attorneys for defendants Malu Custer
Edwards and Michael Hurley*

35